```
 1              IN THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF TEXAS
 2                    FORT WORTH DIVISION

 3   LEASA AND BRET WILLIAMS        )
                                    )
 4                                  )  CIVIL ACTION NO.
     VS.                            )   4:19-CV-00872
 5                                  )
     ROSS STORES, INC.              )
 6

 7

 8         -----------------------------------

 9             VIDEOTAPED DEPOSITION OF
                    LEASA WILLIAMS
10                  MARCH 3, 2020

11         -----------------------------------

12

13

14

15

16         ANSWERS AND DEPOSITION OF LEASA WILLIAMS,

17   produced as a witness at the instance of the

18   Defendant, taken in the above-styled and -numbered

19   cause on MARCH 3, 2020, at 10:09 a.m., before

20   CHARIS M. HENDRICK, a Certified Shorthand Reporter

21   in and for the State of Texas, located at Aulsbrook

22   Law Firm, PLLC, located at 420 East Lamar

23   Boulevard, Suite 110, in the City of Arlington,

24   County of Tarrant and State of Texas, in accordance

25   with the Federal Rules of Civil Procedure.
```

**Appendix A**

**001**

Leasa and Brett Williams vs
Ross Stores, Inc.

Leasa Williams
03/03/2020

```
                                              Page 2
 1         A P P E A R A N C E S
 2   FOR THE PLAINTIFF:
 3      MR. MATTHEW E. AULSBROOK
        AULSBROOK LAW FIRM, PLLC
 4      420 East Lamar Boulevard, Suite 110
        Arlington, Texas  76011
 5      (817) 775-5364
        matt@thetexaslawdog.com
 6
 7   FOR THE DEFENDANT:
 8      MR. C. RYAN CURRY
        FLETCHER, FARLEY, SHIPMAN & SALINAS
 9      9201 North Central Expressway, Suite 600
        Dallas, Texas  75231
10      (214) 987-9600
        ryan.curry@fletcherfarley.com
11
12   ALSO PRESENT:  MS. ALEXIS FRANK - VIDEOGRAPHER
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
                                              Page 3
 1                 INDEX
 2   Appearances ...................................2
 3   LEASA WILLIAMS
 4      Examination by Mr. Curry.................4
 5      Examination by Mr. Aulsbrook............66
 6
 7   Signature and Changes........................72
 8   Reporter's Certificate.......................74
 9
10               EXHIBITS
11   Exhibit 1 - .................................40
     Video Recording
12
     Exhibit 2 - .................................44
13   Copy of Photograph
14   Exhibit 3 - .................................44
     Copy of Photograph
15
16
17
18
19
20
21
22
23
24
25
```

```
                                              Page 4
 1              PROCEEDINGS
 2        THE VIDEOGRAPHER:  Going on the record
 3   in the videotaped deposition of Leasa Williams.
 4   This deposition is being taken under the Federal
 5   Rules of Civil Procedure in the United States
 6   District Court, Northern District of Texas --
 7   Texas, Fort Worth Division; case styled Leasa and
 8   Bret Williams versus Ross Stores, Inc., Civil
 9   Action Number 4:19-cv-00872.
10        Today's date is March 3rd, 2020.
11   Time, 10:10 a.m.  Start of Disk 1.  For the record,
12   counsel will state their appearances and then the
13   court reporter will swear in the witness.
14        MR. CURRY:  Ryan Curry for Defendant
15   Ross.
16        MR. AULSBROOK:  Matt Aulsbrook for
17   Plaintiff Leasa Williams.
18        LEASA WILLIAMS,
19   having been first duly sworn, testified as follows:
20              EXAMINATION
21   BY MR. CURRY:
22     Q.  Good morning, Ms. Williams.  Can you
23   please --
24     A.  Good morning.
25     Q.  Could you please state your full name for
```

```
                                              Page 5
 1   the record?
 2     A.  Leasa Ann Williams.
 3     Q.  And as I said, my name is Ryan Curry, and
 4   I represent defendants, Ross Stores, Incorporated,
 5   in a lawsuit that you filed against them --
 6     A.  Yes, sir.
 7     Q.  -- for an incident that occurred about
 8   February 15th, 2018; does that sound right?
 9     A.  Yes, sir.
10     Q.  Okay.  Do you understand who I am and who
11   I represent?
12     A.  I do.
13     Q.  Have you ever given your deposition
14   before?
15     A.  No, sir.
16     Q.  Okay.  So the purpose of today's
17   deposition is for you to be able to tell your story
18   to the jury, okay; do you understand that?
19     A.  I do.
20     Q.  All right.  Excellent.  And this is going
21   to be recorded.  We have a lovely woman sitting
22   here next to my left that is going to type down
23   everything that we say.
24     A.  Okay.
25     Q.  So as we're engaging, I am going to ask
```

STEVEN H. GENTRY & ASSOCIATES, INC.  (214) 321-5333
5115 NORTH GALLOWAY AVENUE, SUITE 202, MESQUITE (DALLAS COUNTY) TEXAS 75150

002

Leasa and Brett Williams vs
Ross Stores, Inc.

Leasa Williams
03/03/2020

Page 10

1  apologize, but we need to get a --
2  **A. Okay.**
3  Q. -- clear understanding for the jury of who
4  you are and what we are here to discuss today.
5  **A. Okay.**
6  Q. Okay. Have you ever gone by any other
7  names?
8  **A. Yes.**
9  Q. What would those be?
10 **A. My maiden name, Leasa Montgomery.**
11 Q. And could you spell that for me, please?
12 **A. M-o-n-t-g-o-m-e-r-y.**
13 Q. Excellent. Any other names besides
14 Montgomery and Williams?
15 **A. No.**
16 Q. And what city were you born?
17 **A. Galax, Virginia.**
18 Q. Can you spell that for me?
19 **A. G-a-l-a-x.**
20 Q. Where is that located in Virginia?
21 **A. In the North Carolina Blue Ridge Mountain**
22 **area.**
23 Q. And what year was that?
24 **A. From my birth up to 14 years old.**
25 Q. Okay. What -- what year were you born?

Page 11

1  **A. 1964.**
2  Q. And that would make you how old today?
3  **A. 55.**
4  Q. And 14 -- at 14, you said, you moved?
5  **A. Yes, sir.**
6  Q. Where did you move?
7  **A. To Fort Worth with my mom.**
8  Q. And lived in the Metroplex ever since?
9  **A. Yes.**
10 Q. And what is your current address?
11 **A. 2145 Ladonna Court, Burleson, Texas 76028.**
12 Q. And how long have you been at that
13 address?
14 **A. 21 years.**
15 Q. Assuming 21 years, you have not been
16 paying rent; you -- you are a homeowner?
17 **A. Correct.**
18 Q. And do you have a cell phone number?
19 **A. Yes.**
20 Q. What would that be?
21 **A. 817-909-5942.**
22 Q. 5942?
23 **A. Yes.**
24 Q. And who is your provider?
25 **A. Verizon.**

Page 12

1  Q. And what kind of phone --
2  THE REPORTER: Sir, I'm not hearing
3  you.
4  Q. (By Mr. Curry) I am sorry. I need to
5  speak up. I figured the caffeine would have done a
6  little more justice at this point. But what type
7  of cell phone do you have?
8  **A. An iPhone.**
9  Q. And is it the same phone that you had back
10 in February of 2018?
11 **A. I don't think so.**
12 Q. Okay. Do you --
13 **A. I don't remember.**
14 Q. Fair enough. And if you don't remember
15 something, just let me know. And that's -- answer
16 the best you can, okay?
17 **A. Okay.**
18 Q. Do you remember what phone you had in
19 2018?
20 **A. No, sir.**
21 Q. Do you remember if it was a smartphone?
22 **A. I am sure.**
23 Q. And by smartphone, I mean, has internet
24 access, camera, video, audio recording; all that
25 sort of thing?

Page 13

1  **A. Yes, sir.**
2  Q. Okay. You like your iPhone?
3  **A. I love it, yeah.**
4  Q. All right. And are you presently married?
5  **A. I am.**
6  Q. And to whom?
7  **A. Brett Williams.**
8  Q. And he is -- is he present in the room
9  with us today?
10 **A. Yes.**
11 Q. And how long have you been married to
12 Brett?
13 **A. 36 years.**
14 Q. 36 years. All right. And have you been
15 previously married?
16 **A. No.**
17 Q. And where were you married?
18 **A. In Fort Worth.**
19 Q. What year?
20 **A. 1983.**
21 Q. '83. And did you have a formal ceremony?
22 **A. Yes, sir.**
23 Q. And where was that?
24 **A. At my in-laws' home.**
25 Q. Friends and family attend?

STEVEN H. GENTRY & ASSOCIATES, INC. (214) 321-5333
5115 NORTH GALLOWAY AVENUE, SUITE 202, MESQUITE (DALLAS COUNTY) TEXAS 75150

003

Leasa and Brett Williams vs
Ross Stores, Inc.

Leasa Williams
03/03/2020

Page 26

1    Q.  What day of the week was that?
2    **A.  I am sorry.  I don't know what day.**
3    Q.  Do you know about what time the incident
4    occurred?
5    **A.  The day after Valentine's Day, around 2:00**
6    **p.m.**
7    Q.  What were you doing on that date and time?
8    **A.  I was shopping.**
9    Q.  And some of these questions are going to
10   seem really simple, but they are necessary for us
11   to set up for the jury exactly what happened, okay?
12   **A.  Yes, sir.**
13   Q.  Where exactly were you shopping?
14   **A.  Gateway Station.**
15   Q.  And where is that located?
16   **A.  In Burleson.**
17   Q.  And what is Gateway Station?
18   **A.  Shopping center for Pier 1, TJ Maxx, Ross.**
19   Q.  Is there -- there's a Michael's there too;
20   is that right?
21   **A.  Yes.**
22   Q.  Okay.
23   **A.  Yes, sir.**
24   Q.  And shopping for any particular reason or
25   just going out shopping?

Page 27

1    **A.  Shopping for shelving and things for a**
2    **master bathroom re- -- remodel.**
3    Q.  And how did you get to Gateway Station?
4    **A.  I drove my car.**
5    Q.  What type of car is that?
6    **A.  I don't remember.**
7    Q.  But it was your car, correct?
8    **A.  Yes, sir.**
9    Q.  And prior to going to Gateway Station,
10   where had you been?
11   **A.  I am sorry?**
12   Q.  Prior to going to Gateway Station in
13   Burleson, where had you been that day?
14   **A.  Home.**
15   Q.  And that's off Ladonna?
16   **A.  Yes.**
17   Q.  And who were you with that day -- while
18   you were at Gateway Station, I should say?
19   **A.  I was alone.**
20   Q.  And how did you leave Gateway Station?
21   **A.  My son took me to the hospital.**
22   Q.  He came and picked you up from Gateway
23   Station?
24   **A.  In the parking lot.**
25   Q.  So that's a yes?

Page 28

1    **A.  Yes.**
2    Q.  All right.  And did you leave your vehicle
3    there?
4    **A.  No.**
5    Q.  All right.  And what -- what happened to
6    your vehicle?
7    **A.  Prior to leaving, a friend brought my son**
8    **to me.  And my son got in my car and I got in the**
9    **passenger side, my car, then we drove away.**
10   Q.  Okay.  And what friend was that?
11   **A.  Curtis Montgomery.**
12   Q.  How do you know Curtis?
13   **A.  He was the one working in our home as we**
14   **-- he's a hired remodeling person.**
15   Q.  A contractor of some sort?
16   **A.  Yes.**
17   Q.  Do you just know him professionally; do
18   you know him as a friend?
19   **A.  No.  Professionally.**
20   Q.  And you said your son drove your car to
21   the hospital; what hospital was that?
22   **A.  Texas Health in Burleson; the one that's**
23   **almost in Joshua.**
24   Q.  Okay.  Is that south of Huguley or north;
25   do you know --

Page 29

1    **A.  South.**
2    Q.  Texas Huguley Hospital, I think, is right
3    there off of Evergreen --
4    **A.  Oh, no, not Huguley --**
5    Q.  Okay.
6    **A.  -- Hospital.**
7    Q.  Okay.  I am just trying to understand
8    where Texas Health is in relation --
9    **A.  Do you know where Mountain Valley is in**
10   **Joshua?**
11   Q.  I don't.
12   **A.  Well, it's almost in Joshua, but it's --**
13   **the address is Burleson.**
14   Q.  Okay.  So is that farther south from where
15   you were in --
16   **A.  Yes.**
17   Q.  Okay.  Ms. Williams, in your own words,
18   tell me what happened.
19   **A.  I was casually shopping and went into**
20   **Ross.  Just happy-go-lucky, walking through the**
21   **store, looking at different things that I might**
22   **buy.  And I walked to the back because I wanted to**
23   **buy a shelf for my bathroom.  So until I got to the**
24   **shelf, I was fine.**
25   **I looked at a shelf elevated.  I**

STEVEN H. GENTRY & ASSOCIATES, INC.  (214) 321-5333
5115 NORTH GALLOWAY AVENUE, SUITE 202, MESQUITE (DALLAS COUNTY) TEXAS 75150

004

Leasa and Brett Williams vs
Ross Stores, Inc.

Leasa Williams
03/03/2020

Page 30

1  turned to the shelf and I tried to pull a basket
2  out, but it was fixed to the iron shelf and it
3  wouldn't come out.  So I gave up.  I just wanted to
4  see the depth of the -- the shelf -- the basket and
5  the shelf.  I think I tried to fix it back so I
6  could just proceed on my way.  And everything fell
7  over on top of me; the shelf fell over on top of my
8  head on the right side.
9      Q.  Okay.  On the right side of your head?
10     A.  Yes, sir.
11     Q.  Okay.  And so I am taking -- you're
12  walking down an aisle at this -- just before seeing
13  the shelf; is that right?
14     A.  Yes, sir.
15     Q.  Okay.  So if you are walking down the
16  aisle, which way is the shelf located?
17     A.  On the left.
18     Q.  Okay.  And I know we're talking about
19  shelves upon shelves upon shelves.  So can we agree
20  that if I say the shelf or the unit, I am talking
21  about the merchandise; and if I am talking about
22  the display shelf, I just mean whatever it is
23  resting upon; is that fair?
24     A.  Yes.
25     Q.  Okay.  All right.

Page 31

1      A.  Uh-huh.
2      Q.  Just so the jury understands because --
3      A.  Yes.
4      Q.  -- they're going to hear shelf a thousand
5  times and I want to make sure they understand which
6  one we are talking about.
7      A.  Okay.
8      Q.  All right.  Now, you said the -- the shelf
9  you were looking at was elevated.  Do you mean that
10  it was sitting on top of a display shelf?
11     A.  Yes.
12     Q.  About how high was that display shelf?
13     A.  About six feet tall.
14     Q.  And how tall are you?
15     A.  Five-foot-six.
16     Q.  Okay.  And could you describe the -- the
17  shelf for me?
18     A.  Yes.  It's very heavy.  It's very, like --
19  it has five -- five baskets.  And it's iron; it's
20  made of iron.  And it's about seven feet tall.
21     Q.  Seven feet tall, meaning from where you'd
22  sit it on the ground to where it's standing up
23  or --
24     A.  Yes.  If you sit it on the ground and sit
25  it -- you know, sit it on the ground, it would be

Page 32

1  about seven feet tall.
2      Q.  Okay.  So it'd be two feet higher than you
3  are, basically?
4      A.  Yeah.  The bottom of it would be two --
5  the bottom of the shelf would be -- yes.
6      Q.  Okay.  I am sorry.  I need to re- -- the
7  dog is kind of -- I mean, I am sorry --
8          MR. AULSBROOK:  Yeah, you need to take
9  a break?
10         THE WITNESS:  Just a break, yes,
11  please.
12         MR. AULSBROOK:  Okay.  All right.
13         THE VIDEOGRAPHER:  Off the record.
14  Time, 10:45.
15         (Recess taken.)
16         THE VIDEOGRAPHER:  Back on the record.
17  Time, 10:47.
18     Q.  (By Mr. Curry)  We're back now from a
19  break.  And just before the break, you were
20  describing the shelf.  And as we discussed for the
21  jury previously, whenever we talk about the shelf
22  from now on, we're going to talk about the product
23  at Ross that fell on you, okay?
24     A.  Yes.
25     Q.  All right.  So you said a moment ago that

Page 33

1  it was about seven feet tall.  Is that the actual
2  height of the -- the product that fell on you?
3      A.  No.
4      Q.  Okay.  So if you were to take that product
5  and set it on the ground and put a measuring tape
6  up to it, how tall, about, would you think it would
7  be?
8      A.  I think it would be about seven feet tall.
9  I don't remember exactly because I was in no
10  condition to measure the shelf while I was there.
11     Q.  Okay.  And I understand.  You testified
12  earlier that the display shelf that the shelf was
13  sitting on top of was about six feet tall; is that
14  right?
15     A.  Yes.
16     Q.  Okay.  So you are looking at the display
17  shelf, that's six feet tall.  And then this
18  shelving unit is seven feet tall from there?
19     A.  Yes.
20     Q.  Okay.  And you said it was made of iron;
21  is that right?
22     A.  Yes, sir.
23     Q.  And it had five baskets; is that right?
24     A.  I thought it had five baskets.
25     Q.  Okay.  Could you describe these baskets

STEVEN H. GENTRY & ASSOCIATES, INC.  (214) 321-5333
5115 NORTH GALLOWAY AVENUE, SUITE 202, MESQUITE (DALLAS COUNTY) TEXAS 75150

005

Leasa and Brett Williams vs
Ross Stores, Inc.

Leasa Williams
03/03/2020

Page 34

1  for me, please?
2  A. They are white or off-white, woven
3  baskets; plasticy with metal entangled throughout
4  baskets.
5  Q. Okay. So are they, say, a wire frame with
6  a cloth around it; is that -- is that a fair
7  description?
8  A. No. It's more hard plastic.
9  Q. Okay.
10  A. Uh-huh.
11  Q. All right. So there is no cloth on these
12  baskets at all?
13  A. No.
14  Q. And you said there were five baskets; is
15  that right; about, give or take?
16  A. Yes, sir.
17  Q. And how many shelves were on the shelf?
18  A. Five.
19  Q. Okay. So one basket for each shelf --
20  A. Yes, sir.
21  Q. -- to the best you can recall? And what
22  were the shelves made of, the individual shelves
23  that the baskets were on top of?
24  A. Iron.
25  Q. Now, were these baskets attached to the

Page 35

1  shelves?
2  A. Yes.
3  Q. How so?
4  A. Tied to the -- to the frame.
5  Q. What part of the frame?
6  A. I am really not sure. I know they were
7  affixed to the frame.
8  Q. Okay. And how do you know that?
9  A. Because I tried to pull the basket out to
10  see the inside and it wouldn't come; it wouldn't
11  come out.
12  Q. Okay. Were you able to get it out at all
13  or just it was just stuck in there?
14  A. It was stuck.
15  Q. Okay. Okay. And which basket was that?
16  A. Basket Number 1.
17  Q. So is that the one on the bottom?
18  A. Yes.
19  Q. Okay. Now, do these baskets have any
20  rails or anything like that on the sides of them?
21  A. No, sir.
22  Q. Okay. So, typically, would these baskets
23  -- I mean, are they -- are they supposed to just be
24  resting in there or you supposed to be attached to
25  something, or do you know?

Page 36

1  A. They should be attached to something.
2  Q. Okay. And why do you say that?
3  A. Within the frame, it should be attached.
4  Q. Do you know how the basket was attached in
5  the back?
6  A. I think the basket was zip-tied in the
7  back.
8  Q. Okay. So apart from that zip tie, did you
9  see anything else securing that basket in place?
10  A. No, sir.
11  Q. All right. Did you try any of the
12  other baskets?
13  A. No, sir.
14  Q. Okay. But the one you tried, you couldn't
15  -- you couldn't budge, right?
16  A. Correct.
17  Q. Okay. Now, without that zip tie, would it
18  just be kind of freely sitting in the -- on that
19  shelf?
20  A. Yes.
21  Q. Okay. So the shelving unit itself, it's
22  not all just one piece; is that fair to say?
23  A. Yes, sir.
24  Q. So the baskets are -- they are not,
25  you know, attached by wire or anything like that to

Page 37

1  the -- to the shelving frame; is that fair to say?
2  A. I'm not sure.
3  Q. Okay. If -- if you bought this unit and
4  were to take it home, cut off the zip tie, would
5  the baskets be attached to anything at that point?
6  A. I would say not.
7  Q. Okay. All right. And was it pretty
8  obvious to you that this zip tie was the only thing
9  holding that basket in place?
10  A. No, sir.
11  Q. All right. But your testimony to the jury
12  today is that you couldn't move the -- the basket;
13  is that right?
14  A. Yes, sir.
15  Q. About how heavy was that shelf?
16  A. It felt very heavy; I don't know how
17  heavy.
18  Q. You know, and I am not asking you to tell
19  me pounds or anything like that, but could you
20  potentially compare it to something?
21  A. Possibly the ceiling falling in. A
22  bowling ball.
23  Q. A bowling ball. Adult bowling ball, I'm
24  assuming, you mean?
25  A. Yes.

STEVEN H. GENTRY & ASSOCIATES, INC.  (214) 321-5333
5115 NORTH GALLOWAY AVENUE, SUITE 202, MESQUITE (DALLAS COUNTY) TEXAS 75150

006

Leasa and Brett Williams vs
Ross Stores, Inc.

Leasa Williams
03/03/2020

Page 38

1    Q. Okay. And about how long did you take
2  looking at this shelf?
3    **A. Probably just about 20 seconds.**
4    Q. Just long enough to give it a good
5  once-over?
6    **A. Yes, sir.**
7    Q. And you said you -- you didn't remove any
8  drawers from the shelf; is that right?
9    **A. No, sir.**
10    Q. Okay. Now, could you tell if the -- the
11  shelving unit itself was attached to the display
12  shelf?
13    **A. Yes, sir.**
14    Q. Okay. You mean the -- the -- the frame of
15  the shelf was actually attached to the thing that
16  it is sitting on?
17    **A. No, sir.**
18    Q. All right. It was not?
19    **A. It was not.**
20    Q. Okay.
21        MR. AULSBROOK: Can we take a quick
22  break?
23        MR. CURRY: Let me finish this line of
24  questioning.
25        MR. AULSBROOK: Okay, okay.

Page 39

1        MR. CURRY: Yeah. I am getting there.
2    Q. (By Mr. Curry) So -- and how did you know
3  it wasn't attached?
4    **A. Because it fell over on top of me.**
5    Q. Did you try to move -- move it at all
6  prior to -- prior to it falling over?
7    **A. No.**
8    Q. If you wanted to, could you have just
9  lifted it off the shelf and put it on the ground?
10    **A. Presumably, I would hope not.**
11    Q. And why do you say that?
12    **A. Because I would never try to pick it up**
13  **off the shelf and bring it down.**
14    Q. Okay. Was it pretty obvious that it
15  wasn't attached to the display shelf?
16    **A. Yes, sir.**
17        MR. CURRY: I am going to show the
18  video and take a break, okay?
19        MR. AULSBROOK: I was just -- that's
20  what I was going to do.
21        MR. CURRY: Okay.
22        MR. AULSBROOK: Just --
23        MR. CURRY: I know.
24        MR. AULSBROOK: -- I want to make sure
25  she's --

Page 40

1        MR. WILLIAMS: She's lost.
2        MR. AULSBROOK: Yeah, yeah.
3        MR. WILLIAMS: She's very lost because
4  she's --
5        MR. AULSBROOK: All right.
6        MR. CURRY: All right.
7    Q. (By Mr. Curry) What we have is we have
8  security footage of -- of what happened. And I'm
9  going to show that to you now and I am going to
10  mark it as Exhibit 1.
11        (Exhibit 1 marked.)
12    Q. (By Mr. Curry) Defense Exhibit 1 and I
13  will present that later on. And press play now.
14        (Video playing.)
15    **A. The pain comes back every time I see it.**
16    Q. (By Mr. Curry) I am very sorry.
17        MR. CURRY: Would you like to take a
18  break now?
19        MR. AULSBROOK: She looks like she
20  needs a break.
21        MR. CURRY: Yeah, that's fine.
22        THE VIDEOGRAPHER: Off the record.
23  Time, 10:58.
24        (Recess taken.)
25        THE VIDEOGRAPHER: Back on the record.

Page 41

1  Time, 11:09.
2    Q. (By Mr. Curry) We're back now from a
3  break. Before we broke, we just watched the
4  surveillance video from this incident; is that your
5  memory?
6    **A. Yes, sir.**
7    Q. Okay. And as far as you can tell, did
8  that footage appear to be an accurate
9  representation of what happened on the day in Ross?
10    **A. Yes, sir.**
11    Q. Okay. Do you have any reason to believe
12  that it's been altered in any way or something like
13  that?
14    **A. No, sir.**
15    Q. All right. Right before we broke, you --
16  you comment, it hurts every time I see it.
17    **A. Yes, sir.**
18    Q. What did you mean by that?
19    **A. I saw the -- the video when my attorney**
20  **received the video.**
21    Q. All right. So you previously testified
22  that you -- you didn't try to move the shelf at
23  all; is that right?
24    **A. Yes, sir.**
25    Q. Okay. In the video, it appeared that you

STEVEN H. GENTRY & ASSOCIATES, INC. (214) 321-5333
5115 NORTH GALLOWAY AVENUE, SUITE 202, MESQUITE (DALLAS COUNTY) TEXAS 75150

007

Leasa and Brett Williams vs                                    Leasa Williams
Ross Stores, Inc.                                                03/03/2020

Page 42

1    attempted to -- to tilt the video (sic) towards
2    you; is that incorrect?
3        A. No, sir.
4        Q. So you did try to tilt the -- tilt the
5    shelving unit towards you?
6        A. No, sir.
7        Q. You are saying you did not?
8        A. No, sir.
9        Q. Okay. And you previously testified that
10   you weren't -- you weren't able to move any of the
11   shelves because they were zip-tied; is that right?
12       A. Yes, sir.
13       Q. Okay. But in the video, it shows you
14   actually partially removing one of the shelves; is
15   that right?
16       A. Yes, sir.
17       Q. Okay. And that would be the bottom shelf?
18       A. Yes, sir.
19       Q. So do you maintain that that bottom shelf
20   is still zip-tied to the -- to the shelving unit
21   itself?
22       A. No, sir.
23       Q. Okay. So you don't believe it was
24   zip-tied, meaning?
25       A. I believe it was zip-tied.

Page 43

1        Q. Okay. Even after being able to pull it
2    out partially?
3        A. Yes, sir.
4        Q. Okay. And why -- why did you believe
5    that?
6        A. I felt it should be zip-tied.
7        Q. And I understand that, and I am -- I am
8    not going to disagree with you on that. My
9    question is --
10       A. I don't remember.
11       Q. Okay. And I may have asked this before,
12   but just to double-check. Did you try to remove
13   the shelving unit from the display shelf?
14       A. No, sir.
15           MR. AULSBROOK: Just so I'm clear, are
16   we saying this whole thing is the shelving unit?
17           MR. CURRY: I am saying -- yeah. And
18   that's what I am trying to clear up for the jury.
19           MR. AULSBROOK: Because I'm trying to
20   follow the word is what.
21           MR. CURRY: This item -- and I will do
22   my best to -- I am going to go ahead and mark this
23   as Defense Exhibit 2.
24           MR. AULSBROOK: Yeah, I think having
25   something in front of her to kind of go off of may

Page 44

1    help.
2            (Exhibit 2 marked.)
3            MR. AULSBROOK: So he's saying this
4    whole thing is the --
5            THE WITNESS: It's the whole thing.
6            MR. AULSBROOK: -- is the shelving.
7        Q. (By Mr. Curry) Right.
8        A. Okay.
9        Q. Now, is what I've shown you a picture of
10   you with the -- the shelf?
11       A. Yes, sir.
12       Q. Okay. And it's sitting on a display
13   shelf; is that right?
14       A. Yes.
15       Q. Okay. And do you understand the
16   difference between those two things that I'm
17   describing --
18       A. Yes, sir.
19       Q. Okay. I just want to make sure that is
20   clear for the jury. And now I'm going to
21   show you what I am marking as Exhibit 3.
22           (Exhibit 3 marked.)
23       Q. (By Mr. Curry) And I am going to
24   represent to you that is a screenshot progression
25   of what took place during the video we just

Page 45

1    watched.
2        A. Okay.
3        Q. Do you believe that to be an accurate
4    progression of what --
5        A. Yes.
6        Q. -- what took place? Okay. Right. From
7    the left to right on the top row, and followed by
8    left to right in the bottom row; just like you are
9    reading a book.
10       A. Yes.
11       Q. Okay. And that's how it happened?
12       A. Yes.
13       Q. Okay. Did you ever ask for help when
14   examining the shelf?
15       A. Yes.
16       Q. Who did you ask for?
17       A. Employee.
18       Q. Okay. Was that before or after the shelf
19   fell?
20       A. After the shelf fell.
21       Q. Prior to the shelf falling, did you ask
22   for any help?
23       A. No.
24       Q. What happened after the accident?
25       A. Customers come (sic) to my aid. I was not

STEVEN H. GENTRY & ASSOCIATES, INC.  (214) 321-5333
5115 NORTH GALLOWAY AVENUE, SUITE 202, MESQUITE (DALLAS COUNTY) TEXAS 75150

008

Leasa and Brett Williams vs
Ross Stores, Inc.

Leasa Williams
03/03/2020

Page 66

1  questions today?
2  **A. Pretty much.**
3  Q. Have I been polite and courteous to you?
4  **A. Yes, you have.**
5  Q. All right.
6  MR. CURRY: I'll pass the witness at
7  this time.
8  EXAMINATION
9  BY MR. AULSBROOK:
10  Q. Yeah, I just have a couple of follow-up
11  things. I just want to walk through that video
12  again. What was that exhibit? 1? Okay. So we
13  are going to go back to Exhibit 1.
14  So you previously testified that this
15  -- this shelving here on Exhibit 1 is -- is -- that
16  -- that fell on you is seven feet tall; that's --
17  that's what you -- that's what you testified. So
18  are we clear that, you know, from the floor -- and
19  you know how tall I am?
20  **A. Yes, sir.**
21  Q. So that would be taller than me. So it
22  would stretch from the floor to taller than me --
23  that shelving system -- if it were seven feet high.
24  So do you still --
25  **A. No.**

Page 67

1  Q. -- is that still your testimony? It's not
2  still your testimony?
3  **A. No.**
4  Q. Okay. So if it were -- if it were sitting
5  on the floor, maybe about this high?
6  **A. Yes.**
7  Q. Can we say it might be three feet high?
8  **A. Yes, sir.**
9  Q. Okay. Just wanted to make sure we were
10  clear on that. So you are walking down the aisle
11  here and you stop and you see the -- the shelving
12  that you want to --
13  **A. Yes.**
14  Q. -- you want to look at? Is that you --
15  **A. Yes.**
16  Q. -- maybe looking at the price tag?
17  **A. Possibly, yes.**
18  Q. Okay.
19  **A. Uh-huh.**
20  Q. Me, not knowing, it kind of looks like
21  looking at the price tag, so --
22  **A. It's -- it's important to me before I**
23  **start investing my time in looking further.**
24  Q. I understand. That looks like you pulling
25  out the bottom drawer and sticking it back in; is

Page 68

1  that -- is that accurate?
2  **A. Yes, sir.**
3  Q. Okay. So, to me, that doesn't look like
4  there is any zip tie there or anything; is that
5  correct?
6  **A. Yes, sir.**
7  Q. Okay. Now, I believe -- I would have to
8  take a look at the record to -- to -- to be for
9  sure, but I believe you testified that you tilted
10  this shelving. And my understanding, if you tilt
11  it, it's kind of like you're -- you're pulling it
12  on yourself.
13  **A. I don't remember --**
14  Q. We're fixing to go through it, but --
15  **A. Okay.**
16  Q. So you had just pulled out the bottom
17  drawer?
18  **A. Uh-huh.**
19  Q. It looks like you kind of grab the whole
20  thing; is that correct?
21  **A. Yes.**
22  Q. Then looks like you are grabbing the
23  middle of it --
24  **A. Uh-huh.**
25  Q. -- to pull it off of the shelf and

Page 69

1  potentially set it on the ground. What are you --
2  what are you trying to do? I am just trying to get
3  a -- a feel.
4  **A. It isn't my nature to straighten things**
5  **up, and I was not -- I would never try to take that**
6  **off the shelf and put it down on the ground.**
7  Q. So what were you trying to do there? Were
8  you trying to pull out --
9  **A. I think it --**
10  Q. -- that drawer --
11  **A. -- was already trying to come over on me.**
12  **I thought that it was already trying to come down,**
13  **so it was my nature to keep it back.**
14  Q. Based on the video sequence, it looks to
15  me like you are trying to pick it up and set it on
16  the ground; so that's not true?
17  **A. I don't think I would -- I don't remember.**
18  **I just don't remember that, trying to take it off**
19  **the shelf and put it on the floor.**
20  Q. Well, it doesn't look, to me, like you are
21  grabbing a drawer there. It looks like you're
22  grabbing the whole thing.
23  **A. Whole thing, yes.**
24  Q. The whole thing?
25  **A. Yes --**

STEVEN H. GENTRY & ASSOCIATES, INC. (214) 321-5333
5115 NORTH GALLOWAY AVENUE, SUITE 202, MESQUITE (DALLAS COUNTY) TEXAS 75150

009

# APPENDIX
# "B"

# (STORE SURVEILLANCE VIDEO; COURTESY COPIES WILL BE PROVIDED TO THE COURT AND PLAINTIFFS' COUNSEL)









ADT LLC v. Capital Connect, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 1426302

2017 WL 1426302
Only the Westlaw citation is currently available.
United States District Court, N.D. Texas, Dallas
Division.

ADT LLC, et al., Plaintiffs,
v.
CAPITAL CONNECT, INC., et al., Defendants.

CIVIL ACTION NO. 3:15-CV-2252-G
|
Signed 04/21/2017

**Attorneys and Law Firms**

Robert N. LeMay, Kane Russell Coleman & Logan PC,
Dallas, TX, Charles C. Eblen, Jason R. Scott, Kerensa
Cassis, Aaron K. Kirkland, Kenneth Cochran, Shook
Hardy & Bacon LLP, Kansas City, MO, Charles Sanders
McNew, McNew P.A., Boca Raton, FL, Kali R. Backer,
Richard G. Sander, Shook Hardy & Bacon LLP, Denver,
CO, for Plaintiffs.

Douglas D. Fletcher, David C. Colley, Eugene Taehyun
Rhee, Martha Clare Jones Smitham, Richard G. Miller,
Lorin M. Subar, Fletcher Farley Shipman & Salinas LLP,
William J. Clay, Christopher J. Hanlon, Foster Reese, III,
Stewart K. Smith, The Willis Law Group PLLC, Annette
Michelle Sepulveda, Eric R. Yepez, Jacqueline Ellise
Montejano, Stephen C. Carter, Holden & Carr, Dallas,
TX, Drew A. Lagow, Holden & Carr, Tulsa, OK, for
Defendants.

**MEMORANDUM OPINION AND ORDER**

A. JOE FISH, Senior United States District Judge

**\*1** Before the court are the motions for partial summary
judgment filed by the defendants, Capital Connect, Inc.
("Capital Connect"), John Lee, John Backus, Victor
Vega, Trevor McAlees (docket entry 161), and Power
Home Technologies, LLC ("PHT") (docket entry 216);
and the motion for summary judgment filed by the
defendant, Alliance Security, Inc. ("Alliance") (docket
entry 164). For the reasons stated below, the defendants'

motions are granted in part and denied in part.

I. BACKGROUND

A. Factual Background

The plaintiff, ADT LLC ("ADT"), provides electronic
security services and equipment to homes and businesses
throughout the United States. Complaint ¶ 18 (docket
entry 1). ADT US Holdings, Inc. ("ADT Holdings"), also
a plaintiff, owns the ADT trademarks. *Id.* ¶ 1. The
defendants seeking summary judgment are three
alarm-service companies, Capital Connect, Alliance, and
PHT, and four individual alarm-salespersons, John Lee,
John Backus, Victor Vega, and Trevor McAlees. See *id.*
¶¶ 4-5, 7, 9-12. ADT brought this action alleging that the
defendants sell alarm systems in unannounced
door-to-door sales visits, during which the defendants
have made false statements, confusing the homeowners
into believing that the defendants were somehow
affiliated with ADT. See *id.* ¶¶ 27-30. ADT contends that
the defendants' sales tactics violate the Lanham Act, 15
U.S.C. § 1125(a), and ADT's rights against unfair
competition at common law. *Id.* at 34-41.

Capital Connect, Alliance, and PHT sell and install alarm
systems on behalf of Monitronics International, a direct
competitor of ADT. *See* Brief in Support of Defendants
Capital Connect, Inc., John Lee, John Backus, Victor
Vega, and Trevor McAlees' Motion for Partial Summary
Judgment ("Capital Connect's Brief") at 3-4 (docket entry
162); Alliance's Motion for Summary Judgment and Brief
in Support ("Alliance's Brief") at 1 (docket entry 164);
PHT's Brief in Support of Its Motion for Partial Summary
Judgment ("PHT's Brief") at 3 (docket entry 217). ADT
alleges that each of the defendants' sales forces engaged
in false and misleading sales pitches during their
door-to-door sales visits, which targeted ADT's
customers. ADT further claims that the defendants'
misleading pitches were designed to convince ADT
customers to terminate their contracts with ADT. *See*
Plaintiffs' Memorandum in Opposition to Capital
Connect's Motion for Partial Summary Judgment
("Plaintiffs' Capital Connect Response") at 2 (docket
entry 180); Plaintiffs' Memorandum in Opposition to

Appendix E

013

2017 WL 1426302

Alliance's Motion for Summary Judgment ("Plaintiffs' Alliance Response") at 3 (docket entry 179); Plaintiffs' Memorandum in Opposition to PHT's Motion for Partial Summary Judgment ("Plaintiffs' PHT Response") at 2 (docket entry 242).[1]

According to ADT, the defendants' sales forces arrived unannounced at the homes of ADT customers, falsely stated that they were affiliated with ADT, and that the customers' ADT alarm equipment was out of date and needed to be upgraded. See, *e.g.*, Plaintiffs' Capital Connect Response at 6-7 (citing Declaration of Annie May Edwards at 1-2 (docket entry 7-6)); Plaintiffs' Alliance Response at 7 (citing Declaration of Patricia Belcher-Wuchte at 1-2 (docket entry 179-15)); Plaintiffs' PHT Response at 6-7 (citing Deposition of Gladys Walker at 216-17 (docket entry 243)). As a result, ADT's customers signed contracts with the defendants and agreed to the removal of ADT's alarm equipment and the installation of the defendants' equipment. *See* Plaintiffs' Capital Connect Response at 6-7 (citing Declaration of Annie May Edwards at 1-2 (docket entry 7-6)); Plaintiffs' Alliance Response at 7 (citing Declaration of Patricia Belcher-Wuchte at 1-2 (docket entry 179-15)); Plaintiffs' PHT Response at 6-7 (citing Deposition of Gladys Walker at 216-17 (docket entry 243)). After receiving complaints, ADT often returned to its customers' homes to reinstall ADT equipment in place of the defendants' equipment. *See* Plaintiffs' Capital Connect Response at 2 (citing Declaration of Marcia Gold at 5 (docket entry 7-2)); Plaintiffs' Alliance Response at 3 (citing to same); Plaintiffs' PHT Response at 2 (citing to same). The plaintiffs have documented over 700 incidents committed by Capital Connect's sales force, *see* Plaintiffs' Capital Connect Response at 2; numerous incidents committed by Alliance's sales force, *see* Plaintiffs' Alliance Response at 3; and at least 135 incidents committed by PHT's sales force, *see* Plaintiffs' PHT Response at 2.

**\*2** The defendants have been aware of the conduct of their sales forces for years. *See* Capital Connect's Brief at 4; Alliance's Brief at 2-3; PHT's Brief at 4. In fact, on August 26, 2013, the plaintiffs entered into a settlement agreement which released all claims against the defendants as of the date of the agreement. Capital Connect's Brief at 4; Alliance's Brief at 2-3; PHT's Brief at 4. However, nearly all of the incidents at issue in the present case occurred after the August 26, 2013 settlement agreement. *See* Plaintiffs' Capital Connect Response at 12 (citing Complaint at 9-18); Plaintiffs' Alliance Response at 9 (citing Complaint at 27-31); Plaintiffs' PHT Response at 12 (citing Complaint at 19-24).

B. Procedural Background

ADT filed this suit against the defendants on July 7, 2015. *See* Complaint. On the same day, ADT filed a motion for a preliminary injunction against Capital Connect, seeking to enjoin Capital Connect from engaging in false sales pitches. *See generally* Plaintiffs' Motion for a Preliminary Injunction (docket entry 4). On October 28, 2015, this court granted the plaintiffs' motion for a preliminary injunction. Memorandum Opinion and Order Granting the Plaintiffs' Motion for Preliminary Injunction (docket entry 82).

On January 17, 2017, Capital Connect, John Lee, John Backus, Victor Vega, Trevor McAlees, and Alliance filed the instant motions. Capital Connect, Inc., John Lee, John Backus, Victor Vega, and Trevor McAlees' Motion for Partial Summary Judgment (docket entry 161); Alliance's Motion for Summary Judgment (docket entry 164). On February 7, 2017, the plaintiffs filed responses. Plaintiffs' Capital Connect Response; Plaintiffs' Alliance Response. On February 21, 2017, Capital Connect, John Lee, John Backus, Victor Vega, and Trevor McAlees filed a reply to ADT's response to their motion for summary judgment. Reply in Support of Capital Connect, Inc., John Lee, John Backus, Victor Vega, and Trevor McAlees' Motion for Partial Summary Judgment ("Capital Connect's Reply") (docket entry 209). On February 23, 2017, Alliance filed a reply. Alliance's Reply to Plaintiffs' Response to Its Motion for Summary Judgment ("Alliance's Reply") (docket entry 220). Also on February 23, 2017, PHT filed its motion for partial summary judgment. PHT's Motion for Partial Summary Judgment (docket entry 216). On March 15, 2017, the plaintiffs timely filed a response to PHT's motion. Plaintiffs' PHT Response. The motions are now ripe for decision.

II. ANALYSIS

A. Legal Standard

Summary judgment is proper when the pleadings,

2017 WL 1426302

depositions, admissions, disclosure materials on file, and affidavits, if any, "show[ ] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a), (c)(1).[2] A fact is material if the governing substantive law identifies it as having the potential to affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue as to a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; see also *Bazan ex rel. Bazan v. Hidalgo County*, 246 F.3d 481, 489 (5th Cir. 2001) ("An issue is 'genuine' if it is real and substantial, as opposed to merely formal, pretended, or a sham."). To demonstrate a genuine issue as to the material facts, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Company v. Zenith Radio Corporation*, 475 U.S. 574, 586 (1986). The nonmoving party must show that the evidence is sufficient to support the resolution of the material factual issues in his favor. *Anderson*, 477 U.S. at 249 (citing *First National Bank of Arizona v. Cities Service Company*, 391 U.S. 253, 288-89 (1968)).

**\*3** When evaluating a motion for summary judgment, the court views the evidence in the light most favorable to the nonmoving party. *Id.* at 255 (citing *Adickes v. S.H. Kress & Company*, 398 U.S. 144, 158-59 (1970)). However, it is not incumbent upon the court to comb the record in search of evidence that creates a genuine issue as to a material fact. See *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003). The nonmoving party has a duty to designate the evidence in the record that establishes the existence of genuine issues as to the material facts. *Celotex Corporation v. Catrett*, 477 U.S. 317, 324 (1986). "When evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court." *Malacara*, 353 F.3d at 405.

### B. Application

### 1. *Alliance's Evidentiary Objections*

Before considering the merits of Alliance's motion for summary judgment, the court must address its objections

to evidence cited in the plaintiffs' summary judgment response. The court will consider only the evidentiary objections specifically raised by Alliance. See *Eguia v. Tompkins*, 756 F.2d 1130, 1136 (5th Cir. 1985) ("Documents presented in support of a motion for summary judgment may be considered even though they do not comply with the requirements of Rule 56 if there is no objection to their use.").

### a. Alliance's Objections to the Plaintiffs' Exhibit 12

Alliance objects on several grounds to the plaintiffs' exhibit 12 (docket entry 179-12) attached to the plaintiffs' response to Alliance's motion for summary judgment. Alliance's Reply at 1-2. However, "because the court did not find it necessary rely on this evidence in support of its decision, these objections are overruled as moot." *Detgen ex rel. Detgen v. Janek*, 945 F. Supp. 2d 746, 753 (N.D. Tex. 2013) (Fish, J.), *aff'd*, 752 F.3d 627 (5th Cir. 2014).

### b. Alliance's Objections to the Plaintiffs' Exhibits 15 and 16

Alliance objects to the plaintiffs' exhibits 15 and 16 (docket entries 179-15 and 179-16) attached to the plaintiffs' response to Alliance's motion for summary judgment, contending that the exhibits (1) fail to meet the requirements of 28 U.S.C. § 1746(2); (2) fail to meet the requirements of FED. R. CIV. P. 56(c)(4); and (3) contain unsupported speculation and are replete with hearsay. Alliance's Reply at 2-3. Exhibit 15 is the declaration of ADT customer Patricia Belcher-Wuchte (docket entry 179-15) and exhibit 16 is the declaration of ADT customer Phyllis Conlon (docket entry 179-16).

As to Alliance's first objection, 28 U.S.C. § 1746 requires that declarations "substantially" follow the requirements of the statute.[3] *See* 28 U.S.C. § 1746. Here, both declarations were signed, dated, and end with the following statement: "I understand that false statements made herein are made subject to the penalties of [section 1746]." Declaration of Patricia Belcher-Wuchte at 4 (docket entry 179-15); Declaration of Phyllis Conlon at 4 (docket entry 179-16). The court concludes that the declarants have substantially adhered to the requirements of section 1746. Therefore, Alliance's first objection is

overruled.

As to Alliance's second objection, Rule 56(c)(4) requires that

> [a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

**\*4** FED. R. CIV. P. 56(c)(4). Here, both exhibits are based on the declarants' personal knowledge and both declarants appear to be competent to testify. *See generally* Declaration of Patricia Belcher-Wuchte at 1 (docket entry 179-15); Declaration of Phyllis Conlon at 1 (docket entry 179-16). While Alliance does not specify which requirements of Rule 56(c)(4) are not met, presumably Alliance contends that the declarations do not contain facts that would be admissible in evidence, reasoning that the declarations contain "unsupported speculation and [are] replete with hearsay." Alliance's Reply at 2-3. It is true that "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." *Brown v. City of Houston, Texas*, 337 F.3d 539, 541 (5th Cir. 2003). However, the court concludes that the declarations in question do not contain unsubstantiated assertions or speculation and are not so devoid of details to render any inferences improbable. Moreover, the court concludes that any relevant statements that could be considered hearsay are exempt as opposing party statements. *See* FED. R. EVID. 801(2)(D). Therefore, Alliance's objections are overruled.

### 2. *Whether Alliance Had a Principal-Agency Relationship with Its Sales Force*

Alliance contends that it is not liable for the actions of its sales force because it does not have a principal-agency relationship with its sales force. *See* Alliance's Brief at 4-5. Rather, Alliance contends that its sales force is comprised of independent contractors. *Id.* Under Texas law, "an employer is vicariously liable for the negligence of an agent or employee acting within the scope of his or her agency or employment, although the principal or employer has not personally committed a wrong." See *Baptist Memorial Hospital System v. Sampson*, 969 S.W.2d 945, 947 (Tex. 1998) (noting that an employer is liable for the actions of its employees when the employee is acting within the scope of his/her employment and "the employer has the right to control the means and methods of the agent or employee's work"). "The essential element of an agency relationship is the right of control." *In re Carolin Paxson Advertising, Inc.*, 938 F.2d 595, 598 (5th Cir. 1991). To determine whether an employer exercises sufficient control over a worker to render the worker an agent, courts look to:

> (1) [t]he independent nature of his business; (2) his obligation to furnish necessary tools, supplies, and material to perform the job; (3) his right to control the progress of the work, except as to final results; (4) the time for which he is employed; and (5) the method of payment, whether by time or by the job.

*Texas A & M University v. Bishop*, 156 S.W.3d 580, 584-85 (Tex. 2005) (quoting *Industrial Indemnity Exchange v. Southard*, 160 S.W.2d 905, 907 (Tex. 1942)). This court previously found that Capital Connect exercised sufficient control over its sales force when

> (a) it requires its sales force to wear Capital Connect gear; (b) it requires its sales force to complete training; (c) it requires its sales force to sign a Code of Conduct; (d) it requires its sales force to wear a Capital Connect badge; (e) it requires its sales force to obey its sales rules; and (f) it punishes its sales force if it violates any of these provisions.

*ADT, LLC v. Capital Connect, Inc.*, 145 F. Supp. 3d 671, 692 (N.D. Tex. 2015) (Fish, J.) (internal citations omitted).

An independent contractor, on the other hand, "has sole

2019 WL 346895

2019 WL 346895
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR DESIGNATION
AND SIGNING OF OPINIONS.

Court of Appeals of Texas, Houston (1st Dist.).

Angela CARTER, Appellant
v.
TARANTINO PROPERTIES, INC., Appellee

NO. 01-17-00843-CV
|
Opinion issued January 29, 2019

**On Appeal from the 215th District Court, Harris
County, Texas, Trial Court Case No. 2015-57423**

**Attorneys and Law Firms**

Angela Carter, pro se.

Joseph M. Heard, Mary Elizabeth Graham, for Tarantino
Properties, Inc.

Panel consists of Justices Lloyd, Kelly, and Hightower.

**MEMORANDUM OPINION**

Richard Hightower, Justice

**\*1** Appellant Angela Carter, a tenant in a Houston
Housing Authority apartment complex managed by
appellee Tarantino Properties, Inc., asserted a premises
liability claim against Tarantino based on her allegation
that the glass cover of an improperly installed bathroom
light fixture fell and cut her wrist. The trial court granted
Tarantino's traditional motion for summary judgment on
Carter's premises liability claim and denied Carter's
motion for new trial. Carter appeals those rulings.

**Background**

In early January 2014, Carter moved into the Irvington
Village Apartments, a public housing project owned by
the Houston Housing Authority.[1] Tarantino began
managing the apartment complex on February 1, 2014.
On June 25, 2014, while Carter was in the process of
closing her bathroom medicine cabinet, the glass cover
(or glass shade) for the light fixture fell and cut her right
wrist. Broken glass also cut her leg. Carter's daughter
called 9-1-1, and Carter was taken by ambulance to a
hospital where her wrist wound was sutured and her leg
wound was cleaned. Because of subsequent numbness and
painful swelling in her right hand, a hand physician sent
Carter to physical therapy. According to Carter's
summary-judgment affidavit, since her wrist was cut, she
has suffered numbness and painful swelling in her right
hand and has been unable to perform a number of daily
tasks that she was able to perform before she was injured.

With its traditional motion for summary judgment on
Carter's premises liability claim, Tarantino included,
among other items, the following summary-judgment
evidence: Carter's deposition and the affidavits of
Tarantino employees Rachel Chavez and Sal Thomas.
Carter's response to Tarantino's motion included the
affidavits of Carter and of Frank Rogers, her electrical
expert, and Tarantino's discovery responses.

The trial court granted Tarantino's traditional motion for
summary judgment,[2] and Carter then filed a motion for
new trial as to that ruling. The trial court denied that
motion, and Carter appealed. Appearing pro se on appeal
and proceeding as an indigent, Carter asserts in two issues
that the trial court erred in granting Tarantino's traditional
motion for summary judgment and in denying her motion
for new trial.

We affirm.

**Analysis**

We review summary judgments de novo. *Valence
Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex.
2005). The movant has the burden of showing that no
genuine issue of material fact exists and that it is therefore



entitled to judgment as a matter of law. *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548 (Tex. 1985). A defendant moving for summary judgment must conclusively negate at least one essential element of the plaintiff's cause of action. *Sci. Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 911 (Tex. 1997).

**\*2** In reviewing a traditional motion for summary judgment, we must consider whether reasonable and fair-minded jurors could differ in their conclusions in light of all of the evidence presented. *See Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 755 (Tex. 2007). We must consider all the evidence in the light most favorable to the nonmovant, indulging every reasonable inference in favor of the nonmovant and resolving any doubts against the motion. *See id.* at 756. In our review, we take the competent evidence favorable to the nonmovant as true. *Diversicare Gen. Partner, Inc. v. Rubio*, 185 S.W.3d 842, 846 (Tex. 2005).

The elements of an invitee's premises liability claim are:

> (1) the plaintiff was an invitee;
>
> (2) the defendant was a possessor of the premises;
>
> (3) a condition of the premises created an unreasonable risk of harm to the plaintiff;
>
> (4) the defendant knew or reasonably should have known of the condition (actual or constructive knowledge);
>
> (5) the defendant failed to exercise ordinary care to protect the invitee from danger by failing to adequately warn the plaintiff of the condition or by failing to make the condition reasonably safe; and
>
> (6) the defendant's failure was a proximate cause of injury to the plaintiff.

*See Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 767 (Tex. 2010); *LMB, Ltd. v. Moreno*, 201 S.W.3d 686, 688 (Tex. 2006); *Seideneck v. Cal Bayreuther Assocs.*, 451 S.W.2d 752, 753–54 (Tex. 1970).

Tarantino moved for summary judgment on elements three through six. We begin with the fourth element: the threshold issue of Tarantino's actual or constructive knowledge of the alleged dangerous condition. *See Farrar v. Sabine Mgmt. Corp.*, 362 S.W.3d 694, 700 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (citing *Motel 6 G.P., Inc. v. Lopez*, 929 S.W.2d 1, 3 (Tex. 1996) ); *Hall v. Sonic Drive-In of Angleton, Inc.*, 177 S.W.3d 636, 644

(Tex. App.—Houston [1st Dist.] 2005, pet. denied) (same).

"The duty owed by an owner or occupier of premises to an invitee is not that of an insurer." *CMH Homes, Inc. v. Daenen*, 15 S.W.3d 97, 101 (Tex. 2000). An invitee must establish that the defendant knew or should have known of the condition that posed an unreasonable risk of harm. *Moreno*, 201 S.W.3d at 688; *Farrar*, 362 S.W.3d at 700; *Hall*, 177 S.W.3d at 644. A possessor's knowledge of a dangerous condition can be actual or constructive. *Del Lago Partners*, 307 S.W.3d at 769. Carter does not contend that Tarantino had actual knowledge of the alleged dangerous condition, nor is there summary-judgment evidence that Tarantino had actual knowledge.

Constructive knowledge is "what a person after a reasonable inspection ought to know or have reason to know." *Duncan v. First Tex. Homes*, 464 S.W.3d 8, 16 (Tex. App.—Fort Worth 2015, pet. denied) (citing *Lopez*, 929 S.W.2d at 3–4); *see also Seideneck*, 451 S.W.2d at 754 ("[B]ecause the owner or occupier is charged with knowledge of any dangerous condition that a reasonable inspection would have revealed, the plaintiff must show as a matter of law or through a finding of fact that the owner 'knew or should have known of the existence of the condition and that he should have appreciated its dangers.' "). " 'The inviter ... will not be held liable for defects which would not have been disclosed by a reasonably careful inspection, even though no such inspection has been made.' " *Kansas City So. R.R. v. Guillory*, 376 S.W.2d 72, 76 (Tex. Civ. App.—Beaumont 1964, writ ref'd n.r.e.) (quoting 65 C.J.S. *Negligence* § 51).

**\*3** Because the core of the duty [to an invitee] depends on actual or constructive knowledge of a dangerous condition that a reasonable inspection would reveal, it follows that an owner or occupier is not liable for deterioration of its premises unless it knew of or by reasonable inspection would have discovered the deterioration.

Many building materials will, over time, deteriorate and require repair or replacement. That does not necessarily mean that the owner or occupier has created a dangerous condition or that the owner has actual or constructive knowledge of a dangerous condition.

*Daenen*, 15 S.W.3d at 101 (citations omitted).

Carter's premises liability claim is that the bathroom light fixture was "jerry-rigged"—it was improperly attached to the wall with just one nail, and when the light fixture

became dislodged, its glass cover fell off, breaking and cutting Carter. Carter asserts that when Tarantino employee Rachel Chavez inspected Carter's apartment on April 11, 2014, she should have discovered that the light fixture was improperly installed and thus a dangerous condition. Chavez's inspection report does not indicate that she inspected the light fixture.

Carter's expert Rogers stated in his summary-judgment affidavit that, in his opinion, the fixture had been improperly installed by securing it to the wall with a nail. Rogers opined that if a "reasonable, proper visual and physical inspection" of the fixture had been done between February 1, 2014 and June 25, 2014, "any reasonable inspector would have determined that that lighting fixture was not securely attached to the bathroom wall" and that it needed to be replaced. Rogers further opined that if Chavez did not inspect the light fixture, she should have inspected it because it was an "older-type lighting fixture" that would have "flagged the attention of any reasonable inspector to properly inspect it."

Regarding constructive knowledge, Tarantino first notes that it was not the property manager and did not perform the move-in inspection in January 2014, when Carter moved in. Next, Tarantino highlights that Carter's own testimony establishes that an inspection would not have detected the alleged dangerous condition and that no one had any reason to suspect a problem with the fixture or its cover.

Specifically, Carter testified that the alleged dangerous condition was not visible because the light fixture itself was covering the nail. She testified that she saw the light fixture daily for about five months, and the alleged problem was never visible until the light fixture came down "because the light fixture was covering the problem." Carter testified that "you couldn't see anything wrong with it. It was perfect. It looked perfect to me until it came down on me." She testified that the cover to the light fixture had never come off before. Carter also admitted in her brief that the condition of the base of the light fixture (attached to the wall with "an old nail"), which she characterized as "jerry-rigged", was "imperceptible."

Carter viewed the light fixture in her bathroom multiple times a day and never saw anything unusual: it never looked like it was coming off the wall, nor did it look out of place. Neither the fixture nor its cover ever appeared broken, hanging, or loose. Carter said that she opened and closed the medicine cabinet below the light fixture daily because she kept her toothbrush and toothpaste in it. When she closed the medicine cabinet, the fixture did not

make any sound, such as a rattling sound, indicating that it was loose. Nothing about the light fixture or its cover concerned Carter. She further admitted that nothing would indicate to her or anybody else that there was anything wrong with the light fixture. In the approximately five months that Carter lived in the apartment before the incident, she never reported to Tarantino any incidents or complaints regarding the light fixture or cover.

**\*4** Carter's own testimony establishes that the alleged dangerous condition—the single nail affixing the light fixture's base to the wall above the medicine cabinet—was concealed, and therefore a visual inspection of the light fixture would not have detected how the base of the light fixture was affixed to the wall. Further, Carter's testimony establishes that the only way to determine that the light fixture had been improperly installed would have been to detach it from the wall, and Carter's expert is silent on how a visual or physical inspection would have revealed the alleged improper installation. His statement that "any reasonable inspector would have determined that that lighting fixture was not securely attached to the bathroom wall" is conclusory, and a "conclusory statement of an expert witness is insufficient to create a question of fact to defeat summary judgment." *McIntyre v. Ramirez*, 109 S.W.3d 741, 749 (Tex. 2003). Also, Carter's expert fails to state that, in the absence of any complaints or problems with the light fixture, a reasonable inspection would have included detaching the light fixture from the wall to make a determination of proper installation.

Because Carter's summary-judgment evidence does not raise a fact issue on Tarantino's constructive knowledge of the alleged dangerous condition, and because Tarantino's summary-judgment evidence establishes that no genuine issue of material fact exists on its constructive knowledge, Tarantino has disproved, as a matter of law, the constructive-knowledge element of Carter's premises liability claim. The trial court properly granted Tarantino's traditional motion for summary judgment on Carter's premises liability claim. *See Elliott-Williams Co. v. Diaz*, 9 S.W.3d 801, 803 (Tex. 1999) (summary judgment proper if defendant disproves at least one element of plaintiff's claim). We therefore overrule Carter's two issues.

### Conclusion

We affirm the judgment of the trial court.

2015 WL 12532127
Only the Westlaw citation is currently available.
United States District Court,
S.D. Texas, Corpus Christi Division.

Roger Dangler, Plaintiff,
v.
Kohl's Department Stores, Inc., Defendant.

CIVIL ACTION NO. 2:14-CV-169
|
Signed 10/16/2015

**Attorneys and Law Firms**

Craig Edward Brunkenhoefer, Robert Blake Brunkenhoefer, Brunkenhoefer L. Turman, P.L.L.C., Corpus Christi, TX, for Plaintiff.

Charles Robert Dorsett, Kevin Leahy, Jessica Amy Putonti, Dorsett Johnson & Swift LLP, Austin, TX, for Defendant.

**ORDER**

NELVA GONZALES RAMOS, UNITED STATES DISTRICT JUDGE

**\*1** Roger Dangler (Dangler) sues Kohl's Department Stores, Inc. (Kohl's) for personal injuries suffered when he tripped over a garment rack and fell, alleging that the racks were too close to allow safe walking among the clothing displays. Before the Court is Defendant Kohl's Department Stores, Inc.'s Motion for Summary Judgment (D.E. 30). Kohl's argues two bases for its motion: (1) that there is no evidence to support Dangler's claim that it had knowledge of a dangerous condition thus defeating the premises liability claim; and (2) negligence is not a viable claim where the allegations relate to a condition on the premises rather than an activity. For the reasons set out

below, the motion is GRANTED IN PART and DENIED IN PART.

Dangler's response includes direct and circumstantial evidence that Kohl's knows that inspection and maintenance of aisles and fixtures is an important safety issue so as to avoid tripping hazards for customers walking among the clothing racks. Kohl's is responsible for maintaining floor plans and the placement of garment racks and is aware of potential hazards when the store is particularly crowded with merchandise. Kohl's created the condition on the premises that Dangler encountered, allegedly causing his injury.

In reviewing a summary judgment motion, the Court must consider the record as a whole by reviewing all pleadings, depositions, affidavits, and admissions on file, and drawing all justifiable inferences in favor of the party opposing the motion. *Caboni v. Gen. Motors Corp.*, 278 F.3d 448, 451 (5th Cir. 2002). After reviewing Dangler's response and the evidence attached thereto, the Court DENIES IN PART the motion for summary judgment to the extent that it challenges the existence of evidence to show Kohl's knowledge of the safety hazard to support the premises liability claim.

Next, Kohl's argues that the Supreme Court of Texas has determined that, where a claim is based on a premises condition rather than a negligent activity, a general negligence claim is precluded. *H.E. Butt Grocery Co. v. Warner*, 845 S.W.2d 258, 259 (Tex. 1992); *Keetch v. Kroger Co.*, 845 S.W.2d 262, 264 (Tex. 1992). Dangler did not respond to this argument and Kohl's is correct with respect to Texas law. Because Dangler alleges that a condition on the premises caused his injury and because he does not allege a negligent activity, he is not entitled to proceed on a general negligence theory. His recovery must be premised upon an adequate showing of the requirements for a premises liability claim at trial.

For the reasons set out above, Kohl's motion for summary judgment (D.E. 30) is GRANTED IN PART as to Dangler's negligence claim and it is DISMISSED. The motion (D.E. 30) is DENIED IN PART as to Dangler's premises liability claim.

ORDERED this 16th day of October, 2015.

End of Document                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Appendix G

020

Diaz v. D.R. Wright Enterprises, Inc., Not Reported in S.W. Rptr. (2018)

2018 WL 3484227

2018 WL 3484227
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR DESIGNATION
AND SIGNING OF OPINIONS.

Court of Appeals of Texas, Dallas.

J. Manuel DIAZ, Appellant
v.
D.R. WRIGHT ENTERPRISES, INC. and Wright
Way Construction Enterprises, Inc., Appellees

No. 05-17-00172-CV
|
Opinion Filed July 19, 2018

**On Appeal from the 191st Judicial District Court,
Dallas County, Texas, Trial Court Cause No.
DC-15-01413-J, The Honorable Gena Slaughter,
Judge.**

**Attorneys and Law Firms**

Domingo A. Garcia, Ryan Sorrells, Law Offices
Of Domingo A. Garcia, P.C., Dallas TX, for Appellant.

Mark J. Carroll, Law Office of Mark J. Carroll, Cedar Hill
TX, for Appellee.
Before Justices Bridges, Evans, and Whitehill

**MEMORANDUM OPINION**

Opinion by Justice Bridges

**\*1** Appellant J. Manuel Diaz sustained injuries after
falling off a roof. He filed suit against appellees D.R.
Wright Enterprises, Inc. and Wright Way Construction
Enterprises, Inc. (Wright Way) alleging negligence,
premises liability, and negligent activity.[1] Wright Way
filed a traditional and no-evidence motion for summary
judgment, which the trial court granted. On appeal, Diaz
argues the trial court erred by granting summary
judgment. We affirm.

**Background**

Ray Wright is the owner and president of Wright Way, a
residential and commercial construction company. On
June 6, 2013, Wright entered into an oral contract on
behalf of Wright Way with Kent Ellis to provide various
construction services, including replacing the roof on
Ellis's home and garage (the Project).

Wright Way later entered into an oral agreement with
Francisco Marin, a roofing contractor Wright Way had
used many times in the past, to provide labor, tools, and
equipment to remove and replace shingles on the Ellis
roof. Marin provided a bid of $3,760, which included
providing labor, tools, and equipment (but not roofing
material) and hauling of debris. Wright Way agreed to
provide shingles, nails, and felt paper for the Project.

Marin subsequently entered into an oral agreement with
Diaz, whom Marin had worked with over the past
twenty-five years "from time to time on projects." Diaz
agreed to provide all the labor, tools, and equipment for
the Project. Wright had known Diaz for about five years
and believed he was a competent roofer. However, Wright
did not have a relationship with Diaz other than through
Marin and had only worked with Diaz two or three times.

Diaz and his crew replaced the roof on the home on June
14, 2013. On June 15, 2013, Diaz began replacing the
garage roof. Shortly before noon, Wright received a call
from Marin, who told him Diaz fell off the roof after
removing some shingles and slipping on the old felt paper
underneath. Wright took Diaz to the hospital for treatment
of his injured foot.

Diaz's crew finished the Project on or about June 15,
2013. Wright Way paid Marin for the work on June 17,
2013. Marin subsequently paid Diaz and sent him a 1099
to report his income from the Project.

Diaz filed suit against Wright Way for negligence,
negligent activity, and premises liability. Wright Way
filed a traditional and no-evidence motion for summary
judgment arguing, among other things, that it did not owe
a duty to Diaz because Diaz was an independent
contractor. The trial court granted Wright Way's
summary judgment motion without specifying the
grounds. This appeal followed.


Appendix H
021

2018 WL 3484227

#### Objections to Summary Judgment Evidence

In his first issue, Diaz argues the trial court abused its discretion by (1) considering Ray Wright's affidavit (exhibit A) and Francisco Marin's affidavit (exhibit B) attached to Wright Way's summary judgment motion because the evidence was not competent and (2) considering Wright Way's summary judgment reply and attached evidence because it was untimely.

*2 We begin by considering Diaz's objections to the two affidavits attached to Wright Way's motion for summary judgment.

For preservation purposes, objections to "form" and "substance" are treated differently. *See Stewart v. Sanmina Tex. L.P.*, 156 S.W.3d 198, 207 (Tex. App.—Dallas 2005, no pet.). Failure to affirmatively show that the affiant had personal knowledge or that facts stated are "true and correct" are defects in form and must be preserved in the trial court. *Id.* (citing *Grand Prairie Indep. Sch. Dist. v. Vaughan*, 792 S.W.2d 944, 945 (Tex. 1990) ); *see also Bastida v. Aznaran*, 444 S.W.3d 98, 104 (Tex. App.—Dallas 2014, no pet.); *Bradley v. Mid-Century Ins. Co.*, No. 05-05-00856-CV, 2006 WL 1545324, at *1 (Tex. App.—Dallas June 7, 2006, no pet.) (mem. op.).[2] An objection that a party is an interested witness is also a defect in form that must be preserved in the trial court. *See Ayati-Ghaffari v. Gumbodete*, No. 05-14-01019-CV, 2015 WL 4482158, at *5 (Tex. App.—Dallas July 23, 2015, no pet.) (mem. op.). Accordingly, by failing to obtain a ruling from the trial court on his personal knowledge and interested witness objections, Diaz cannot raise these objections on appeal. *Id.*; *Bastida*, 444 S.W.3d at 104.

Defects in the substance of the evidence do not require a written ruling, and such objections may be raised for the first time on appeal. *Stewart*, 156 S.W.3d at 207; *Thompson v. Curtis*, 127 S.W.3d 446, 450 (Tex. App.—Dallas 2004, no pet.). Substantive defects are those that leave the evidence legally insufficient and include affidavits which are nothing more than legal or factual conclusions. *Stewart*, 156 S.W.3d at 207; *Bastida*, 444 S.W.3d at 105. A conclusory statement is one that does not provide the underlying facts to support the conclusion. *Brown v. Brown*, 145 S.W.3d 745, 751 (Tex. App.—Dallas 2004, pet. denied).

Diaz argues he "objected to Mr. Wright's statements in

the last four paragraphs of his affidavit because they are legal conclusions which he is unqualified to state or factual conclusions unsupported by any facts or explanations." Diaz also objected to the first sentence of the last paragraph of Marin's affidavit because they are "nothing more than legal or factual conclusions ... and does not provide the underlying facts to support" them. We have held that such objections are not sufficiently specific. For example, in *Stewart v. Sanmira Texas LP*, we concluded "simply quoting one or more sentences from particular paragraphs and stated 'the following evidence is improper because it is conclusory and/or is not based on personal knowledge,'" was not sufficiently specific. 156 S.W.3d at 207. We also concluded "identifying only the number of particular paragraphs and exhibits" was not enough to explain how statements were conclusory. *Id.*; *see also Anderson v. Limestone Cnty.*, No. 10-07-00174-CV, 2008 WL 2629664, at *2–3 (Tex. App.—Waco, July 2, 2008, pet. denied) (mem. op.); *Morales v. Uptown Props., Inc.*, No. 05-05-00295-CV, 2005 WL 3418603, at *3 (Tex. App.—Dallas Dec. 1, 2005, no pet.) (mem. op.) (objections that statements are conclusory may not be conclusory themselves). Diaz's complaints about Wright's and Marin's affidavits suffer the same flaws. Diaz failed to "provide a description of the particular basis for the objection" or offer any explanation as to why he believed those portions of the affidavits are conclusory. Accordingly, we overrule Diaz's first issue to the extent he raised objections to Wright's and Marin's affidavits, and we shall consider both documents in our summary judgment review.

*3 We now consider whether the trial court abused its discretion by considering Wright Way's reply and attached evidence to Diaz's response to the summary judgment motion.

Diaz filed his response to Wright Way's summary judgment motion on January 13, 2017. The hearing on the motion was set for January 20, 2017. Under Dallas County Local Rule 2.09, a reply brief must be filed and served no less than three days before the hearing. *See* DALLAS CNTY. LOC. R. 2.09 (reply briefs in support of a motion for summary judgment must be filed and served no less than three days before the hearing). Wright Way filed its reply, with attached evidence, on January 18, 2017. The attached evidence consisted of two corrected pages from Wright's oral deposition taken on August 1, 2016.

Relying on Dallas County Local Rule 2.09, Diaz argues Wright Way's summary judgment reply was untimely and should not have been considered by the trial court. First, the record does not reflect that Diaz objected, either in

Diaz v. D.R. Wright Enterprises, Inc., Not Reported in S.W. Rptr. (2018)

2018 WL 3484227

contract between Wright Way and Diaz. Therefore, we must determine whether Wright Way actually exercised any control over the manner in which Diaz performed his work relating to the activity that caused his injury.

Diaz focuses on statements from Wright and Ellis stating Wright was in charge of safety at the job and should have provided fall-protection equipment. However, evidence of the potential or possibility of control is not evidence that actual control is exercised or retained. *See Coastal Marine Serv. of Tex., Inc. v. Lawrence*, 988 S.W.2d 223, 226 (Tex. 1999). Moreover, we have addressed a similar argument in *Hernandez*. In that case, we concluded an independent contractor who fell off a roof and alleged the home builder was negligent in failing to provide fall protection could not survive summary judgment by arguing the supervisor had knowledge of the risk of roofers' falling and the supervisor agreed he could have provided protection to prevent the fall. 345 S.W.3d at 154 ("knowledge of the risk of roofers' falling and appellees' failure to require fall-protection equipment is not evidence that Stroud and appellees actually exercised control over the manner in which Brito's employees performed their work"). Similarly, Diaz's contention that Wright was in charge of safety and did not provide safety equipment is not evidence that Wright Way exercised control over the manner in which Diaz installed the roof.

Diaz next argues Wright's inspections of the Project was evidence of some control. However, a contractor has the authority to inspect progress without subjecting himself to liability. *See, e.g., Hernandez*, 345 S.W.3d at 154 n.3. Diaz presented no evidence that during any inspection Wright told him how to do his job such that Wright Way was exercising control.

Finally, Diaz argues he raised a genuine issue of material fact regarding control because Wright Way provided the nails and shingles and Wright told him what he wanted done, for example, instructing Diaz to put on 30-year shingles, wanting "all the valleys cut," and telling Diaz not to remove the old paper before installing new shingles. To create a duty, there must be a nexus between the condition or activity that caused the injury and a general contractor's retained supervisory control. *Arana*, 2018 WL 3017307, at *2. Providing materials for the Project is not evidence of such a nexus. Further, Diaz has not provided evidence explaining how instructions to cut "all the valleys" related to his injury. While instructing Diaz not to replace the old paper before installing new shingles was a detail of the Project, it was not an "operative detail to the point" Diaz was not entirely free to do the work in his own way. *See Koch*, 11 S.W.3d at 155 (limited duty arises when contractor retains control over methods of work or operative details). Instead, Wright Way's decision to not replace the paper was a job specification. Further, Diaz presented no evidence that Wright Way controlled how Diaz removed the paper and then replaced the shingles. Rather, Diaz testified it is a "common practice" for roofers to walk on old paper, and he knew he needed to be careful while working on a roof because paper, even new paper, can tear. Further, Diaz admitted Wright did not tell him how to do his job, and "he's never going to tell you, you got to put the shingles this way." Accordingly, we conclude, as a matter of law, Wright Way did not owe Diaz a duty, and Diaz did not raise a genuine issue of material fact to overcome summary judgment on his negligence cause of action.

**\*7** We now consider whether the trial court properly granted Wright Way's motion for summary judgment on Diaz's negligent activity claim. Duty, breach, and proximate cause are elements of a negligent activity claim. *See, e.g., Taylor v. Louis*, 349 S.W.3d 729, 738 (Tex. App.—Houston [14th Dist.] 2011, no pet.). Diaz argues he raised a genuine issue of material fact regarding whether his injuries arose from an activity on the premises or as a contemporaneous result of that activity because Wright told him not to remove the old paper and did not insist he wear proper safety equipment which contributed to his fall. As previously discussed, Wright Way did not owe a legal duty to Diaz. Without evidence of such a duty, his negligent activity claim fails. *See Oncor Elec. Delivery Co. v. Murillo*, 449 S.W.3d 583, 592 (Tex. App.—Houston [1st Dist.] 2014, pet. denied).

Having affirmed the trial court's summary judgment ruling on traditional grounds, we need not address or review the no-evidence grounds. *See Shih*, 306 S.W.3d at 945 n.8.

## Premises Liability

Diaz argues the trial court erred by granting summary judgment on his premises liability claim because, among other things, he presented evidence creating a genuine issue of material fact regarding Wright Way's duty to warn. Wright Way responds Diaz failed to present evidence of a duty to warn and the two recognized exceptions do not apply, or alternatively, there is no evidence to support them.

In a premises liability case, a landowner or general contractor is liable to employees of an independent

**023**

Diaz v. D.R. Wright Enterprises, Inc., Not Reported in S.W. Rptr. (2018)

2018 WL 3484227

contractor only for claims arising from a concealed, pre-existing defect rather than from the contractor's work. *Gen. Elec. Co. v. Moritz*, 257 S.W.3d 211, 215 (Tex. 2008). "With respect to existing defects, an owner or occupier has a duty to inspect the premises and warn of concealed hazards the owner knows or should have known about." *Id.* (quoting *Shell Oil Co. v. Khan*, 138 S.W.3d 288, 295 (Tex. 2004) ); *see also Austin v. Kroger Tex., LP*, 465 S.W.3d 193, 203 (Tex. 2015) (landowner has duty to make safe or warn against any concealed, unreasonably dangerous condition of which the landowner is or should be aware, but the invitee is not). However, in most cases, a contractor or landowner owes no duty to protect an invitee against a dangerous condition that is open and obvious or known to the invitee. *Austin*, 465 S.W.3d at 201. Such is the case because when the condition is open and obvious or known to the invitee, the landowner is not in a better position to discover it. *Id.* When invitees are aware of dangerous premises conditions—whether because the danger is obvious or because the landowner provided an adequate warning—the condition will, in most cases, no longer pose an unreasonable risk because the law presumes that invitees will take reasonable measures to protect themselves against known risks, which may include a decision not to accept the invitation to enter onto the premises. *Id.*

The Texas Supreme Court has provided two exceptions to this general rule: (1) the criminal-activity exception, meaning a dangerous condition results from the foreseeable criminal activity of a third party and (2) the necessary-use exception, meaning the invitee necessarily must use the unreasonably dangerous premises and despite the invitee's awareness and appreciation of the dangers, the invitee is incapable of taking precautions that will adequately reduce the risk. *Id.* at 204.

The evidence relied on by Diaz is as follows: (1) Wright Way never went up on the roof before anyone started working to inspect its condition and ascertain whether it could be safely used without wearing a safety harness and lanyard properly tied onto an anchor point; (2) Wright Way exercised control over how Diaz performed his work;⁵ (3) Wright knew the roof was seven feet high and OSHA regulations require safety devices for employees working over six feet high; (4) Wright admitted he never saw anyone using safety harnesses; (5) Wright would not admit working on a roof over seven feet tall without safety protection was a hazardous condition; (6) he was aware if someone fell off the roof they could suffer an injury; (7) he never inspected the roof after telling Diaz not to replace the old paper to see if there was a potential danger and did not tell Diaz to be careful because the old

paper might be slippery or tear.

**\*8** First, Texas courts, including this Court, have held that "the common law duties imposed by state law are not expanded by OSHA regulations." *See Arana*, 2018 WL 3017307, at *7. Thus, Diaz's OSHA argument is not evidence creating a fact issue. Likewise, to the extent Diaz argues Wright (1) did not inspect the roof first to ascertain if safety equipment was necessary, (2) would not admit such work was dangerous, and (3) did not see anyone wearing safety equipment, Diaz testified in his deposition "everything was fine" with the Project's roof. He explained the roof was considered a 4-12 roof, meaning it was "flat" and "any person could walk on it." Diaz had never used a safety line on that type of roof and had never seen any other roofers use a safety line on one that flat. As we concluded in *Hernandez*, the danger of falling off a roof and the lack of fall protection, such as a safety-rope system or scaffolding, was open and obvious, not a concealed defect. 345 S.W.3d at 156. Wright Way's only duty was to warn Diaz of concealed defects he might encounter in doing his work. The danger of falling and the lack of fall protection were not concealed defects, and Wright Way owed no duty to Diaz to warn him. *Id.*

Diaz further relies on *Buchanan v. Rose*, 159 S.W.2d 109, 110 (Tex. 1942) for the proposition that "if a party negligently creates a dangerous situation, it then becomes his duty to do something about it to prevent injury to others if it reasonably appears or should appear to him that others ... may be injured." However, Diaz has not provided any evidence supporting his argument. Diaz's argument is premised on the fact that Wright instructed him to not replace the old felt paper, which caused him to slip and fall while replacing the shingles. The record does not contain any evidence that walking on old felt paper created a dangerous situation. Rather, Diaz admitted regardless of whether he replaced the paper or installed new paper over the old paper, he must walk on the old paper as part of the process. It is a "common practice" for roofers to walk on old paper. "You have to do it." He knew he needed to be careful while working on a roof because paper, even new paper, can tear. "You have to be careful the whole time." When asked if he found anything unsafe about the roof he did not ordinarily encounter, such as the old paper, he answered, "No. Well, to me everything was fine; everything was fine." Thus, Diaz provided no evidence that Wright negligently created a dangerous situation by requiring him to shingle over old paper. Rather, the evidence established that the condition is common in roofing and Diaz knew to be careful. As such, the condition was open and obvious and known to the invitee. The condition, therefore, did not pose an unreasonable risk because the law presumes Diaz would

024

Henson v. Kroger Texas, L.P., Not Reported in Fed. Supp. (2017)

2017 WL 2168526

2017 WL 2168526
Only the Westlaw citation is currently available.
United States District Court, N.D. Texas, Fort Worth
Division.

Judith HENSON, Plaintiff,
v.
KROGER TEXAS, L.P., Defendant.

NO. 4:16-CV-298-A
|
Signed 05/16/2017

**Attorneys and Law Firms**

Craig Weldon Thomas, McKey & Sanchez PC, James
Duane Trujillo, The Law Offices of David Sanchez, P.C.,
Dallas, TX, for Plaintiff.

B. Kyle Briscoe, Luke McMahan, The Peavler Group,
Grapevine, TX, for Defendant.

MEMORANDUM OPINION AND ORDER

JOHN McBRYDE, United States District Judge

**\*1** Came on for consideration the motion of defendant,
Kroger Texas, L.P., for summary judgment. The court,
having 'considered the motion, the response of plaintiff',
Judith Henson, the reply, the record, the summary
judgment evidence, and applicable authorities, finds that
the motion should be granted.

I.

Plaintiff's Claims

Plaintiff's operative pleading is her amended complaint
filed June 21, 2016. Doc.¹ 12. In it, she alleges that on
August 30, 2014, while shopping at defendant's premises
in the aisle where defendant stocks and displays dog food
that is packaged in four and eight pound bags, she was
injured when an eight pound bag of dog food fell on her.
Specifically:

> 3.3 Defendant's employees stacked large eight (8) lb.
> bags of dog food on top of the four (4) lb. bags on the
> highest shelf in the aisle.

> 3.4 Unbeknownst to Plaintiff, she attempted to remove
> a four (4) lb. bag, but was injured when an eight (8) lb.
> bag that was stacked on top of the four (4) lb. bag
> struck the left side of her body.

Doc. 12 at 2. Plaintiff asserts a premises liability claim,
seeking to recover for injuries allegedly sustained when
an eight pound bag of dog food fell on her. Doc. 12 at 3-4.

II.

Grounds of the Motion

Defendant says that it is entitled to judgment because
plaintiff can produce no evidence of an unreasonably
dangerous premises condition about which defendant had
actual or constructive notice. And, in the event plaintiff is
asserting a claim based on an unreasonably dangerous
premises defect, plaintiff cannot prevail because such
defect was open and obvious and/or actually known to
plaintiff and defendant owed her no duty to warn or to
protect her from such defect.

III.

Applicable Summary Judgment Principles

Appendix 11

025

Henson v. Kroger Texas, L.P., Not Reported in Fed. Supp. (2017)

2017 WL 2168526

Rule 56(a) of the Federal Rules of Civil Procedure provides that the court shall grant summary judgment on a claim or defense if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986), The movant bears the initial burden of pointing out to the court that there is no genuine dispute as to any material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 325 (1986). The movant can discharge this burden by pointing out the absence of evidence supporting one or more essential elements of the nonmoving party's claim, "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323. Once the movant has carried its burden under Rule 56(a), the nonmoving party must identify evidence in the record that creates a genuine dispute as to each of the challenged elements of its case. Id. at 324; see also Fed. R. Civ. P. 56(c) ("A party asserting that a fact ... is genuinely disputed must support the assertion by ... citing to particular parts of materials in the record...."). If the evidence identified could not lead a rational trier of fact to find in favor of the nonmoving party as to each essential element of the nonmoving party's case, there is no genuine dispute for trial and summary judgment is appropriate. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 597 (1986). In Mississippi Prot. & Advocacy Sys. v. Cotten, the Fifth Circuit explained:

> **\*2** Where the record, including affidavits, interrogatories, admissions, and depositions could not, as a whole, lead a rational trier of fact-to find for the nonmoving party, there is no issue for trial.

929 F.2d 1054, 1058 (5th Cir. 1991).

The standard for granting a motion for summary judgment is the same as the standard for rendering judgment as a matter of law.[2] Celotex Corp., 477 U.S. at 323. If the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial. Matsushita, 475 U.S. at 597; see also Mississippi Prot. & Advocacy Sys., 929 F.2d at 1058.

IV.

Analysis

This is a diversity case in which Texas law applies. Cleere Drilling Co. v. Dominion Exploration & Prod., Inc., 351 F.3d 642, 646 (5th Cir. 2003). In Texas, an owner/occupier owes a duty to use reasonable care to make and keep its premises safe for business invitees. Clayton Williams, Jr., Inc., v. Olivo, 952 S.W.2d 523, 527 (Tex. 1997). The elements of a cause of action for premises liability are: (1) existence of a condition of the premises creating an unreasonable risk of harm; (2) the owner/occupier knew or should have known of the existence of the condition; (3) the owner/occupier failed to use reasonable care to reduce or eliminate the risk by rectifying or warning of the condition; and (4) such failure was a proximate cause of plaintiff's injury. CMG Homes, Inc. v. Daenen, 15 S.W.3d 97, 99 (Tex. 2000); Keetch v. Kroger Co., 845 S.W.2d 262, 264 (Tex. 1992). An owner/occupier is not an insurer of the safety of its guests; it is not liable to invitees for conditions of which it did not have actual or constructive knowledge. Wal-Mart Stores, Inc. v. Reece, 81 S.W.3d 812, 814 (Tex. 2002).

To prevail on the notice element of her claim, plaintiff must show that:(1) defendant actually created the condition; (2) defendant actually knew that the condition existed; or (3) it is more likely than not that the condition existed long enough to give defendant reasonable notice of it. Reece, 81 S.W.3d at 814. Further, the proximity of an employee to the location where the incident occurred merely indicates that it was possible for the owner/occupier to discover the condition, not that it reasonably should have discovered the condition. There must be temporal evidence of the amount of time that the condition had existed. Id. at 816-17.

Here, as defendant points out, plaintiff cannot, and has not, produced any evidence to show that defendant knew or should have known of an unreasonably dangerous condition. A condition is not unreasonably dangerous just because it is not foolproof, e.g., that something more could have been done to prevent something falling off a shelf and striking a customer is not evidence of unreasonable danger. Brookshire Grocery Co. v. Taylor, 222 S.W.3d 406, 408 (Tex. 2006). Plaintiff has not come forward with any evidence that the condition was actually unreasonably dangerous or that defendant knew of the condition. She has no temporal evidence of how long the condition existed. Reece, 81 S.W.3d 812, 816 (Tex.

**026**

2017 WL 2168526

2002); Keetch, 845 S.W.2d at 265. Nor is there any evidence that the overlapping condition of the bags of dog food was caused by defendant and not other customers.[3]

**\*3** To the extent that plaintiff is treating the overlapping placement of the bags of dog food as a premises condition, defendant contends that such condition was open and obvious to plaintiff or actually made known to her. Austin v. Kroger Texas, L.P., 465 S.W.3d 193, 203-04 (Tex. 2015). A landowner's duty is to warn against concealed, unreasonably dangerous conditions. Id. Here, plaintiff admitted in response to requests for admission that she did not seek assistance in removing the four pound bag from the shelf. Doc. 22 at 33. She testified that she saw the way the bags were stacked-the heavier bags overlapping the lighter bags—and that when she reached up to get the four pound bag, she felt that it was stuck between two other bags and she had to tug on it to get it free. Doc. 22 at 14-15, 17. (As noted, _infra_, plaintiff's affidavit, now claiming that she did not know that the bags were so closely shelved, Doc. 25 at 7, directly contradicts this testimony and will not be considered.)

In her summary judgment response, plaintiff relies on a case, Univ. of Tex. at Austin v. Hayes, 279 S.W.3d 877 (Tex. App.-Austin 2009), that was reversed by the Texas Supreme Court. 327 S.W.3d 113 (Tex. 2010). In reversing the appellate court, the Supreme Court pointed out that showing what a defendant typically does or how it wrote up an incident report after an accident is no evidence of defendant's actual knowledge of the condition of the premises at the time of the accident. 327 S.W.3d at 117-18. And, the fact that the plaintiff cannot show defendant received reports of prior injuries or of the potential danger caused by the condition is a factor to consider. Id. at 118. If there is no evidence of actual knowledge of a dangerous condition at the time of the accident, the plaintiff fails to establish a premises defect claim. Id. Such are the facts in this case.

Here, plaintiff is not only relying on an after-action report, she attempts to change the facts established by her own admissions and testimony by stating in her affidavit

that the store manager admitted that the stacking of "heavy" bags created a dangerous condition. Doc. 25 at 7-8. Neither plaintiff's discovery responses nor her deposition testimony had disclosed any conversation with the store manager about the possibility of dog food bags falling and injuring customers.[4] And, plaintiff controverts her own admissions and testimony that she could see as well as feel that the bags were closely stacked in an overlapping manner. Doc. 25 at 7. As defendant notes, the court will not consider an affidavit or declaration that contradicts without explanation prior sworn testimony. S.W.S. Erectors, Inc. v. Infax, Inc., 72 F.3d 489, 495 (5th Cir. 1996); Powell v. Dallas Morning News, L.P., 776 F. Supp. 2d 240, 246-47 (N.D. Tex. 2011), aff'd, 486 Fed.Appx. 469 (5th Cir. 2012).

For the reasons discussed, plaintiff has not presented sufficient summary judgment evidence to raise a genuine fact issue for trial and defendant is entitled to judgment as a matter of law.

V.

Order

The court ORDERS that defendant's motion for summary judgment be, and is hereby, granted; that plaintiff take nothing on her claims against defendant; and that such claims be, and are hereby, dismissed.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 2168526

Footnotes

1    The "Doc. ___" reference is to the number of the item on the docket in this action.

2    In Boeing Co. v. Shipman, 411 F.2d 365, 374-75 (5th Cir. 1969) (en banc), the Fifth Circuit explained the standard to be applied in determining whether the court should enter judgment on motions for directed verdict or for judgment notwithstanding the verdict.

3    The court notes that the summary judgment evidence establishes that plaintiff cannot prove the case she has pleaded. Her

**027**

Hernandez v. Sun Crane and Hoist, Inc., Not Reported in S.W. Rptr. (2018)

2018 WL 5725243

2018 WL 5725243
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR DESIGNATION
AND SIGNING OF OPINIONS.

Court of Appeals of Texas, Dallas.

Jose HERNANDEZ, Appellant
v.
SUN CRANE AND HOIST, INC. : JLB Partners,
L.P.; JLB Builders, L.L.C., Auger Drilling, Inc.,
and D'Ambra Consruction Corporation, Appellees

No. 05-17-00719-CV
|
Opinion Filed November 1, 2018

On Appeal from the County Court at Law No. 4,
Dallas County, Texas, Trial Court Cause No.
CC-15-00715-D. Honorable Ken Tapscott, Judge

**Attorneys and Law Firms**

George Tex Quesada, Jody Rodenberg, Sommerman,
McCaffity & Quesada, L.L.P., 3811 Turtle Creek Blvd.,
Suite 1400, Dallas TX 75219, for Appellant.

Timothy R. George, Brett A. Smith, Daniel Mical Karp,
Fee, Smith, Sharp & Vitullo, L.L.P., Three Galleria
Tower, 13155 Noel Road, Ste. 1000, Bryan Wendt, Burt
Barr & Associates, P.O. Box 223667, Dallas, TX, for
Appellees.
Before Justices Bridges, Evans, and Whitehill

**MEMORANDUM OPINION**

Opinion by Justice Bridges

**\*1** Jose Hernandez appeals the trial court's order granting
the traditional and no-evidence summary judgment
motion of Sun Crane and Hoist, Inc., JLB Partners L.P.,
and JLB Builders, L.L.C., and ordering that Hernandez
take nothing on his claims. In two issues, Hernandez
argues the trial court erred in granting JLB's traditional
and no-evidence motion for summary judgment. We
affirm the trial court's judgment.

In October 2013, JLB entered into a Subcontract
Agreement with Capform, Inc. regarding a construction
project in Dallas. On December 5, 2013, Alejandro
Molina was Capform's foreman and Hernandez was a
member of the work crew under Molina's supervision.
Hernandez was injured when he fell from a "rebar cage"
while attempting to place on the cage a concrete form
suspended from a crane. According to Molina's affidavit,
the crane operator "made the form strike the rebar cage
and cause it to start falling over." Hernandez was injured
in the fall, and he later sued JLB and asserted negligence
claims.

In the Subcontract, JLB was listed as "Contractor," and
Capform was listed as "Subcontractor." Among other
things, the Subcontract provided the following:

> [Capform], at its expense, shall
> furnish all of the supervision, labor,
> material, tools, equipment,
> insurance, services, shop drawings,
> samples, protection, hoisting,
> scaffolding, supplies, warrantees
> and all permits, licenses and fees
> (as applicable) necessary to
> perform, construct, and complete,
> in the manner set out in the
> Contract Documents (defined
> below), the work described in
> EXHIBIT A of this Agreement (the
> "Work").

The Subcontract further provided that Capform was
responsible for furnishing all equipment required to
perform the Work including, but not limited to, ramps,
ladders, scaffolds, hoisting and other equipment. An
entire subsection of the Subcontract related to "Safety"
and provided, among other things, the following:

> (1) Compliance. [Capform] shall fully comply with all
> laws, orders, citations, rules, regulations, standards and
> statutes with respect to occupational health and safety,
> accident prevention, and safety equipment and
> practices, including without limitation, OSHA
> standards and any accident prevention and safety
> program sponsored by Owner or [JLB]. Without
> limiting the foregoing, simultaneous with the execution
> hereof, Subcontractor shall complete, execute and
> deliver to [JLB] an Accident Prevention Plan in the

essential elements of the nonmovant's claim on which the nonmovant would have the burden of proof at trial. *See* TEX. R. CIV. P. 166a(i); *Henning v. OneWest Bank FSB*, 405 S.W.3d 950, 957 (Tex. App.—Dallas 2013, no pet.). "The motion must state the elements as to which there is no evidence." TEX. R. CIV. P. 166a(i); *Henning*, 405 S.W.3d at 957. Once the movant specifies the elements on which there is no evidence, the burden shifts to the nonmovant to raise a fact issue on the challenged elements. *See* TEX. R. CIV. P. 166a(i); *Henning*, 405 S.W.3d at 957; *see also S.W. Elec. Power Co. v. Grant*, 73 S.W.3d 211, 215 (Tex. 2002). We review a no-evidence motion for summary judgment under the same legal sufficiency standard used to review a directed verdict. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 750-51 (Tex. 2003); *Flood v. Katz*, 294 S.W.3d 756, 762 (Tex. App.—Dallas 2009, pet. denied). Our inquiry focuses on whether the nonmovant produced more than a scintilla of probative evidence to raise a fact issue on the challenged elements. *See King Ranch*, 118 S.W.3d at 751; *Flood*, 294 S.W.3d at 762. Evidence is no more than a scintilla if it is "so weak as to do no more than create a mere surmise or suspicion" of a fact. *King Ranch*, 118 S.W.3d at 751. If a no-evidence motion for summary judgment and a traditional motion for summary judgment are filed which respectively asserts the plaintiff has no evidence of an element of its claim and alternatively asserts that the movant has conclusively negated that same element of the claim, we address the no-evidence motion for summary judgment first. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004).

To prevail on a traditional summary judgment motion, a movant has the burden of proving that he is entitled to judgment as a matter of law and that there is no genuine issue of material fact. TEX. R. CIV. P. 166a(c); *Cunningham v. Tarski*, 365 S.W.3d 179, 185-86 (Tex. App.—Dallas 2012, pet. denied). When a defendant moves for summary judgment, he must either (1) disprove at least one essential element of the plaintiff's cause of action or (2) plead and conclusively establish each essential element of an affirmative defense, thereby defeating the plaintiff's cause of action. *Cunningham*, 365 S.W.3d at 186. In determining whether there is a genuine fact issue precluding summary judgment, evidence favorable to the nonmovant is taken as true and the reviewing court makes all reasonable inferences and resolves all doubts in the nonmovant's favor. *Id.*; *Nixon v. Mr. Prop. Mgmt. Co., Inc.*, 690 S.W.2d 546, 548–49 (Tex. 1985). A matter is conclusively established if reasonable minds cannot differ as to the conclusion to be drawn from the evidence. *Cunningham*, 365 S.W.3d at 186; *see also City of Keller v. Wilson*, 168 S.W.3d 802, 816 (Tex. 2005). Once a movant conclusively establishes an

affirmative defense, the burden of production shifts to the nonmovant to present summary judgment evidence that raises a fact issue on at least one element of the movant's affirmative defense or an exception or defense to that affirmative defense. *Cunningham*, 365 S.W.3d at 186. Where, as here, the trial court's order granting summary judgment does not specify the grounds relied upon, we must affirm the summary judgment if any of the summary judgment grounds are meritorious. *Id.*

**\*4** Our review of the evidence concerning negligence begins with duty. *Lee Lewis Const., Inc. v. Harrison*, 70 S.W.3d 778, 783 (Tex. 2001). Ordinarily, a general contractor does not owe a duty to ensure that an independent contractor performs its work in a safe manner. *Id.* (citing *Elliott–Williams Co. v. Diaz*, 9 S.W.3d 801, 803 (Tex.1999)). A duty does arise, however, if the general contractor retains some control over the manner in which the independent contractor performs its work. *Id.* The general contractor's duty of care is commensurate with the control it retains over the independent contractor's work. *Id.* A general contractor can retain the right to control an aspect of an independent contractor's work or project so as to give rise to a duty of care to that independent contractor's employees in two ways: by contract or by actual exercise of control. *Id.*

General supervisory control, however, that does not relate to the activity causing the injury is not sufficient to create a duty. *Gonzalez v. VATR Constr. LLC*, 418 S.W.3d 777, 785 (Tex. App.—Dallas 2013, no pet.). As a result, merely exercising or retaining a general right to recommend a safe manner for the independent contractor's employees to perform their work is not enough to impose a duty. *Id.* In addition, there must be a nexus between a general contractor's retained supervisory control and the condition or activity that caused the injury. *Hoechst-Celanese Corp. v. Mendez*, 967 S.W.2d 354, 357-58 (Tex. 1998). The right to control must be more than a general right to order work to stop and start, or to inspect progress. *Coastal Marine Serv. of Tex., Inc. v. Lawrence*, 988 S.W.2d 223, 226 (Tex. 1999). The supervisory control must relate to the activity that actually caused the injury, and grant the owner at least the power to direct the order in which work is to be done or the power to forbid it being done in an unsafe manner. *Id.* If the contract does not explicitly assign control over the manner of work to the general contractor, then the plaintiff must present evidence of the actual exercise of control by the general contractor. *See Gonzalez*, 418 S.W.3d at 785.

Here, in its Health & Safety Manual, JLB referred to itself as a "Controlling Employer for their Multi-employer

2016 WL 3390510
Only the Westlaw citation is currently available.
United States District Court,
N.D. Texas, Dallas Division.

Nettie Hughes, Plaintiff,
v.
Kroger Texas L.P., Defendant.

No. 3:15-CV-0806-M
|
Signed 03/04/2016

**MEMORANDUM OPINION AND ORDER**

BARBARA M. G. LYNN, UNITED STATES DISTRICT
JUDGE

**\*1** Before the Court is the Second Amended Motion for
Summary [Docket Entry #38], filed by Defendant Kroger
Texas L.P. ("Kroger"). For the reasons stated, the Motion
is GRANTED.

I. Background

This is a premises liability case arising out of injuries
Plaintiff Nettie Hughes allegedly sustained when she
tripped and fell in a grocery store parking lot. According
to Plaintiff, her husband, Wesley Childs, drove her to
Kroger Store No. 492 in Balch Springs, Texas on or about
June 8, 2012. Childs parked the car, and Plaintiff got out.
As she walked through the parking lot toward the store
entrance, Plaintiff asserts she was distracted by another
car and did not notice a raised patch of concrete in her
path. Plaintiff tripped over the concrete patch and fell to
the ground. She claims she suffered serious injuries as a
result of the fall.

Plaintiff filed suit against Kroger in state court on May
30, 2014. Kroger removed the case to federal court on the

basis of diversity jurisdiction. Plaintiff filed an amended
complaint asserting claims for premises liability,
negligence per se, and violations of the Americans with
Disabilities Act. Kroger filed a motion and an amended
motion for summary judgment as to all of Plaintiff's
claims. On November 20, 2015, the Court heard oral
argument on Kroger's motions and granted summary
judgment in Kroger's favor on all of Plaintiff's claims
except her premises liability claim. The Court permitted
Kroger to file a second motion for summary judgment as
to Plaintiff's premises liability claim, and Kroger did so
on December 18, 2015. The issues have been fully
briefed, and the matter is ripe for determination.

II. Legal Standards

Summary judgment is warranted when the movant shows
that there is no genuine dispute of material fact as
reflected in the pleadings, affidavits, and other summary
judgment evidence, and that the movant is entitled to
judgment as a matter of law. Fed. R. Civ. P. 56; *see also
Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 884 (1990);
*McGee v. Arkel Int'l, LLC*, 671 F.3d 539, 542 (5th Cir.
2012). The moving party bears the initial burden of
demonstrating the absence of evidence supporting the
nonmovant's claims. *Babcock v. Hartmarx Corp.*, 182
F.3d 336, 338 (5th Cir. 1999) (citing *Celotex Corp. v.
Catrett*, 477 U.S. 317, 325 (1986)). Once the moving
party satisfies its initial burden, the burden shifts to the
nonmovant to prove that summary judgment is not
appropriate. *Tobin v. AMR Corp.*, 637 F. Supp. 2d 406,
411 (N.D. Tex. 2009) (Lynn, J.) (citing *Fields v. City of S.
Houston*, 922 F.2d 1183, 1187 (5th Cir. 1991)).

The nonmovant must go beyond the pleadings and
identify specific facts that prove the existence of a
genuine issue of material fact. *Matsushita Elec. Indus. Co.
v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In
determining whether a genuine issue of material fact
exists, all factual disputes will be interpreted in the light
most favorable to the nonmovant, provided that both
parties have introduced evidence showing that a dispute
exists. *Lynch Props., Inc. v. Potomac Ins. Co.*, 140 F.3d
622, 625 (5th Cir. 1998). A district court properly grants
summary judgment if, when viewing all facts in the light
most favorable to the nonmovant, it determines that there
are no genuine issues of material fact and that the movant
is entitled to judgment as a matter of law. Fed. R. Civ. P.
56(c).

Hughes v. Kroger Texas L.P., Not Reported in F.Supp.3d (2016)

2016 WL 3390510

### III. Analysis

**\*2** Kroger moves for summary judgment on Plaintiff's premises liability claim on two grounds: (1) it owed Plaintiff no duties with respect to the concrete patch in the parking lot, because the patch was an "open-and-obvious" condition; and (2) Plaintiff has no evidence that the concrete patch created an unreasonable risk of harm. Under Texas law, "a property owner owes invitees a duty to use ordinary care to reduce or eliminate an unreasonable risk of harm created by a premises condition about which the property owner knew or should have known." *Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 767 (Tex. 2010). However, the owner is not an insurer of a patron's safety. *Wal–Mart v. Reece,* 81 S.W.3d 812, 814 (Tex. 2002). To prevail on her premises liability claim, Plaintiff must show: (1) a condition of the premises created an unreasonable risk of harm; (2) the owner, Kroger, knew or reasonably should have known of the condition; (3) Kroger failed to exercise ordinary care to protect Plaintiff from danger; and (4) Kroger's failure was a proximate cause of injury to Plaintiff. *See Del Lago Partners*, 307 S.W.3d at 776 (citing *State Dep't of Highways & Pub. Transp. v. Payne*, 838 S.W.2d 235, 237 (Tex. 1992)); *see also Corbin v. Safeway Stores, Inc.*, 648 S.W.2d 292, 296 (Tex. 1983).

### A.

==The Texas Supreme Court recently affirmed that a landowner owes no duty of open and obvious dangers, or dangers the invitee knew about, on its premises. *Austin v. Kroger Texas, LP,* 2015 WL 3641066 (Tex. June 12, 2015). Rather, landowners in Texas owe their invitees the "duty to make safe or warn against any concealed, unreasonably dangerous conditions of which the landowner is, or reasonably should be, aware but the invitee is not." *Id.* In other words, to impose a duty on a landowner, a plaintiff must prove: (1) there is an unreasonably dangerous condition on the premises; (2) the landowner knew, or should have known, about the dangerous condition; (3) the condition is concealed (*i.e.*, not "open and obvious"); and (4) the plaintiff was not aware of the danger. *Id.* The existence of a duty is typically a question of law for the Court to decide. *Austin==*

==*v. Kroger Tex., L.P.*, 746 F.3d 191, 198 (5th Cir. 2013).==

Kroger contends the concrete patch was an open and obvious condition, and, therefore, Kroger is entitled to summary judgment because it owed Plaintiff no duty with respect to the patch. In support of its argument, Kroger points to Plaintiff's own deposition testimony that she did not have any trouble seeing the concrete patch immediately after she got up from her fall or several weeks later, when she returned to the store to take photographs. Def. MSJ App. at 42, 46. Kroger further points to Childs's deposition testimony that the concrete patch is "easy to see." *Id.* at 57. Kroger also submits six color photographs of the concrete patch. *Id.* at 67-72. The pictures show the patch, which is a different shade and composition of concrete than the rest of the parking lot, is located in the middle of a lined parking space and is not hidden or obscured by landscaping, a curb, or any other object. *See id.*

In an attempt to avoid summary judgment, Plaintiff points to her own testimony describing the concrete patch as the same color as the other concrete in the parking lot. She also states that she never saw the patch prior to the day of her fall, even though she had shopped at the store several times. Pl. MSJ Resp. App. at 2. Plaintiff testified that she did not notice the patch because her attention was distracted by a moving car. *Id.* Plaintiff further argues that Defendant's photographs of the patch are not probative of the open and obvious issue because they do not show the patch from the perspective of a reasonable person in Plaintiff's position at the time the accident occurred. In her summary judgment response, Plaintiff asserts that the accident happened "at dusk or near dark." Pl. Resp. App. at 2. Plaintiff also submits her own color photograph of the patch, which she contends was taken in "approximately the same lighting conditions as existed at the time when [she] tripped." *Id.* at 3, 5. Kroger objects to Plaintiff's statement on grounds that it contradicts her previous deposition testimony that she took the photograph in the "morning time." Def. Reply App. at 1-2. If a party's own affidavit contradicts that party's earlier testimony, the affidavit must explain the reason for the change. *Farroux v. Denny's Rests.*, Inc., 962 S.W.2d 108, 111 (Tex. App. —Houston [1st Dist.] 1997, no pet.). Without an explanation, it is assumed that the sole purpose of the affidavit was to avoid summary judgment, and, as such, the affidavit merely presents a "sham" issue. *Id.* A sham issue will not defeat a motion for summary judgment. *Cantu v. Peacher*, 53 S.W.3d 5, 7 (Tex. App. — San Antonio 2001, pet. denied).

**\*3** Viewing all of the evidence, except for her unexplained, inconsistent testimony, in the light most

Lippoldt v. Quillian, Not Reported in S.W. Rptr. (2016)

2016 WL 7405811

2016 WL 7405811
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR DESIGNATION
AND SIGNING OF OPINIONS.

Court of Appeals of Texas, Fort Worth.

Timothy LIPPOLDT, Appellant
v.
Sallie M. QUILLIAN, Individually and as Trustee
of the Rozell Quillian 2009 Family Trust, Appellee

NO. 02–16–00088–CV
|
DELIVERED: December 22, 2016

FROM THE 355TH DISTRICT COURT OF HOOD
COUNTY, TRIAL COURT NO. C201506, HON.
RALPH H. WALTON, JR., JUDGE

**Attorneys and Law Firms**

ATTORNEYS FOR APPELLANT: JIM R. ROSS, AMY
M. LORENZ, JIM ROSS LAW GROUP, P.C.,
ARLINGTON, TEXAS

ATTORNEYS FOR APPELLEE: ANDY MCSWAIN,
COLIN H. O'NEILL, LAUREN E. JAYNES,
FULBRIGHT WINNIFORD, WACO, TEXAS

PANEL: LIVINGSTON, C.J.; DAUPHINOT and
SUDDERTH, JJ.

**MEMORANDUM OPINION**[1]

LEE ANN DAUPHINOT, JUSTICE

**\*1** Appellant Timothy Lippoldt sued Appellee Sallie M.
Quillian, individually and as trustee of the Rozell Quillian
2009 Family Trust (the Trust), for injuries he sustained
while on property owned by her. The trial court granted
summary judgment for Quillian on all of Lippoldt's
claims, and Lippoldt now appeals the summary judgment
as to his premises liability claim. In two issues, he argues
that genuine issues of fact exist regarding (1) whether the
level of control Quillian, as landlord, maintained over the

portion of the premises on which he, an invitee, was
injured gave rise to a duty owed to him and (2) whether
she, as a landlord maintaining control over common areas,
breached the duties of ordinary care she owed him as an
invitee who was injured as a result of a condition of the
common area. Because we hold that the summary
judgment is proper, we affirm the trial court's judgment.

**Background**

Lippoldt was injured when car jacks failed and allowed
the sport utility vehicle (SUV or Hummer) they had
supported to collapse on top of him. The incident left
Lippoldt partially paralyzed. At the time of the incident,
Lippoldt had been assisting Ryan Gibson and the SUV's
owner in repairing the SUV. The repairs were being made
on property in Granbury, Texas, leased by Gibson from
Quillian. Quillian states that she is the owner of the
property; she executed the lease as trustee in the space
provided for the landlord's signature, under which
appears the typewritten name of the Trust. Lippoldt sued
the owner of the SUV, Gibson, and Quillian, individually
and as trustee of the Trust. Only Lippoldt and Quillian are
parties to this appeal.

Lippoldt alleged a premises liability claim against
Quillian, asserting that an alleged condition on the
premises—namely, Quillian's allowing Gibson "to store
and utilize inadequate and/or defective car repair
equipment on [the] premises"—posed an inherent risk to
him and others and was unreasonably dangerous. Lippoldt
alleged that Quillian "breached the duty of ordinary care
by neither adequately warning [him] of the condition nor
making the condition reasonably safe" and by

[f]ailing to supervise [the] tenants
to ensure the safety of licensees;[2]
... [a]llowing improper and/or
defective equipment on the
premises; ... [f]ailing to warn
[Lippoldt] and others of the
dangerous condition; and ...
[f]ailing to remedy or make safe the
dangerous condition.

Lippoldt also alleged that Quillian was negligent by
failing to use "ordinary care in maintaining the premises

Appendix L

032

Lippoldt v. Quillian, Not Reported in S.W. Rptr. (2016)
2016 WL 7405811

in a safe condition by inspecting the property for any dangerous conditions and by making safe any latent defect or giving warning of any defect." He alleged that she had a legal duty to control or avoid increasing the danger from a condition at least partially created by her failure to supervise Gibson.

Lippoldt further claimed that this conduct constituted negligence per se, contending that Quillian had violated section 301.2 of the International Property Maintenance Code, which he later stated had been adopted by Hood County.

**\*2** Lippoldt further alleged, as an "alternative to other counts," a negligent activity claim based on Gibson's storage and use of the car jack and Quillian's alleged control over the premises, authority to oversee the tenants' activities, and actual or constructive knowledge of the potential danger of Gibson's negligent activity.

Finally, Lippoldt asserted a claim of gross negligence against Quillian.

Quillian filed a combined no-evidence and traditional motion for summary judgment. She asserted that Gibson began storing car jacks on the property without her knowledge or consent and that, except for one room, she retained no control over the barn. She also asserted that she had no knowledge that Gibson, Lippoldt, and the SUV's owner performed automobile repairs on the property.

As no-evidence grounds, she asserted that there was no evidence that she or the Trust owed or breached any duty to support a premises liability, negligence, or negligence per se claim; owed any duty to support a negligent activity claim; or had any actual, subjective awareness of an extreme risk involved with any activities going on at the rented property to support a gross negligence claim.

As traditional grounds, Quillian asserted that the Trust was not the owner of the property; that control of the premises had been transferred to Gibson as the tenant and therefore neither she nor the Trust owed a duty to Lippoldt to support a premises liability or negligence claim; that section 301.2 of the International Property Maintenance Code, which Lippoldt relied on for his negligence per se claim, imposed no duty outside the common law standard of care; that neither she nor the Trust committed a negligent act; and that neither of them had an actual, subjective awareness of any risk to support a gross negligence claim. As evidence, Quillian attached her own affidavit.

Quillian stated in her affidavit that she owned the property leased to Gibson. When she leased the property to him, she knew of no defects in or on any part of the leased property. She stated that she "transferred the entire portion of the land to the control of Ryan Gibson, except for a large barn located on the property." After the lease was signed, she and Gibson agreed that he would be allowed to store some items in the barn, but she "had [had] and still ha[d] no knowledge of what items he stored in the barn." She asserted that once he began storing items in the barn, she retained no control over it except for a room in the back in which her daughter stored some furniture. Quillian stated that she was not aware that Lippoldt had been invited to the property, and she did not consent to or instruct anyone to invite him there.

Along with his summary judgment response, Lippoldt objected to factual assertions made in Quillian's motion and objected to her statements that the written lease was modified orally as being in violation of the statute of frauds. He attached as evidence his own affidavit, the affidavit of Gibson, and a copy of the lease. The lease, which listed the Trust as the landlord, expressly did not include the barn. The lease described the leased premises by address and as "4.850 acres SUBD" in Hood County. The lease stated that the tenant "may use the Property as a private residence only" and that the "[t]enant may not permit any part of the Property to be used for ... the repair of any vehicle."

**\*3** In Lippoldt's affidavit, he stated that he was unaware that Gibson stored defective jacks in the barn and used them in automotive repair and that his lease prohibited him from repairing vehicles on the property; that Gibson told him that he usually dealt with Quillian's daughter regarding his lease; that at one time Quillian's daughter saw them repairing a truck; that items were stored in the barn that were not Gibson's; and that a third party was allowed by Quillian to store his tractor in the barn.

Gibson stated in his affidavit that most of his dealings regarding the lease were with Quillian's daughters, that Quillian's children periodically accessed the entire barn and kept property stored there, that a third party was allowed by Quillian to store his tractor there, and that Quillian's daughter saw Gibson and Lippoldt repairing a truck on the property.

The trial court granted summary judgment for Quillian without specifying the grounds. Lippoldt filed a motion for new trial that was denied by operation of law. He then filed this appeal challenging the summary judgment only as to his premises liability claim.

033

Lippoldt v. Quillian, Not Reported in S.W. Rptr. (2016)

2016 WL 7405811

**Standard of Review**

After an adequate time for discovery, the party without the burden of proof may, without presenting evidence, move for summary judgment on the ground that there is no evidence to support an essential element of the nonmovant's claim or defense.[3] The motion must specifically state the elements for which there is no evidence.[4] The trial court must grant the motion unless the nonmovant produces summary judgment evidence that raises a genuine issue of material fact.[5]

When reviewing a no-evidence summary judgment, we examine the entire record in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the motion.[6] We review a no-evidence summary judgment for evidence that would enable reasonable and fair-minded jurors to differ in their conclusions.[7] We credit evidence favorable to the nonmovant if reasonable jurors could, and we disregard evidence contrary to the nonmovant unless reasonable jurors could not.[8] If the nonmovant brings forward more than a scintilla of probative evidence that raises a genuine issue of material fact, then a no-evidence summary judgment is not proper.[9]

We review a traditional summary judgment de novo.[10] We consider the evidence presented in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could, and disregarding evidence contrary to the nonmovant unless reasonable jurors could not.[11] We indulge every reasonable inference and resolve any doubts in the nonmovant's favor.[12] A defendant who conclusively negates at least one essential element of a cause of action is entitled to summary judgment on that claim.[13]

**\*4** When a party moves for summary judgment under both rules 166a(c) and 166a(i), we will first review the trial court's judgment under the standards of rule 166a(i).[14] If the appellant failed to produce more than a scintilla of evidence under that burden, then there is no need to analyze whether the appellee's summary judgment proof satisfied the rule 166a(c) burden.[15]

**Analysis**

In Lippoldt's first issue, he asserts that the evidence demonstrates a genuine issue of material fact regarding whether the level of control Quillian, as landlord, maintained over the portion of the premises on which he, an invitee, sustained serious physical injuries gave rise to a duty owed him by Quillian. In his second issue, Lippoldt argues that the evidence demonstrates a genuine issue of material fact regarding whether Quillian as landlord breached the duties of ordinary care owed him, an invitee who suffered serious physical injuries as a result of the condition of the common area of the leased property. In both issues, Lippoldt presupposes that he was injured by a condition of the property.

In her primary response, Quillian argues, as she did in her reply to Lippoldt's response to summary judgment and in the summary judgment hearing, that Gibson's use, condition, and storage of purportedly defective car jacks did not give rise to a premises liability claim against her because the jacks were not a condition of the premises. We agree.

When a person is injured on another's property, the injured person may have either a negligent activity claim or a premises liability claim against the property owner.[16] They are independent theories of recovery.[17] The Supreme Court of Texas and this court have recognized that a claim based on "negligent activity encompasses a malfeasance theory based on affirmative, contemporaneous conduct by the owner that caused the injury, while [a] premises liability [claim] encompasses a nonfeasance theory based on the owner's failure to take measures to make the property safe."[18] Whether a specific case involves a negligent activity or a premises defect is an issue of law.[19]

In *Williams*, the plaintiff fell and landed on his back on one of many drill pipe thread protectors left lying on the ground, and the court concluded that the case involved a premises defect, not a negligent activity.[20] In *Sampson*, the plaintiff tripped on an extension cord lying across a "pedestrian walkway."[21] The supreme court held that the claim was a premises defect claim and focused on the fact that the cord was not being put "into action or service *at the time* of the injury."[22] Instead, the static cord hanging over the concrete with a gap between the cord and the ground created a tripping hazard, a dangerous condition, on the campus.[23] On the other hand, when a dirt hauler moved dirt with his tractor while people were working in a construction area, and the tractor's box blade crushed a worker's finger, that injury was caused by a negligent activity, not a condition of the premises.[24]

**\*5** Lippoldt did not fall on or trip over Gibson's jacks. Instead, according to his own amended petition, the jacks were being used when they gave way, and the SUV fell on him. Thus, we conclude as a matter of law that this is a

2016 WL 7405811

negligent activity case, not a premises liability case.[25] On appeal, Lippoldt does not challenge the summary judgment on his negligent activity claim or any other claim other than his premises liability claim. We therefore hold that the trial court correctly granted summary judgment for Quillian on the grounds that there was no evidence that she (or the Trust) owed or breached any duty to support a premises liability claim. Accordingly, we overrule Lippoldt's two issues.

**Conclusion**

Having overruled Lippoldt's two issues, we affirm the trial court's judgment.

**All Citations**

Not Reported in S.W. Rptr., 2016 WL 7405811

Footnotes

1       *See* Tex. R. App. P. 47.4.

2       Lippoldt claimed invitee status in his response to Quillian's motion for summary judgment and also does so in his brief on appeal.

3       Tex. R. Civ. P. 166a(i).

4       *Id.*; *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 310 (Tex. 2009).

5       *See* Tex. R. Civ. P. 166a(i) & cmt.; *Hamilton v. Wilson*, 249 S.W.3d 425, 426 (Tex. 2008).

6       *Sudan v. Sudan*, 199 S.W.3d 291, 292 (Tex. 2006).

7       *Hamilton*, 249 S.W.3d at 426 (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005)).

8       *Timpte Indus.*, 286 S.W.3d at 310 (quoting *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006)).

9       *Smith v. O'Donnell*, 288 S.W.3d 417, 424 (Tex. 2009); *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003), *cert. denied*, 541 U.S. 1030 (2004).

10      *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010).

11      *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009).

12      *20801, Inc. v. Parker*, 249 S.W.3d 392, 399 (Tex. 2008).

13      *Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494, 508 (Tex. 2010), *cert. denied*, 562 U.S. 1180 (2011); *see* Tex. R. Civ. P. 166a(b), (c).

14      *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004).

15      *Id.*

16      *Occidental Chem. Corp. v. Jenkins*, 478 S.W.3d 640, 644 (Tex. 2016); *see Keetch v. Kroger Co.*, 845 S.W.2d 262, 264 (Tex. 1992)

2019 WL 387367
Only the Westlaw citation is currently available.
United States District Court, N.D. Texas, Fort Worth
Division.

Hugo LOVO, et al.
v.
EXPRESS COURIER INTERNATIONAL, INC., et
al.

ACTION NO. 4:16-CV-853-Y
|
Signed 01/30/2019

**Attorneys and Law Firms**

Allen Ryan Vaught, Melinda Arbuckle, Baron & Budd
PC, Farsheed Fozouni, Thompson Coe, Roger D.
Marshall, Marshall Law Firm, Dallas, TX, for Hugo
Lovo, Bashar Masoud, Mark Urbina, Luis Castellanos,
Kaima C. Wilder, Suraj Bajracharya, Khalid Alfheed,
Tariq Alfheed, Corey Tatum, Glennis Davis, Robert
Woodrow, Sanjiv Prajapati, Khaled Bira.

Emily A. Quillen, Elizabeth M. Beck, Scopelitis Garvin
Light Hanson & Feary PC, Fort Worth, TX, Adam Carl
Smedstad, Pro Hac Vice, Andrew Joseph Butcher, Pro
Hac Vice, Scopelitis Garvin Light Hanson & Feary,
Chicago, IL, for Express Courier International, Inc., EMP
LSO Holding Corporation.

ORDER PARTIALLY GRANTING CROSS-MOTIONS
FOR SUMMARY JUDGMENT

TERRY R. MEANS, UNITED STATES DISTRICT
JUDGE

**\*1** Pending before the Court is Defendants' Motion for
Summary Judgment (doc. 74). Also pending before the
Court is Plaintiffs' Motion for Partial Summary Judgment
(doc. 81). After consideration of the motions, the related
briefs, and the applicable law, the Court concludes that
the motions should be and hereby are PARTIALLY
GRANTED.

I. Factual Background

Defendant Express Courier International, Inc.
("Express"), is a third-party logistics company that assists
businesses in delivering their products to the end
consumer. Express provides its business customers with
warehouse services for the storage of freight and
facilitates the "last mile" of delivery of their products to
consumers. These last-mile deliveries are generally over
short distances in congested urban areas.

Express does not own or operate delivery vehicles but
instead facilitates these deliveries by hiring drivers as
independent contractors. The drivers provide their own
vehicles to complete these deliveries and are paid on a
piece-rate basis, agreeing to accept a certain rate of pay
per package delivered for Express. During the period in
question, the bulk of Express's services out of the Fort
Worth branch consisted of Amazon Prime deliveries in
the Dallas/Fort Worth area.

Plaintiffs are a group of Express's former drivers who
contend that Express violated the Fair Labor Standards
Act ("FLSA"), 29 U.S.C. § 201, et seq., regarding their
work. Specifically, the drivers contend that, despite the
fact that they signed independent-contractor agreements
with Express, they were actually employees under the
FLSA and should have been paid a minimum wage and
overtime for making deliveries for Express. Certain of the
plaintiffs also contend that Express retaliated against them
in violation of the FLSA. Both parties have filed motions
for summary judgment.

II. Summary-Judgment Standard

When the record establishes "that there is no genuine
dispute as to any material fact and the movant is entitled
to judgment as a matter of law," summary judgment is
appropriate. Fed. R. Civ. P. 56(a). "[A dispute] is
'genuine' if it is real and substantial, as opposed to merely
formal, pretended, or a sham." Bazan v. Hidalgo Cnty.,
246 F.3d 481, 489 (5th Cir. 2001) (citation omitted). A
fact is "material" if it "might affect the outcome of the
suit under governing law." Anderson v. Liberty Lobby,

**Appendix M**

**036**

Lovo v. Express Courier International, Inc., Not Reported in Fed. Supp. (2019)

2019 WL 387367

*Inc.*, 477 U.S. 242, 248 (1986).

To demonstrate that a particular fact cannot be genuinely in dispute, a defendant movant must (a) cite to particular parts of materials in the record (e.g., affidavits, depositions, etc.), or (b) show either that (1) the plaintiff cannot produce admissible evidence to support that particular fact, or (2) if the plaintiff has cited any materials in response, show that those materials do not establish the presence of a genuine dispute as to that fact. Fed. R. Civ. P. 56(c)(1). Similarly, a plaintiff movant must (a) cite to particular parts of materials in the record (e.g., affidavits, depositions, etc.), and (b) if the defendant has cited any materials in response, show that those materials do not establish the presence of a genuine dispute as to that fact. Fed. R. Civ. P. 56(c)(1). Although the Court is **required** to consider only the cited materials, it **may** consider other materials in the record. *See* Fed. R. Civ. P. 56(c)(3). Nevertheless, Rule 56 "does not impose on the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir.), *cert. denied*, 506 U.S. 825 (1992). Instead, parties should "identify specific evidence in the record, and ... articulate the 'precise manner' in which that evidence support[s] their claim." *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994).

*2 In evaluating whether summary judgment is appropriate, the Court "views the evidence in the light most favorable to the nonmovant, drawing all reasonable inferences in the nonmovant's favor." *Sanders-Burns v. City of Plano*, 594 F.3d 366, 380 (5th Cir. 2010) (citation omitted) (internal quotation marks omitted). "After the non-movant has been given the opportunity to raise a genuine factual [dispute], if no reasonable juror could find for the non-movant, summary judgment will be granted." *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 424 (5th Cir. 2000) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ).

## III. Analysis

### A. Independent Contractor or Employee?

Under the FLSA, the plaintiff has the burden to demonstrate an employer/employee relationship. *See Eberline v. Media Net, L.L.C.*, 636 F. App'x 225, 226-27 (5th Cir. 2016). Whether a worker is an employee or an independent contractor is a mixed question of law and fact. *See Robicheaux v. Radcliff Material, Inc.*, 697 F.2d 662, 666 (5th Cir. 1983). But "the determination of whether a particular factual setting gives rise to coverage under the FLSA is a matter of law." *Donovan v. Brandel*, 736 F.2d 1114, 1116 (6th Cir. 1984); *see also Wherley v. Schellsmidt*, No. 3:12-CV-0242-D, 2013 WL 5744335, *3 (N.D. Tex. Oct. 23, 2013) (Fitzwater, J.) ("The ultimate determination of whether an individual is an employee under the FLSA is a legal, and not factual, finding."). Here, the parties largely agree as to the facts regarding the employee/independent-contractor analysis but disagree as to the conclusion to be reached from those facts.

The FLSA defines an "[e]mployee" as "any individual employed by an employer." 29 U.S.C. § 203(e)(1)(West 2018). "Employer includes any person acting directly or indirectly in the interest of an employer in relation to an employee." *Id.* § 203(d). And "[e]mploy" means "to suffer or permit to work." *Id.* § 203(g). As a result, "[t]he definition of employee under the FLSA is particularly broad." *Hopkins v. Cornerstone Am.*, 545 F.3d 338, 343 (5th Cir. 2008); *see also Robicheaux*, 697 F.2d at 665 (Under the FLSA, "[t]he term 'employee' is thus used 'in the broadest sense ever ... included in any act.' ") (quoting *Donovan v. Am. Airlines, Inc.*, 686 F.2d 267, 271 (5th Cir. 1982) ); *cf. Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992) (noting that the FLSA's definition of "employ" "stretches the meaning of 'employee' to cover some parties who might not qualify as such under a strict application of traditional agency law principles"); *Brandel*, 736 F.2d at 1116 ("In interpreting [the FLSA] the courts have construed the Act's definitions liberally to effectuate the broad policies and intentions of Congress").

In deciding whether a worker qualifies as an employee or is instead an independent contractor, "common law concepts of 'employee' and 'independent contractor' have been specifically rejected by the courts." *Robicheaux*, 697 F.2d at 666. And the fact that workers "signed contracts stating that they were independent contractors, while relevant, is not dispositive." *Id.* at 667; *accord Carrell v. Sunland Constr., Inc.*, 998 F.2d 330, 334 n.4 (5th Cir. 1993); *see also Robicheaux*, 697 F.2d at 667 ("An employee is not permitted to waive employee status."). Instead, courts "focus on whether, as a matter of economic reality, the worker is economically dependent upon the alleged employer or is instead in business for himself." *Hopkins*, 545 F.3d at 343; *see also Herman v. Express Sixty-Minutes Delivery Serv., Inc.*, 161 F.3d 299, 303 (5th Cir. 1998) ("In other words, our task is to determine whether the individual is, as a matter of economic reality, in business for himself or herself.").

2017 WL 999259

2017 WL 999259
Only the Westlaw citation is currently available.
United States District Court, S.D. Texas, Houston
Division.

Lynn LOWERY, Plaintiff,
v.
WAL-MART STORES TEXAS, LLC , et al.,
Defendants.

CASE NO. 4:17-cv-0166
|
Signed 03/15/2017

**Attorneys and Law Firms**

Roy Dayton Brantley, West Webb Albritton & Gentry
P.C., College Station, TX, for Plaintiff.

John A. Ramirez, Bush Ramirez, LLC, Houston, TX, for
Defendants.

**MEMORANDUM AND ORDER**

NANCY F. ATLAS, SENIOR UNITED STATES
DISTRICT JUDGE

**\*1** On January 19, 2017, Defendants Wal-Mart Stores
Texas, LLC,[1] ("Wal-mart") and Ruben Lopez
(collectively, "Defendants") removed this case from the
506th Judicial District of Grimes County, Texas, where it
was filed under Cause No. 33947. Pending before the
Court is Plaintiff Lynn Lowery's Motion to Remand
("Motion") [Doc. # 6]. Defendants have filed a Response.
[Doc. # 7]. Plaintiff has neither filed a reply nor requested
additional time to do so. After considering the parties'
briefing, all matters of record, and the applicable legal
authorities, the Court **denies** Lowery's Motion.

**I. FACTUAL AND PROCEDURAL BACKGROUND**

Lowery, a resident of Texas,[2] brings this action against
Defendants to seek compensation for injuries she
allegedly suffered in the Wal-Mart parking lot on or about

December 24, 2014.[3] Lowery's state court Original
Petition and Request for Disclosure ("Petition") [Doc. #
1-2] alleges that after Lowery purchased certain items in
the Wal-Mart store in Navasota, Texas, she carried her
merchandise to her car, which she had earlier properly
parked in a handicapped parking spot.[4] Lowery opened
the trunk of her car, stepping back as she did so to allow
the door space to lift.[5] Lowery's foot caught in a hole that
pocked the handicapped parking spot.[6] She fell backward,
bracing herself with her right hand as she landed on the
right side of her body.[7] Medical practitioners at St. Joseph
Grimes County Health Center, where Lowery sought care
immediately following her fall, informed her she had
fractured her wrist and back.[8]

**\*2** Lowery initiated this action in state court on December
9, 2016, bringing claims against Wal-Mart[9] and Lopez,
the store manager at the time of Lowery's fall, under
theories of respondeat superior liability, premises liability
negligence and gross negligence.[10] Lowery seeks damages
potentially in excess of $100,000 for past and future
physical pain and suffering, past and future medical
expenses, past and future physical impairment, past and
future physical disfigurement, emotional distress, "loss of
the ability to enjoy life," and punitive and/or exemplary
damages.[11]

On January 19, 2017, Defendants removed the action on
the grounds that this court has diversity jurisdiction under
28 U.S.C. § 1332.[12] Defendants assert that Lopez, the only
non-diverse Defendant, was improperly joined.[13]
Lowery's Motion to Remand [Doc. # 6] followed.

**II. LEGAL STANDARD FOR REMOVAL**

"Federal courts are courts of limited jurisdiction." *Gunn v.
Minton*, —— U.S. ——, 133 S. Ct. 1059, 1064 (2013)
(quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511
U.S. 375, 377 (1994)); *Hotze v. Burwell*, 784 F.3d 984,
999 (5th Cir. 2015); *Scarlott v. Nissan N. Am., Inc.*, 771
F.3d 883, 887 (5th Cir. 2014). "They possess only that
power authorized by Constitution and statute, which is not
to be expanded by judicial decree." *Gunn*, 133 S. Ct. at
1064 (quoting *Kokkonen*, 511 U.S. at 377). Any state
court civil action over which the federal courts would
have original jurisdiction may be removed by the
defendant to federal court. *See* 28 U.S.C. § 1441(a);
*Barker v. Hercules Offshore, Inc.*, 713 F.3d 208, 228 (5th
Cir. 2013).

District courts have both federal question jurisdiction and
diversity jurisdiction. Federal question jurisdiction exists

Appendix N

038

2017 WL 999259

over "all civil actions arising under the Constitution, laws, or treaties of the United States." *28 U.S.C. § 1331*. A district court also has diversity jurisdiction over "civil actions where the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and is between citizens of different States." *28 U.S.C. § 1332(a)(1)*.[14] Diversity jurisdiction requires *complete* diversity—that is, the citizenship of each plaintiff must be diverse from the citizenship of each defendant. *See, e.g., Int'l Energy Ventures Mgmt., L.L.C. v. United Energy Group, Ltd., 818 F.3d 193, 200 (5th Cir. 2016)*.

The removing party bears the burden of establishing both the existence of federal subject-matter jurisdiction and that removal is otherwise proper. *Vantage Drilling Co. v. Hsin-Chi Su, 741 F.3d 535, 537 (5th Cir. 2014)*.

### III. DISCUSSION

#### A. Improper Joinder Standards

"A defendant is improperly joined if the moving party establishes that (1) the plaintiff *has* stated a claim against a diverse defendant that he fraudulently alleges is nondiverse, or (2) the plaintiff *has not* stated a claim against a defendant that he properly alleges is nondiverse." *Int'l Energy Ventures Mgmt., 818 F.3d at 199* (emphasis in original) (citing *Smallwood v. Ill. Cent. R.R. Co., 385 F.3d 568, 573 (5th Cir. 2004)* (en banc), *cert. denied, 544 U.S. 992 (2005))*; *Mumfrey v. CVS Pharm. Inc., 719 F.3d 392, 401 (5th Cir. 2013)*; *Kling Realty Co. v. Chevron USA, Inc., 575 F.3d 513 (5th Cir. 2009)* (citing *Campbell v. Stone Ins., Inc., 509 F.3d 665, 669 (5th Cir. 2007))*. The Fifth Circuit repeatedly has explained that a defendant seeking to defeat a motion to remand on the basis of improper joinder must demonstrate "that there is no possibility of recovery by the plaintiff against an in-state defendant, which stated differently means that there is no reasonable basis for the district court to predict that the plaintiff might be able to recover against an in-state defendant." *Smallwood, 385 F.3d at 573*.

**\*3** The party asserting improper joinder bears a heavy burden of persuasion. *See, e.g., Kling Realty, 575 F.3d at 514*. "[A]ny doubt about the propriety of removal must be resolved in favor of remand." *Gasch v. Hartford Acc. & Indem. Co., 491 F.3d 278, 281–82 (5th Cir. 2007)*. "In this inquiry the motive or purpose of the joinder of in-state defendants is not relevant." *Smallwood, 385 F.3d. at 574*. "Any contested issues of fact and any ambiguities of state law must be resolved in [the plaintiff's] favor."

*Travis v. Irby, 326 F.3d 644, 649 (5th Cir. 2003)* (citing *Griggs v. State Farm Lloyds, 181 F.3d 694, 699 (5th Cir. 1999), abrogated in part on other grounds by Smallwood, 385 F.3d at 573); accord B., Inc. v. Miller Brewing Co., 663 F.2d 545, 549 (5th Cir. 1981)*.

To determine whether an in-state defendant has been improperly joined, the Court usually "conduct[s] a Rule 12(b)(6)-type analysis, looking initially at the allegations of the complaint to determine whether the complaint states a claim under state law against the in-state defendant." *Smallwood, 385 F.3d at 573*. District courts apply the substantive law of the forum state to determine the merits of a claim over which they properly have diversity jurisdiction. *See Hughes v. Tobacco Institute, Inc., 278 F.3d 417, 420-21 (5th Cir. 2001)* (citing *Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938))*. The Fifth Circuit recently held, however, that federal pleading standards, rather than state standards, govern federal courts' determinations regarding improper joinder. *Int'l Energy Ventures, 818 F.3d at 202*. Accordingly, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Gines v. D.R. Horton, Inc., 699 F.3d 812, 816 (5th Cir. 2012)* (quoting *Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007))*. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal, 556 U.S. 662 (2009)*. "Factual allegations must be enough to raise a right to relief above the speculative level ... on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly, 550 U.S. at 555*.

#### B. Analysis

##### 1. Legal Standards for Premises Liability and Gross Negligence Claims

Lowery asserted premises liability negligence and gross negligence claims against all Defendants.[15] Defendants argue that Lowery's claims fail with respect to Lopez, the non-diverse Defendant, because Lowery has not alleged that Lopez owed her a duty apart from that which Wal-Mart owed any store patron.[16] Lowery contends that her state court pleadings present sufficient allegations with respect to Lopez for purposes of joinder. Lowery also requests, as an alternative to a denial of remand, that

she be permitted to conduct discovery to obtain evidence in support of remand.[17]

Premises liability, a species of negligence, requires a plaintiff show existence of a duty, breach of that duty, and damages suffered by the plaintiff that were proximately caused by the breach. See *W. Invs., Inc. v. Urena*, 162 S.W.3d 547, 550 (Tex. 2005).[18] The scope of the duty under a premises liability theory turns on the status of the plaintiff at the time of the incident. *Id.* In Texas, a property owner or occupier owes invitees a duty to use ordinary care to reduce or to eliminate an unreasonable risk of harm created by a premises condition that it knew or should have known about. *See id.*

**\*4** "To recover for gross negligence in Texas, a plaintiff must satisfy the elements of an ordinary negligence or premises liability claim *and* demonstrate clear and convincing evidence of 'an act or omission involving subjective awareness of an extreme degree of risk, indicating conscious indifference to the rights, safety, or welfare of others.' " *Austin v. Kroger Texas L.P.*, 746 F.3d 191, 196 n.2 (5th Cir. 2014) (emphasis in original) (quoting *State v. Shumake*, 199 S.W.3d 279, 286 (Tex. 2006)). "Extreme risk [ ] 'is not a remote possibility of injury or even a high probability of minor harm, but rather the likelihood of serious injury to the plaintiff.' " *Id.* (quoting *Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917, 921 (Tex. 1998)).

In Texas, an individual acting as an officer, agent, or employee of a company can only be held individually liable for negligence when the individual owes an independent duty of reasonable care to the injured party apart from the employer's duty. *Tri v. J.T.T.*, 162 S.W.3d 552, 562 (Tex. 2005) (citing *Leitch v. Hornsby*, 935 S.W.2d 114, 117 (Tex. 1996)). This principle was explained by the Texas Supreme Court in 1996 in *Leitch*. There, an employee brought negligence claims against his company and two of the company's corporate officers for injuries the employee sustained on the job when he was unloading equipment. *Leitch*, 935 S.W.2d at 116. The Court held that the officers' actions or inactions arose within their capacities as officers, that the officers did not owe the employee an individual duty to provide a safe work place, and that the court of appeals erred in affirming their individual liability. *Id.* at 118.

In 1998, the Fifth Circuit declined to extend *Leitch* beyond the employer-employee context in the unpublished opinion *Valdes v. Wal–Mart Stores, Inc.*, 158 F.3d 584 (5th Cir. 1998), noting that "*Leitch* was not a premises case and we cannot say with full confidence that it will be applied outside of the employer-employee

context." *Valdes*, 158 F.3d at \*5 n.6. In 2005, however, the Texas Supreme Court expanded *Leitch*'s application to premises cases in *Tri v. J.T.T. & M.T.*, 162 S.W.3d 552, 562 (Tex. 2005). *Tri* concerned two female plaintiffs who were raped by a monk while they were guests at a Buddhist temple in California. *Tri*, 162 S.W.3d at 554. The plaintiffs' lawsuit included causes of action against both the corporation that operated the Buddhist temple and an officer of the corporation. *Id.* The trial court declined to render judgment against the officer, even though the jury found that the officer and the corporation acted negligently. *Id.* at 555–56. Agreeing with the trial court's ruling, the Texas Supreme Court stated that

> a negligence finding against an individual does not automatically result in individual liability when the individual was acting as the agent or employee of a corporation. Corporations can, of course, only act through individuals. We explained in *Leitch v. Hornsby* when individual liability will be imposed and when it will not. Individual liability arises only when the officer or agent owes an independent duty of reasonable care to the injured party apart from the employer's duty.

*Id.* at 562(footnotes and internal quotations omitted).

### 2. Application to Lopez

Lowery's Petition [Doc. # 1-2] does not allege any facts against Lopez in his individual capacity. Instead, it alleges generally that "Defendants" failed to warn Lowery adequately of the hole in the parking lot, failed to make the condition reasonably safe, and that such actions also constituted gross negligence and malice.[19] Indeed, the Petition specifies that "[w]henever this Petition alleges that Defendants did any act or thing, the Petition means that the Defendants' officers, agents, servants, employees, or representatives did such an act or thing and ... it was done with the full authorization or ratification of the Defendants, or was done in the normal and routine course and employment of the Defendants' officers, agents,

Lowery v. Wal-Mart Stores Texas, LLC, Not Reported in Fed. Supp. (2017)

2017 WL 999259

16    *See* Notice of Removal [Doc. # 1], at 10-11 ¶ 31, 11 ¶ 32; Defendants, Wal-Mart Stores Texas, LLC, and Ruben Lopez's Response to Plaintiff's Motion to Remand ("Response") [Doc. # 7], at 1-2 ¶ 1, 6-7 ¶ 12.

17    Motion [Doc. # 6], at 8 ¶ 23.

18    Premises liability and active negligence liability differ with respect to scope of duty and causation. *See Del Lago Partners, Inc.*, 307 S.W.3d 762, 776 (Tex. 2010); *W. Invs., Inc. v. Urena*, 162 S.W.3d 547, 550 (Tex. 2005). The scope of the duty under a premises liability theory turns on the status of the plaintiff at the time of the incident. *W. Invs., Inc.*, 162 S.W.3d at 550 (Tex. 2005). Whereas negligent activity "encompasses a malfeasance theory based on affirmative, contemporaneous conduct" that caused the injury, premises liability "encompasses a nonfeasance theory based on the ... failure to take measures to make the property safe." *Del Lago Partners, Inc.*, 307 S.W.3d at 776 (citing *Timberwalk Apartments, Partners, Inc. v. Cain*, 972 S.W.2d 749, 753 (Tex. 1998)).

19    *See* Petition [Doc. # 1-2], at 6 ¶¶ 19-21.

20    Petition [Doc. # 1-2], at 5 ¶ 17.

21    *See* Motion [Doc. # 6], at 7-8.

22    *Id.* at 7 ¶ 18. Lowery provides the following examples of issues she argues are relevant to the question of improper joinder:
      ... [W]hat did Ruben Lopez know about this aged handicap parking hole? Had [Lopez] observed this defect in his individual capacity or in his managerial capacity? Had this defect in the handicap parking spot been there long? Had there been any reports to [Lopez]? Did [Lopez] act within or outside the scope of his employment with respect to any complaints, knowledge, or reporting regarding this defect? What action was he required to take as a manager with respect to such handicap parking spot defects? What training did [Lopez] have regarding handicap parking spots? What training was [Lopez] required to take as a manager of Walmart for safety and did not take?
      *Id.* at 7-8 ¶¶ 20-21.

---

2019 WL 4087376
Only the Westlaw citation is currently available.
United States District Court, W.D. Texas, Austin
Division.

Winne MANNA, Plaintiff,
v.
ROSS DRESS FOR LESS, INC., Defendant.

1:18-CV-489-RP
|
Signed 07/12/2019

**Attorneys and Law Firms**

Robert L. Ranco, DC Law, PLLC, Scott Patrick Ogle,
Law Office of Scott P. Ogle, Christopher T. Morrow,
Michael S. Tucker, Pro Hac Vice, Komie and Morrow,
LLP, Austin, TX, for Plaintiff.

Mark D. Hardy, Jr., Fernando P. Arias, Fletcher, Farley,
Shipman & Salinas, L.L.P., Dallas, TX, for Defendant.

### ORDER

ROBERT PITMAN, UNITED STATES DISTRICT
JUDGE

**\*1** Before the Court is Defendant Ross Dress for Less,
Inc.'s ("Ross") Motion for Summary Judgment. (Dkt. 18).
Plaintiff Winne Manna ("Manna") has not responded to
the motion in over three months. Although her failure to
timely respond to the dispositive motion renders it
unopposed,[1] summary judgment is not automatic, and the
Court must determine whether Ross is entitled to
judgment as a matter of law. *See, e.g., Johnson v.
Pettiford*, 442 F.3d 917, 918 (5th Cir. 2006); Fed. R. Civ.
P. 56(a). Having considered Ross's motion, the record,
and the relevant law, the Court finds that the motion
should be granted.

## I. BACKGROUND

This is a personal injury action. Manna was shopping in
an Austin Ross store when she slipped on a rolling vase
holder and fell. (Orig. Pet., Dkt. 1-3, at 8–12).[2] Manna
asserts a cause of action against Ross for negligence. (*Id.*
at 9–10). Ross now seeks summary judgment on that
claim, whether it be construed as a claim for negligent
conduct or premises liability. (Mot., Dkt. 18).

## II. LEGAL STANDARDS

Summary judgment is appropriate under Rule 56 of the
Federal Rules of Civil Procedure only "if the movant
shows that there is no genuine dispute as to any material
fact and the movant is entitled to judgment as a matter of
law." Fed. R. Civ. P. 56(a). A dispute is genuine only if
the evidence is such that a reasonable jury could return a
verdict for the nonmoving party. *Anderson v. Liberty
Lobby, Inc.*, 477 U.S. 242, 254 (1986). "A fact issue is
'material' if its resolution could affect the outcome of the
action." *Poole v. City of Shreveport*, 691 F.3d 624, 627
(5th Cir. 2012).

If the burden at trial rests on the nonmovant, the movant
must merely demonstrate an absence of evidentiary
support in the record for the nonmovant's case. *Celotex
Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the
movant does so, the burden shifts to the nonmoving party
to establish the existence of a genuine issue for trial.
*Austin v. Kroger Texas, L.P.*, 864 F.3d 326, 335 (5th Cir.
2017). After the nonmovant has been given the
opportunity to raise a genuine factual issue, if no
reasonable juror could find for the nonmovant, summary
judgment will be granted. *Miss. River Basin Alliance v.
Westphal*, 230 F.3d 170, 175 (5th Cir. 2000). The
nonmovant must "identify specific evidence in the record
and articulate the manner in which that evidence supports
that party's claim." *Johnson v. Deep E. Tex. Reg'l
Narcotics Trafficking Task Force*, 379 F.3d 293, 301 (5th
Cir. 2004) (citation omitted).

In responding to a motion for summary judgment, the
nonmoving party cannot rest on the mere allegations of its
pleadings. *Duffie v. United States*, 600 F.3d 362, 371 (5th
Cir. 2010); *see also Larry v. White*, 929 F.2d 206, 211

Appendix O

042

2019 WL 4087376

n.12 (5th Cir. 1991) ("Unsworn pleadings, memoranda, or the like are not, of course, competent summary judgment evidence."). Manna did not respond to Ross's motion for summary judgment. Despite her failure to respond, however, the Court may not automatically grant summary judgment without assuring that no material fact issues exist. Fed. R. Civ. P. 56(e) advisory committee's note; *Eversley v. MBank of Dallas*, 843 F.2d 172, 174 (5th Cir. 1988). If the moving party fails to meet its initial burden, the court must deny the motion for summary judgment even if there is no response. *Baton Rouge Oil & Chem. Workers Union v. ExxonMobil Corp.*, 289 F.3d 373, 375 (5th Cir. 2002). However, when no response is filed to a motion for summary judgment, the Court may take the movant's uncontroverted factual assertions as true. *Eversley*, 843 F.2d at 174.

### III. DISCUSSION

**\*2** When a party fails to address another's fact assertions, the Court consider the movant's facts undisputed for purposes of resolving the motion and may grant the motion if it and supporting materials show that the movant is entitled to relief. Fed. R. Civ. P. 56(e)(2), (3).

Ross is a department store that sells clothing and home goods. (*See* Mot., Dkt. 18, at 6–7). In May 2016, Manna was walking toward the back of the store to look for a shower organizer when she stepped on a "rolling vase holder" and fell. (*Id.* at 7). Manna does not know how long the vase holder was on the ground before she stepped on it. (Manna Dep., Dkt. 18-1, at 9).[3]

The threshold issue is whether Manna's negligence claim is based on negligent conduct or premises liability. (Mot., Dkt. 18, at 9–11). "Negligent-activity and premises liability claims 'involve closely related but distinct duty analyses.' " *United Scaffolding, Inc. v. Levine*, 537 S.W.3d 463, 471 (Tex. 2017), *reh'g denied* (Jan. 26, 2018) (quoting *W. Invs., Inc. v. Urena*, 162 S.W.3d 547, 550 (Tex. 2005)). A person injured on another's property may have either claim against the property owner. *Occidental Chem. Corp. v. Jenkins*, 478 S.W.3d 640, 644 (Tex. 2016). "When the injury is the result of a contemporaneous, negligent activity on the property, ordinary negligence principles apply. When the injury is the result of the property's condition rather than an activity, premises-liability principles apply." *Id.* Put another way, negligent activity "encompasses a malfeasance theory based on affirmative,

contemporaneous conduct" by the property owner, while premises liability "encompasses a nonfeasance theory based on the owner's failure to take measures to make the property safe." *United Scaffolding*, 537 S.W.3d at 471 (quoting *Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 776 (Tex. 2010)).

Manna alleges that Ross failed to exercise ordinary care by failing to: (a) keep its premises reasonably safe; (b) inspect the store for hazardous conditions; and (c) ensure that its employees corrected dangerous conditions through proper supervision, training, or recruitment. (Orig. Pet., Dkt. 1-3, at 10). None of these theories is based on affirmative, contemporaneous conduct. *United Scaffolding*, 537 S.W.3d at 471. Rather, they are nonfeasance theories based on Ross's failure to take measures to make its store safe. *Id.* Manna's negligence claim is therefore based on premises liability, not negligent conduct.

Ross and Manna agree that she was an invitee. (Orig. Pet., Dkt. 1-3, at 9; Mot., Dkt. 18, at 11). Accordingly, Ross owed Manna a duty "to make safe or warn against any concealed, unreasonably dangerous conditions" of which Ross was or reasonably should have been aware, but Manna was not. *Austin v. Kroger Texas, L.P.*, 465 S.W.3d 193, 203 (Tex. 2015). Consistent with that duty, Manna must prove that Ross had "actual or constructive knowledge" of the hazardous condition—here, the loose rolling vase holder—in order to recover on her premises-liability claim. *Keetch v. Kroger Co.*, 845 S.W.2d 262, 264 (Tex. 1992). Manna might prove such knowledge in several ways; she could show that: (1) Ross "put the [vase holder] on the floor;" (2) Ross "knew that it was on the floor and negligently failed to remove it;" or (3) the vase holder "was on the floor so long that it should have been discovered and removed in the exercise of ordinary care." *Id.* at 265; *see also Threlkeld v. Total Petroleum, Inc.*, 211 F.3d 887, 892 (5th Cir. 2000) (citing *Keetch*, 845 S.W.2d at 264).

**\*3** Ross argues that there is no evidence that it actually or constructively knew that the vase holder was on the floor when Manna stepped on it. (Mot., Dkt. 18, at 16). There is no evidence that a Ross employee put the vase holder on the floor or knew that it was there and negligently failed to remove it. Likewise, there is no evidence of how long it was on the floor; Manna admits that she does not know. (Manna Dep., Dkt. 18-1, at 9). Given the complete absence of evidence from which a factfinder could reasonably conclude that Ross had actual or constructive knowledge of the dangerous condition, Ross is entitled to judgment as a matter of law. *Threlkeld*, 211 F.3d at 894. The Court will grant its motion for summary judgment.

2011 WL 1233584
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR DESIGNATION
AND SIGNING OF OPINIONS.

**MEMORANDUM OPINION**
Court of Appeals of Texas,
Houston (1st Dist.).

Olga MATA, Individually as Representative of the
Estate of Elpidio Mata and a/n/f of Rocio Mata,
Ruby Mata, Rudy Mata, and Paloma C. Mata,
Minor Children, and Raquel Mata Aquilar,
Rosemary Mata, and Rossy Campa, Appellants
v.
ENERGY ABSORPTION SYSTEMS, LLC a/k/a
Energy Absorption Systems, Inc., Quixote
Transportation Safety, Inc., Keller Krash
Kushions, Inc. d/b/a Contractors Barricade
Service, Williams Brothers Construction Co., and
Odum Services Of Houston, Appellees.

No. 01–09–01097–CV.
|
March 31, 2011.

On Appeal from the 412nd District Court, Brazoria
County, Texas, Trial Court Cause No. 38047.

**Attorneys and Law Firms**

Ray R. Marchan, for Olga Mata, et al.

Lansford Ireson, Charles W. Lyman, David W. Burns,
William Richards Moye, John B. Wallace, for Energy
Absorption Systems, LLC and Williams Brothers
Construction Co.

Panel consists of Chief Justice RADACK and Justices
ALCALA and BLAND.

**MEMORANDUM OPINION**

ELSA ALCALA, Justice.

**\*1** This appeal concerns a highway collision between a
tractor-trailer and a crash cushion. Appellants, Olga Mata,
individually as representative of the estate of Elpidio
Mata and as next friend of Rocio Mata, Ruby Mata, Rudy
Mata, and Paloma C. Mata, minor children, and Raquel
Mata Aquilar, Rosemary Mata, and Rossy Campa
(collectively, "the Matas"), appeal summary judgments
granted in favor of appellees, Energy Absorption
Systems, LLC, also known as Energy Absorption
Systems, Inc. ("Energy Absorption"), Quixote
Transportation Safety, Inc. ("Quixote"), and Keller Krash
Kushions, Inc., doing business as Contractors Barricade
Service ("Keller Krash"), Williams Brothers Construction
Co. ("Williams Brothers"), and Odum Services of
Houston ("Odum Services"). In their first issue, the Matas
contend that the trial court erred by granting Energy
Absorption, Quixote, and Keller Krash's motion for
no-evidence summary judgment. In their second issue, the
Matas contend that the trial court erred by granting
Williams Brothers' motion for no-evidence summary
judgment and by granting Odum Services' motion for
traditional and no-evidence summary judgment.
Concluding that the trial court properly granted the
motions for no-evidence summary judgment, we affirm.

**Background**

In 2006, the Texas Department of Transportation
("TxDOT") contracted with Williams Brothers to
complete a highway construction project on US–59 in
Sugar Land, Texas. Under the terms of the contract,
Williams Brothers agreed to narrow the left lane of the
highway. This was to be accomplished by painting a new
centerline[1] to the right of the existing centerline;
afterward, the preexisting centerline was to be removed.
Williams Brothers also agreed to install a concrete barrier
with a crash cushion in front of it. The barrier and cushion
were to be placed to the left of the new centerline. The
contract terms specified that the crash cushion would be a
REACT 350 Narrow crash attenuation system.

Energy Absorption, which is a subsidiary of Quixote,[2]
manufactured the REACT 350 Narrow. The REACT 350
Narrow consists of a row of high-density plastic barrels
sitting in a metal frame, the front of which is bolted to the
ground. Along each side of the barrels run two or four
rows of metal cables, which are affixed to bolts on the
front of the frame. The main purpose of the cables is to
provide redirective capacity for side impacts.


Appendix P

044

**\*6** The Matas contend that Quixote, Energy Absorption, and Keller Krash are negligent by various acts and omissions relating to the design, testing, and reporting of the REACT 350 Narrow crash cushion. To prevail on a negligence cause of action, a plaintiff must establish that the defendant owed him a duty, the defendant breached that duty, and the breach proximately caused his damages. *W. Invs ., Inc. v. Urena,* 162 S.W.3d 547, 550 (Tex.2005). To establish proximate causation, a plaintiff must prove causation in fact and foreseeability. *Id.* at 551. To establish causation in fact, a plaintiff must prove that the breach was a substantial factor in bringing about his injuries and that without the breach, the harm would not have occurred. *Id.* To establish forseeability, a plaintiff must prove that a person of ordinary intelligence would have anticipated the danger caused by the breach. *Sw. Key Program, Inc. v. Gil–Perez,* 81 S.W.3d 269, 274 (Tex.2002). "If a defect is not a producing cause of an injury, it cannot constitute, as a matter of law, a proximate cause." *Ford Motor Co. v. Miles,* 141 S.W.3d 309, 318 (Tex.App.-Dallas 2004, pet. denied).

In their second amended petition, the Matas contend that Quixote, Energy Absorption, and Keller Krash were negligent:

> (1) in designing the REACT 350 Narrow crash cushion in various ways;
>
> (2) in testing the crash cushion;
>
> (3) by failing to test the crash cushion with heavy trucks;
>
> (4) by failing to inform the Matas of the risk of entanglement;
>
> (5) by failing to disclose the risk of entanglement;
>
> (6) in marketing the crash cushion;
>
> (7) by failing to adequately train and assist dealers as to the risk of entanglement;
>
> (8) by failing to meet or exceed internal corporate guidelines;
>
> (9) by failing to comply with standards of care applicable to the highway safety industry insofar as providing reasonable protection in an impact with the crash cushion.

In their motion for no-evidence summary judgment, Energy Absorption, Quixote, and Keller Krash contend there is no evidence of any negligence by them that caused Mata's injuries. In their summary judgment

response, the Matas do not address the claims enumerated above as (4) through (9). Because they have provided no evidence of negligence under those theories, the trial court properly rendered summary judgment on those claims. *See* Tex.R. Crv. P. 166a(i); *Mack Trucks,* 206 S.W.3d at 582; *Havner,* 953 S.W.2d at 711.

The Matas' claims based on the three remaining assertions, in numbers (1) through (3), for negligent design, negligent testing, and failing to test are premised upon the existence of a design defect. These claims fail because there is no evidence that a design defect was a producing cause of Mata's injuries. *See Miles,* 141 S.W.3d at 318 (finding no evidence of proximate cause in negligence claim based upon product defect where there is no evidence that defect was producing cause). Because the Matas fail to show proximate causation, the trial court properly rendered summary judgment in favor of Quixote, Energy Absorption, and Keller Krash. *See id.*

**\*7** We overrule the Matas' first issue.

### Summary Judgment in favor of Installers

In their second issue, the Matas contend that Williams Brothers and its subcontractor Odum Services were negligent based on their installation of the crash cushion and the premises condition of the construction site. Specifically, the Matas contend that the installers failed to remove the preexisting centerline and failed to install a yellow-and-black striped nosepiece warning sign. Claims for negligent-activity and premises liability are each forms of negligence, but they are independent theories of recovery. *W. Invs ., Inc.,* 162 S.W.3d at 550; *Clayton W. Williams, Jr., Inc. v. Olivo,* 952 S.W.2d 523, 529 (Tex.1997); *West v. SMG,* 318 S.W.3d 430, 438 (Tex.App.-Houston [1st Dist.] 2010, no pet.).

### A. Negligent Activity

Recovery on a negligent-activity theory requires that the person have been injured by or as a contemporaneous result of the activity itself rather than by a condition created by the activity. *Keetch v. Kroger Co.,* 845 S.W.2d 262, 264 (Tex.1992). Because the activities of which the Matas complain occurred during the installation of the crash cushion, which occurred a week before the accident,

the resulting injuries were not a contemporaneous result of the activity. Rather Mata's injuries were a result of the conditions created by the activity, namely the placement of the crash cushion on top of the preexisting centerline and the missing warning sign. Accordingly, the Matas' claims against the installers can arise only under a premises-liability theory. *See id.*

**B. Premises Liability**

To prevail on a premises liability claim, among other elements, a plaintiff must show the existence of a premises condition posing an unreasonable risk of harm. *LMB, Ltd. v. Moreno,* 201 S.W.3d 686, 688 (Tex.2006). "A condition presenting an unreasonable risk of harm is defined as one in which there is a sufficient probability of a harmful event occurring that a reasonably prudent person would have foreseen it or some similar event as likely to happen." *Seideneck v. Cal Bayreuther Assocs.,* 451 S.W.2d 752, 754 (Tex.1970).

Although they produced some evidence that the preexisting centerline could be confusing to a driver, the Matas failed to provide any evidence that the placement of the crash cushion or the presence of the two centerlines presented an unreasonable risk of harm. *See Lofton v. Marmaxx Operating Corp.,* No. 01–06–01109–CV, 2008 WL 525678, at *3 (Tex.App.-Houston [1st Dist.] Feb. 28, 2008, no pet.) (mem.op.). They provided no evidence that any other vehicles had collided with similarly placed crash cushions, that placement of a crash cushion on top of a preexisting centerline is unusual, or that the possibility of confusion presented an a prohibitive degree of danger. *See id.* The Matas' expert, Bosch, testified that the later placement of the crash cushion farther from the road rendered a collision "much less likely," but he provided no basis for this testimony. Bosch never visited the accident site, performed an accident reconstruction, or calculated Mata's speed or direction. *See LMB,* 201 S.W.3d at 688–89. His testimony is incompetent summary judgment evidence because he failed to address the underlying facts on which his conclusion was based. *See id.*

*8 The Matas also contend that the missing black-and-yellow striped warning sign on the front of the crash cushion was a premises condition posing an unreasonable risk of harm. In support of their allegation that the sign was missing before the accident, the Matas observe that the sign is missing in a police photo taken afterwards. Given the tremendous force involved in the intervening crash, however, this photo is no evidence concerning whether the sign was missing before the collision. *See Empire Gas & Fuel Co. v. Muegge,* 135 Tex. 520, 531, 143 S.W.2d 763, 769 (1940) (photos taken after accident used to prove conditions at time of accident must be supported by testimony that photos fairly and accurately represent condition at time of accident). The only evidence regarding the sign prior to the accident is from Marcus Odum, who testified that Odum Services installed the sign at the same time it installed the crash cushion. The Matas have failed to show that this alleged premises condition—the missing sign—existed at the time of the accident.

We conclude that the trial court properly granted Williams Brothers' and Odum Services' motions for no-evidence summary judgment because the Matas produced no evidence of a premises condition posing an unreasonable risk of harm. *See LMB,* 201 S.W .3d at 688.

**C. Matters Not Reached**

Having affirmed the trial court's grant of no-evidence summary judgment on the Matas' claims for relief, we do not reach the question of the applicability of the affirmative defense to those claims asserted in Odum Services' and Williams Borthers' motions for traditional summary judgment. *See* TEX. CIV. PRAC & REM.CODE ANN. § 97.002 (contractors not liable if construction is in compliance with TxDOT contract); *Grynberg v. Grey Wolf Drilling Co ., L.P.,* 296 S.W.3d 132, 136 (Tex.App.-Houston [14th Dist.] 2009, no pet.).

We overrule the Matas' second issue.

**Conclusion**

We affirm the no-evidence summary judgments rendered by the trial court.

**All Citations**

Not Reported in S.W.3d, 2011 WL 1233584

Molina v. HEB Grocery Company, L.P., Not Reported in S.W. Rptr. (2017)

2017 WL 4766655

2017 WL 4766655
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR DESIGNATION
AND SIGNING OF OPINIONS.

Court of Appeals of Texas, Austin.

Elizabeth MOLINA, Appellant
v.
HEB GROCERY COMPANY, L.P., Appellee

NO. 03–17–00343–CV
|
Filed: October 19, 2017

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 419TH JUDICIAL DISTRICT, NO. D–1–GN–16–001527, HONORABLE GISELA D. TRIANA, JUDGE PRESIDING**

**Attorneys and Law Firms**

Mr. Scott Braden, Mr. Christopher T. Morrow, Komie & Morrow, LLP, Josh C. Grimes, 7703 N. Lamar Blvd., Suite 410, Austin, TX 78752, for Appellant.

Ms. Ranelle Moore Meroney, Hawkins Parnell Thackston & Young, 1717 West 6th Street, Suite 250, Austin, TX 78703–4777, for Appellee.
Before Justices Puryear, Field, and Bourland

**MEMORANDUM OPINION**

David Puryear, Justice

**\*1** Appellant Elizabeth Molina was walking through a grocery store operated by appellee HEB Grocery Company, L.P., when she slipped on an unidentified liquid and fell, injuring her back. Molina sued for negligence and premises liability. HEB responded with a motion seeking traditional summary judgment, attaching as evidence excerpts from Molina's deposition, and a motion for no-evidence summary judgment, asserting that

4:45:00 p.m.

there was no evidence (1) that HEB had actual or constructive knowledge that the liquid was on the floor before Molina fell or (2) of how long the substance was on the floor before the incident. The trial court granted summary judgment for HEB without specifying the basis for its order. We affirm the trial court's order.

**Discussion**

We review a trial court's granting of summary judgment de novo, taking as true all evidence favorable to the nonmovant and indulging all reasonable inferences and resolving any doubts in the nonmovant's favor. *Cantey Hanger, LLP v. Byrd*, 467 S.W.3d 477, 481 (Tex. 2015). A plaintiff seeking damages in a slip-and-fall case must prove that (1) the owner/operator had actual or constructive knowledge of some condition on the premises; (2) that the condition posed an unreasonable risk of harm; (3) that the owner/operator did not exercise reasonable care to reduce or eliminate the risk; and (4) that such failure proximately caused the plaintiff's injuries. *Wal–Mart Stores, Inc. v. Gonzalez*, 968 S.W.2d 934, 936 (Tex. 1998). "A slip-and-fall plaintiff satisfies the notice element by establishing that (1) the defendant placed the substance on the floor, (2) the defendant actually knew that the substance was on the floor, or (3) it is more likely than not that the condition existed long enough to give the premises owner a reasonable opportunity to discover it." *Wal–Mart Stores, Inc. v. Reece*, 81 S.W.3d 812, 814 (Tex. 2002).

Molina slipped and fell in a puddle of liquid while walking down the aisle of an HEB. In her deposition testimony, HEB employee Jennifer Painter, who was working in the aisle at the time Molina fell, testified, "We were all trained that if you saw a spill you had to be the one to deal with it, no matter where it was." Neither Molina nor Painter saw the liquid on the floor before Molina fell, and the contents and size of the puddle are unknown. Painter described the liquid as light brown, with a "milky" texture, and Molina described it as a "thick, liquidy substance." Molina introduced a video from the store that includes the incident. The video shows the following:

Video begins. Several people are pushing carts

Appendix Q

047

Molina v. HEB Grocery Company, L.P., Not Reported in S.W. Rptr. (2017)

2017 WL 4766655

|  | through the aisle. From the camera's view, a stocking cart is about 2/3 of the way down the aisle, across from the bulk bins. The video will eventually show Molina fall about fifteen minutes later, a few feet down the aisle from the stocking cart, in about the center of the aisle. |
| --- | --- |
| 4:45:00–4:54:37 p.m. | Customers walk up and down the aisle, several passing over or standing in the same location where Molina eventually falls, including an HEB employee, who appears to stand in and walk over the location of the fall. |
| 4:54:37–4:55:33 p.m. | *2 A woman with a cart in which two children are seated stops her cart on the approximate location of the fall. She puts several items in the cart and then takes some things from the cart and appears to inspect or rearrange them. She then walks down the aisle, out of the camera's view. |
| 4:55:44–4:55:58 p.m. | Another woman stops her cart slightly to the right of the location of the fall. She stands with her back to the spot while she picks out items from the bulk bins. As she moves, she appears to walk or stand on or very near the spot of the fall. |
| 4:55:59–4:57:30 p.m. | That same woman moves her cart slowly down the aisle, continuing to choose items from the bins. Two people walk past her cart, both walking near but not through the area of the fall. |
| 4:58:46 p.m. | A man walks down the aisle and appears to walk over or very close to the location of the fall. |
| 5:00:14 p.m. | A woman pushes her cart down the aisle, appearing to walk over the area of the fall. |

048

Molina v. HEB Grocery Company, L.P., Not Reported in S.W. Rptr. (2017)

2017 WL 4766655

| 5:00:23 p.m. | An HEB employee starts down the aisle but almost immediately turns around and walks back out of the camera's view. |
| 5:01:24 p.m. | Painter comes into view and walks to the stocking cart. As she nears the cart, she is mostly looking down or at the cart. |
| 5:01:31–5:01:36 p.m. | Painter arrives at the cart and walks to its far side, from which she will work. Her back is to the location of the fall. Molina and her companion come into view. Molina's companion is pushing a cart and is slightly ahead of her. Molina stops at a bin, takes something out, and walks on. |
| 5:01:43 p.m. | Molina reaches Painter's position. Molina's companion has walked over the location of the fall. |
| 5:01:46 p.m. | Molina slips. Her companion and Painter walk over to her. Painter places what appears to be paper towels on the spot, and other HEB employees soon arrive to clean up and speak to Molina. |

The floor is a greyish-brown color, and the parties concede that the video quality is such that the liquid on which Molina slipped does not show up on the tape.

Molina argues that because the video does not show the spill itself, it reasonably can be inferred that the substance was on the floor before the tape began, at least seventeen minutes before Molina fell. She further contends that because that area of the aisle is unused for the one minute and thirty-three seconds leading up to her fall, that amounts to " 'some' temporal evidence" that the spill occurred at least that long before Molina fell. That, she insists, combined with the fact that Painter was nearby when Molina slipped, would allow a reasonable person to "differ on whether HEB had constructive notice of the spill." We disagree.

"[W]hen circumstantial evidence is relied upon to prove constructive notice, the evidence must establish that it is more likely than not that the dangerous condition existed long enough to give the proprietor a reasonable opportunity to discover the condition." *Gonzalez*, 968 S.W.2d at 936. "[M]eager circumstantial evidence from which equally plausible but opposite inferences may be drawn is speculative and thus legally insufficient to

049

Molina v. HEB Grocery Company, L.P., Not Reported in S.W. Rptr. (2017)

2017 WL 4766655

support a finding." *Id*. As explained by the supreme court:

> What constitutes a reasonable time for a premises owner to discover a dangerous condition will, of course, vary depending upon the facts and circumstances presented. And proximity evidence will often be relevant to the analysis. Thus, if the dangerous condition is conspicuous as, for example, a large puddle of dark liquid on a light floor would likely be, then an employee's proximity to the condition might shorten the time in which a jury could find that the premises owner should reasonably have discovered it. Similarly, if an employee was in close proximity to a less conspicuous hazard for a continuous and significant period of time, that too could affect the jury's consideration of whether the premises owner should have become aware of the dangerous condition. But in either case, there must be some proof of how long the hazard was there before liability can be imposed on the premises owner for failing to discover and rectify, or warn of, the dangerous condition. Otherwise, owners would face strict liability for any dangerous condition on their premises, an approach we have clearly rejected.

**\*3** *Reece*, 81 S.W.3d at 816.

In *Reece*, similar to HEB's policy here, Wal–Mart's policy "required employees to intervene whenever they passed a known hazard anywhere in the store," and an employee was in the immediate vicinity at the time Reece fell, having ordered a drink from the snack bar just before the fall, but said that he did not notice the liquid until after the fall. *Id*. at 814. The supreme court stated that, in finding constructive notice, the court of appeals "relied on two factors in addition to [the employee's] proximity that it believed constituted some evidence of constructive notice"—a store manager's acknowledgement that self-service drinks and ice "increased the risk of spills"

and the store's policy requiring employees to address hazards anywhere in the store. *Id*. at 817. However, the supreme court said, "this evidence is immaterial to the constructive-notice issue. It is undisputed that [the employee] did not notice the hazard that he purportedly walked past; thus, the hazard was not known and the store's policy was not implicated. Moreover, assuming the fairly obvious fact that spills are more likely to occur in a self-serve beverage area, that does not relieve Reece of her burden to prove the required premises-liability elements." *Id*. The court held that evidence of the employee's proximity was not sufficient to allow the jury to infer that Wal–Mart had a reasonable opportunity to discover the spill and reversed the jury's verdict in Reece's favor. *Id*.

Similar facts were presented in *Fontenette–Mitchell v. Cinemark USA, Inc.*, No. 03–16–00201–CV, 2016 WL 6833104 (Tex. App.–Austin Nov. 16, 2016, no pet.) (mem. op.), *Cox v. H.E.B. Grocery, L.P.*, No. 03–13–00714–CV, 2014 WL 4362884 (Tex. App.–Austin Aug. 27, 2014, no pet.) (mem. op.), and *Sova v. Bill Miller Bar–B–Q Enters., Ltd.*, No. 03–04–00679–CV, 2006 WL 1788231 (Tex. App.–Austin June 30, 2006, no pet.) (mem. op.). In *Fontenette–Mitchell*, a customer slipped on a "foreign, wet substance" while attending the movie theater's first showing of the day, but there was no evidence of how long the liquid had been on the floor, the plaintiff admitted that she did not see it before she fell, and the assistant manager testified that he had not seen it during his morning inspection. 2016 WL 6833104, at \*3. Thus, it was "equally plausible that another patron caused the substance to be on the floor between the opening of the theater and Fontenette–Mitchell's arrival." *Id*. In *Cox*, a store video showed the plaintiff's fall, apparently having slipped on a piece of peach, but the "poor quality of the video recording precludes any conclusion" about when the peach was dropped because no peach is visible either before or after the fall. 2014 WL 4362884, at \*3. The Court stated that the video was "legally insufficient to constitute competent summary judgment proof of how long the piece of peach was on the floor," that there was no evidence "that anyone saw the peach piece on the floor before the fall," and that it was "equally probable that the peach piece was on the floor for two minutes or two hours." *Id*. The Court concluded that "no evidence in the record, either direct or circumstantial, that would allow a factfinder to infer that the peach piece was on the floor long enough to charge H.E.B. with notice of it." *Id*. In *Sova*, the plaintiff slipped on what she believed was melted ice because the liquid on her jeans was cool and she slipped near the restaurant's condiment bar. 2006 WL 1788231, at \*3. The Court noted that, if it was melted ice, the ice could have fallen from another customer's drink

2017 WL 4766655

"just as easily as from the condiment bar," and that it was "just as likely that the puddle was created while Sova was standing at the condiment bar (leaving [the restaurant] virtually no time to discover and remedy the condition) as it was that the substance had been on the floor for some time." *Id.*

**\*4** In each of those cases, the reviewing court noted that, "with no evidence as to the length of time the substance was on the floor, there is no basis upon which a factfinder could assess the opportunity [the defendant] had to discover and remove it." *Fontenette–Mitchell*, 2016 WL 6833104, at \*3; *see Cox*, 2014 WL 4362884, at \*3 ("With no evidence as to the length of time the peach piece was on the floor, there is no basis upon which a factfinder could assess the opportunity H.E.B. had to discover and remove it."); *Sova*, 2006 WL 1788231, at \*4 ("It was Sova's burden to produce more than a scintilla of evidence demonstrating that [the restaurant] had actual or constructive knowledge of an unreasonably dangerous condition on its premises, based on either a specific puddle that was on the floor long enough for [the restaurant] to have discovered and rectified it or on the manner in which the condiment bar was generally maintained.").

The evidence is undisputed that Painter did not see the liquid on the floor until after Molina had fallen. The video does not show any substance on the floor. It instead shows numerous people walking over the same area in the minutes leading up to the fall, without anyone showing signs of noticing liquid on the floor. And if the spill occurred one minute and thirty seconds before Molina slipped, as she asserts a jury could have inferred, no one from HEB walked past the spill in that time. This case is similar to *Reece* and the other cases discussed above in that there is no evidence of when the spill occurred and no evidence that would allow an inference that HEB had a reasonable opportunity to discover and clean up the spill. *See* 81 S.W.3d at 817; *Fontenette–Mitchell*, 2016 WL 6833104, at \*3; *Cox*, 2014 WL 4362884, at \*3; *Sova*, 2006 WL 1788231, at \*4. We therefore affirm the trial court's granting of summary judgment in HEB's favor.

Affirmed

**All Citations**

Not Reported in S.W. Rptr., 2017 WL 4766655

     © 2020 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Nethery v. Turco, Not Reported in S.W. Rptr. (2017)

2017 WL 2774448

KeyCite Yellow Flag - Negative Treatment

Distinguished by Texas Department of Transportation v. Ramirez, Tex.App.-San Antonio, August 8, 2018

2017 WL 2774448
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR DESIGNATION AND SIGNING OF OPINIONS.

Court of Appeals of Texas, Dallas.

Jeannie NETHERY, Appellant
v.
Marty Vincent TURCO and Kelly Leanne Turco, Appellees

No. 05–16–00680–CV
|
Opinion Filed June 27, 2017

On Appeal from the 298th Judicial District Court, Dallas County, Texas, Trial Court Cause No. DC–15–13614

**Attorneys and Law Firms**

Roger Fuller, for Jeannie Nethery.

Kevin M. Curley, Douglas D. Fletcher, Jeffrey Dwayne Smith, David C. Colley, for Marty Vincent Turco and Kelly Leanne Turco.

Before Justices Bridges, Myers, and Brown

**MEMORANDUM OPINION**

Opinion by Justice Myers

**\*1** In this premises liability action, appellant Jeannie Nethery (Nethery) appeals the trial court's order granting traditional summary judgment in favor of appellees Marty Vincent Turco and Kelly Leanne Turco (the Turcos). In one issue, Nethery argues the trial court erred by granting the summary judgment motion. We affirm.

**DISCUSSION**

Nethery contends the trial court erred by granting the traditional summary judgment motion filed by the Turcos because there was insufficient evidence to establish that the allegedly dangerous condition was open and obvious and that Nethery was aware of the risk.

According to the record, on Thursday, January 8, 2015, at approximately 3:30 pm., Nethery arrived at the former residence of Marty and Kelly Turco in Highland Park, Texas. Nethery came to look at the property in her capacity as a realtor with Briggs Freeman Sotheby's International Real Estate. Specifically, Nethery received an email invitation from the Turcos' realtor to attend a private tour of their home prior to the property being listed. In her deposition, Nethery said she would not be surprised if somewhere around fifty people came to view the Turcos' home that day, and that this "would be a normal tour for a property like that."

Nethery arrived and parked in front of the home. She walked up the driveway and went inside. After viewing the upstairs and downstairs portions of the home for approximately ten minutes, Nethery exited the home. She walked out of the house, across a landing area, and across a short sidewalk to the driveway. Nethery then began walking down the circular driveway when she noticed ice on the driveway near a black SUV. The ice appeared to be under the vehicle and extending in front of it towards the sidewalk.

She testified in her deposition that she could see the ice did not cover the entire driveway, but she did not know where it stopped. She appreciated the ice's presence enough to be more cautious and attempted to step around it. She testified that she "was trying to step around it, trying to be very careful, and I couldn't tell where it ended...." She "was stepping very carefully" to avoid the ice she knew was present. Nethery also testified that, before trying to walk around the ice, she did not look at the other side of the circular driveway to see if she could turn around and walk the other way without encountering ice. Asked why she did not do this, she testified, "I thought I could get around." Nethery stepped on the ice in front of her and fell, injuring her wrist. Nethery testified that she did not know whether there was any ice on the other side of the driveway.

Appendix RR

052

2017 WL 2774448

Nethery filed suit against the Turcos for negligence.[1] After answering, the Turcos moved for traditional summary judgment based on the absence of a legal duty to warn or protect against conditions that are open and obvious. The trial court granted the summary judgment motion, and this appeal followed.

**\*2** A party moving for a traditional summary judgment must show no material fact issue exists and it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c). We review a challenge to a traditional summary judgment de novo. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). We must determine whether the movant met its burden to establish that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Sw. Elec. Power Co. v. Grant*, 73 S.W.3d 211, 215 (Tex. 2002); *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex. 1979). We affirm the summary judgment if any of theories presented to the court and preserved for review are meritorious. *Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 157 (Tex. 2004).

A landowner has a duty to exercise reasonable care to make the premises safe for invitees." *Austin v. Kroger Texas, L.P.*, 465 S.W.3d 193, 202–03 (Tex. 2015). A landowner confronted with a dangerous condition on the property can satisfy the duty to an invitee in one of two ways. *See id*. First, the landowner can eliminate or mitigate the dangerous condition such that it is no longer unreasonably dangerous. *Id.* Second, and subject to certain exceptions, the landowner can also satisfy any duty by providing an adequate warning of the danger to the invitee. *Id.*; *see also Gen. Elec. Co. v. Moritz*, 257 S.W.3d 211, 216 (Tex. 2008); *Shell Oil Co. v. Khan*, 138 S.W.3d 288, 295 (Tex. 2004). "Ordinarily, the landowner need not do both, and can satisfy its duty by providing an adequate warning even if the unreasonably dangerous condition remains." *Austin*, 465 S.W.3d at 202–03; *see also TXI Operations, L.P. v. Perry*, 278 S.W.3d 763, 765 (Tex. 2009); *State v. Williams*, 940 S.W.2d 583, 584 (Tex. 1996). The *Austin* court described the duty as requiring the landowner "to make safe or warn against any concealed, unreasonably dangerous conditions of which the landowner is, or reasonably should be, aware but the invitee is not." *Austin*, 465 S.W.3d at 203. This is because the landowner is typically in a better position than the invitee to know the property, and thus rectify or warn about any hidden hazards on the premises. *Id.* At the same time, "[w]hen the condition is open and obvious or known to the invitee, however, the landowner is not in a better position to discover it." *Id.* In such a situation, the condition no longer poses an unreasonable risk "because

the law presumes that invitees will take reasonable measures to protect themselves against known risks, which may include a decision not to accept the invitation to enter onto the landowner's premises." *Id.* "A landowner 'is not an insurer of [a] visitor's safety.' " *Id.* (quoting *Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 769 (Tex. 2010)). As a result, "a landowner generally has no duty to warn of hazards that are open and obvious or known to the invitee." *Id.* at 204.

The summary judgment evidence in this case establishes that the alleged dangerous condition of which Nethery complains—a patch of ice on the Turcos' driveway—was open and obvious or otherwise known to her. She admitted she was aware of and appreciated the presence of ice on the Turcos' driveway before she slipped and fell on it. Nethery argues the reasonableness of her efforts to avoid the ice presented a fact issue for trial because "she was unaware of the extent of the ice and was taking precautions to avoid the ice." But as we noted above, the Texas Supreme Court in *Austin* stated that when, as in this case, the condition is open and obvious or otherwise known to the invitee, "the law presumes that invitees will take measures to protect themselves against known risks." *Id.* at 203. Under controlling precedent, the Turcos' duty to appellant was negated by Nethery's admission that the ice was open and obvious or otherwise known to her. *See id.* at 204.

**\*3** Nethery also argues that even if the Turcos owed no duty to protect or warn her against an open and obvious condition, an exception to the no-duty rule applies. The court in *Austin* specifically noted two exceptions to the general no-duty rule for open and obvious conditions: the "criminal activity" exception and the "necessary use" exception. *Id.* at 204–06. The criminal activity exception has no application here because no one is arguing the allegedly dangerous condition resulted from foreseeable criminal activity of third parties. *See id.* at 205. The necessary use exception, however, may arise when the invitee necessarily must use the unreasonably dangerous premises, and despite the invitee's awareness and appreciation of the dangers, the invitee is incapable of taking precautions that will adequately reduce the risk. *Id.* at 204. This necessary use exception applies when (1) it was necessary for the invitee to use the portion of the premises containing the allegedly unreasonably dangerous condition and (2) the landowner should have anticipated that the invitee was unable to avoid the unreasonable risks despite the invitee's awareness of them. *See id.* at 207 (discussing *Parker v. Highland Park, Inc.*, 565 S.W.2d 512, 520 (Tex. 1978)); *see also Lopez v. Ensign U.S. Southern Drilling, LLC*, —— S.W.3d ——, 2017 WL 1086518, at \*9–10 (Tex. App.–Houston [14th Dist.]

Nethery v. Turco, Not Reported in S.W. Rptr. (2017)

2017 WL 2774448

March 21, 2017, no pet.). When the necessary use exception applies, a landowner's duty to make the premises safe is not relieved by the plaintiff's awareness of the risk. *Austin*, 465 S.W.3d at 208. Rather, the plaintiff's awareness of the risk is relevant to the issue of proportionate responsibility. *Id.*

Nethery asserts that this case falls within the necessary use exception. However, the Turcos argue Nethery waived this argument because she never pleaded application of the necessary use exception in her live pleading—her original petition. She raised it for the first time in her response to the Turcos' summary judgment motion, and she did not amend or supplement her pleading to allege the necessary use exception. Assuming without deciding that Nethery did not waive her argument, it nonetheless fails.

The summary judgment evidence shows it was not necessary that Nethery use the portion of the premises on which she slipped and fell. She testified in her deposition that ice did not cover the entire driveway and that, before trying to walk around the ice on which she slipped and fell, she did not look at the other side of the circular driveway to see if she could turn around and walk the other way without encountering ice. Nethery stated that "I thought I could get around" it. Moreover, Nethery—who viewed the property at approximately 3:30 p.m. on the afternoon of January 8, 2015—testified that she would not have been surprised if somewhere around fifty people had viewed the Turcos' home that day, and this "would be a normal tour for a property like that." Although Nethery testified that a co-worker, Carla Trussler, "almost fell," there is no evidence of any other slip and fall incidents on the premises that day. Additionally, there is no evidence the Turcos should have anticipated Nethery was unable to take appropriate measures to avoid the risks allegedly

posed by the ice on the driveway. Indeed, the evidence shows Nethery was extremely cautious as she attempted to step around the ice. This case is unlike the situation in *Parker v. Highland Park, Inc.*, from which the necessary use exception arises, where the facts demonstrated that the dimly lit staircase was the only means available to the plaintiff to exit the apartment, and that the landowner should have anticipated the plaintiff/invitee would have been unable to take measures to avoid the risks posed by the narrow, unevenly distributed steps. *See Parker*, 565 S.W.2d at 514. Nethery chose to leave the premises the same way she entered it, but she did not present evidence establishing this was the only means of ingress and egress available to her. Finally, we note that, as recognized in *Austin*, criminal activity and necessary use are limited exceptions to the general no-duty rule. *See Austin*, 465 S.W.3d at 198, 204, 213.

Under the applicable standard of review, we conclude the summary judgment evidence establishes as a matter of law that the alleged unreasonably dangerous condition on the premises was open and obvious or otherwise known to Nethery and that the necessary use exception to the general rule of no-duty rule for open and obvious conditions does not apply. *See id.* at 206–08. Accordingly, the trial court did not err by granting summary judgment in the Turcos' favor, and we overrule Nethery's issue.

**\*4** We affirm the trial court's judgment.

**All Citations**

Not Reported in S.W. Rptr., 2017 WL 2774448

Footnotes

1    Nethery alleged in her petition that the Turcos negligently left their sprinkler system on and that this is what caused the ice to accumulate. Asked about this contention in her deposition, Nethery insisted there had been no precipitation for a week leading up to the event and that it was a very dry period of time. But she also acknowledged that she did not know what caused the ice to form; she just did not believe it was due to precipitation.

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

054

Simpson v. Orange County Building Materials, Inc., Not Reported in S.W. Rptr. (2019)

2019 WL 470090

2019 WL 470090
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR DESIGNATION
AND SIGNING OF OPINIONS.

Court of Appeals of Texas, Beaumont.

Arthur SIMPSON Jr., Appellant
v.
ORANGE COUNTY BUILDING MATERIALS,
INC., Appellee

NO. 09-18-00240-CV
|
Submitted on January 31, 2019
|
Opinion Delivered February 7, 2019

**On Appeal from the 260th District Court, Orange
County, Texas, Trial Cause No. D160150-C. Buddie J.
Hahn, Judge.**

**Attorneys and Law Firms**

J.J. Bragg, Jonathan C. Juhan, Juhan Law Office,
Beaumont, TX, for Appellant.

Matthew L. Witherel, Nicholas J. Lanza, Lanza Law
Firm, PC, Houston, TX, for Appellee.

Before McKeithen, C.J., Kreger and Johnson, JJ.

**MEMORANDUM OPINION**

LEANNE JOHNSON, Justice

**\*1** In this premises liability case, Appellant, Arthur
Simpson Jr. (Simpson or Appellant), appeals a summary
judgment granted by the trial court in favor of the
Appellee, Orange County Building Materials (OCBM or
Appellee). In one combined issue, Appellant contends
that the trial court erred in granting OCBM's Motion for
Summary Judgment and denying Simpson's Motion for
New Trial. Simpson argues that he presented more than a

scintilla of evidence "regarding unreasonable risk of harm
and [ ] duty to warn since the condition was not easily
perceptible to [Simpson]." OCBM argues the Summary
Judgment should be affirmed because as a matter of law
the stacked boards that Simpson tripped on did not create
an unreasonably dangerous condition and OCBM owed
no duty to warn or make safe the alleged danger because
(1) the stacked boards were open and obvious; and (2)
Plaintiff was aware of the danger of walking over the
boards. We affirm.

Simpson alleged in his Original Petition that in May of
2014, he was a customer on the premises of OCBM
located in Bridge City, Texas, when he tripped and fell
over some wooden boards while walking through the
loading area of the store. Simpson alleged that there were
no signs in or around the area to warn of "the dangerous
condition which existed due to excessive building
materials strewn in the area." He alleged that he was an
invitee and that OCBM was guilty of negligence, that
OCBM failed "to protect and safeguard [Simpson] from
unreasonably dangerous conditions[,]" and breached its
duty of care to him. According to Simpson, he was an
invitee of OCBM and he had just purchased pvc pipe
from the store and he was in the loading area to obtain
some twine to tie down the pipe onto his vehicle.

OCBM filed a Motion for Summary Judgment[1] with the
trial court, arguing that the lumber or boards in the
loading area did not constitute an unreasonably dangerous
condition. OCBM also argued that the condition was
"open and obvious" and that OCBM owed no duty to
warn Simpson of the open and obvious condition, and that
OCBM had no legal duty to warn Simpson of the alleged
defect because he testified in his deposition that he knew
of and appreciated the danger. OCBM attached exhibits to
its Motion for Summary Judgment, including excerpts
from the March 9, 2017 Deposition of Plaintiff Simpson,
an Affidavit of Troy Arnold (the store manager on the
date in question), and three photographs of the area of the
alleged fall. Simpson filed a Response In Opposition to
OCBM's Motion for Summary Judgment. After hearing
arguments from the parties, the trial court entered an
Order granting the Motion for Summary Judgment.

**\*2** Simpson filed Plaintiff's Motion for New Trial and
argued that the trial court erred in granting the summary
judgment because OCBM did not meet its burden to
establish that there was no unreasonable risk of harm and
OCBM failed to show a lack of a duty to warn because
the dangerous condition was not easily perceptible by
Simpson. Simpson further argued that he raised fact
issues regarding unreasonable risk of harm and duty to

Appendix S

055

Simpson v. Orange County Building Materials, Inc., Not Reported in S.W. Rptr. (2019)

2019 WL 470090

warn that should be submitted to a jury. OCBM filed Defendant Orange County Building Materials, Inc.'s Opposition To Motion For New Trial. An oral hearing was held on Plaintiff's Motion For New Trial. The trial court then entered an Order denying Plaintiff's Motion For New Trial, and Simpson filed a Notice of Appeal.

### Standard of Review

We review a trial court's grant of a motion for summary judgment de novo. *Buck v. Palmer*, 381 S.W.3d 525, 527 (Tex. 2012). The movant for traditional summary judgment must establish that (1) there is no genuine issue of material fact and (2) that the movant is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); *Cmty. Health Sys. Prof'l Servs. Corp. v. Hansen*, 525 S.W.3d 671, 681 (Tex. 2017). A defendant who conclusively negates at least one essential element of a cause of action is entitled to summary judgment. *Boerjan v. Rodriguez*, 436 S.W.3d 307, 310 (Tex. 2014) (per curiam). If the moving party produces evidence that it is entitled to summary judgment, the burden shifts to the non-movant to present evidence that raises a material fact issue. *Walker v. Harris*, 924 S.W.2d 375, 377 (Tex. 1996).

In determining whether a party seeking summary judgment has met its burden, we view the evidence in the light most favorable to the non-moving party, disregarding all conflicts in the evidence and taking as true all evidence favorable to the non-moving party. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005); *Harwell v. State Farm Mut. Auto. Ins. Co.*, 896 S.W.2d 170, 173 (Tex. 1995). "Every reasonable inference must be indulged in favor of the non-movant and any doubts resolved in [his] favor." *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548-49 (Tex. 1985). We consider evidence that supports the position of the moving party only if such evidence is uncontroverted. *Great Am. Reserve Ins. Co. v. San Antonio Plumbing Supply Co.*, 391 S.W.2d 41, 47 (Tex. 1965); *Procter v. RMC Capital Corp.*, 47 S.W.3d 828, 830 (Tex. App.—Beaumont 2001, no pet.).

When the order granting summary judgment does not specify the grounds upon which the trial court relied, we must affirm the summary judgment if any of the independent summary judgment grounds is meritorious. *FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex. 2000). When a summary judgment does not state the grounds on which it is based, a nonmovant is required to show that each ground alleged in the motion for summary judgment was insufficient to support the summary judgment. *Star-Telegram, Inc. v. Doe*, 915 S.W.2d 471, 473 (Tex. 1995).

### Applicable Law

In Texas, a landowner owes a duty to use reasonable care to make and keep its premises safe for business invitees. *Clayton W. Williams, Jr., Inc. v. Olivo*, 952 S.W.2d 523, 527 (Tex. 1997). When an injury arises from a premises condition, the resulting cause of action is exclusively a premises liability claim, rather than a negligent activity claim. *Austin v. Kroger Texas, L.P.*, 465 S.W.3d 193, 216 (Tex. 2015). In the case now before us, Simpson alleged that he was injured by a premises condition and the parties agree on appeal that he asserted a premises liability claim.

The elements of a cause of action for a premises liability claim are: (1) the existence of a condition of the premises creating an unreasonable risk of harm; (2) the landowner knew or should have known of the existence of the condition; (3) the landowner failed to use reasonable care to reduce or eliminate the risk by rectifying or warning of the condition; and (4) such failure was a proximate cause of plaintiff's injury. *Henkel v. Norman*, 441 S.W.3d 249, 251-52 (Tex. 2014); *CMH Homes, Inc. v. Daenen*, 15 S.W.3d 97, 99 (Tex. 2000). A landowner is not an insurer of the safety of his guests and liability may not be imposed merely because someone is injured. *Austin*, 465 S.W.3d at 203. The duty the landowner owes to an invitee is "to make safe or warn against any concealed, unreasonably dangerous conditions of which the landowner is, or reasonably should be, aware but the invitee is not." *Id.* When the invitee is aware of the dangerous condition or the condition is open and obvious, generally the law presumes that the invitee will take reasonable measures to protect himself. *Id.*; *Wallace v. ArcelorMittal Vinton, Inc.*, 536 S.W.3d 19, 23 (Tex. App.—El Paso 2016, pet. denied).

**\*3** In other words, "the open-and-obvious nature of the hazard or the invitee's knowledge of the hazard negates the landowner's negligence claim ...." *Phillips v. Abraham*, 517 S.W.3d 355, 361 n.2 (Tex. App.—Houston [14th Dist.] 2017, no pet.). There are two recognized exceptions when the open and obvious nature of the risk or the invitee's knowledge will not, as a matter of law negate the

056

Simpson v. Orange County Building Materials, Inc., Not Reported in S.W. Rptr. (2019)

2019 WL 470090

landowner's duty, the criminal-activity exception and the necessary-use exception. *Austin*, 465 S.W.3d at 204-08. Simpson argued in the trial court and he argues on appeal that the necessary-use exception applies to this case. The necessary-use exception applies when the invitee must use the unreasonably dangerous area of the premises and the landowner should have anticipated that the invitee was unable to avoid the unreasonable risks associated with the condition despite the invitee's awareness of the risk. *Austin*, 465 S.W.3d at 206-07; *Wallace*, 536 S.W.3d at 24-25.

Discussion

In this case, Simpson testified in his oral deposition that he had no trouble seeing the boards in front of him on the way into, or on his way out of the building. He also testified in his deposition that nothing prevented him from walking to either side to avoid the boards. Simpson testified in his deposition that when he walked into the store to get some twine he walked on top of the stacked boards to get into the store for the twine. Simpson also acknowledged in his deposition that although he thought the stacked boards were "unsafe" when he walked across them to go into the store to get the twine, he did not mention it to the people inside the store. Simpson agreed in his deposition that if there was room on either side to walk around the boards it would have been prudent to do so, but he could not recall if he looked to see if there was a way around the boards. Both parties attached the same photographs of the stacked boards to their summary judgment pleadings in the trial court, and OCBM also marked on one of the photographs to show what OCBM argued was an available alternate path where Simpson could have walked. (See below)



In the affidavit that Simpson attached to his response to the Motion for Summary Judgment, he stated:

... On or about May 21, 2014, I went to the Orange County Building Materials, Inc. in Bridge City, Texas, to buy a piece of PVC pipe. I purchased the PVC pipe and it was loaded in my truck bed, loose. I dr[o]ve my truck and realized that it needed to be tied down. I drove to the other side of the building to get twine to tie the PVC pipe in the back of my truck. When I entered the building to get the twine, I walked on Hardie board which was stacked in front of the concrete steps to enter the building where I entered. I saw footprints on the Hardie board, so I knew that people had been walking on the Hardie board to get into the building. I purchased the piece of PVC pipe and I got some twine to tie it in my truck's bed. As I left the building exit, I stepped down the concrete steps and then I walked on the concrete between two pallets of material and when I reached the end of the concrete, meaning where the concrete met the pallet, I stepped on the Hardie boards, directly in front of the concrete steps, and when I took my second step, my toe hung up on a piece of Hardie board in the middle of the stack. Due to the Defendant's placement of the steps and material, it was necessary that I step on the Hardie board to get to my truck after I had stepped down the steps and walked on the concrete to where the pallet was located. The Hardie board on which my toe hung was higher or taller than the rest of the Hardie boards in the stack and it was not even vertically with the rest of the walking surface of the Hardie boards on the pallet; it stuck up. In my deposition, I testified to the effect that I did not have any trouble seeing the Hardie plank in front of me, either going in or coming out, but the complete truth on the topic is that the piece of Hardie board on which my toe hung was not level with the

Simpson v. Orange County Building Materials, Inc., Not Reported in S.W. Rptr. (2019)

2019 WL 470090

walking surface; it was a single piece on top of what would have been a flat walking surface; I could see it, but I could not tell that it was higher than the rest of the Hardie boards due to its color and the color of the rest of the Hardie boards on the pallet.

**\*4** At the hearing on the motion for summary judgment and in his response to the motion for summary judgment, Simpson argued that his affidavit created a genuine issue of a material fact about whether the stacked boards created an unreasonably dangerous condition, whether the condition was open or obvious, and whether he had knowledge of the condition. OCBM filed a reply brief in support of its motion for summary judgment and argued in its reply and at the hearing that the affidavit failed to create a fact issue. OCBM also argued that the affidavit contained statements that were contrary to the testimony Simpson gave in his deposition and contrary to the photographs that both parties rely upon and agree are accurate depictions of the stacked boards. According to OCBM, the photographs visibly show the boards, that one board in the stack is higher, and that there was a clear path on the concrete which allowed a person to walk around the stacked boards. OCBM further argues that the stacked boards and the risk of tripping or falling when walking on a stack of boards was "open and obvious" and was a risk that Simpson himself knew.

The trial court's order granting the summary judgment does not specify the grounds upon which it granted the summary judgment. The trial court could have granted the motion for summary judgment based upon a conclusion that Simpson failed to raise a genuine issue of material fact on whether the boards created an unreasonably dangerous condition, or upon the conclusion that Simpson failed to create a genuine issue of material fact that the risk was open and obvious, or Simpson was aware of the risk, and the necessary-use exception did not apply. For purposes of deciding this appeal, we need not determine whether the boards created an unreasonably dangerous condition because we conclude that the summary judgment evidence proves as a matter of law that the alleged unreasonably dangerous condition on the premises was open and obvious or known to Simpson before the occurrence made the basis of this suit, and the necessary-use exception would not apply. *Phillips*, 517 S.W.3d at 361-62 (citing to *Brookshire Grocery Co. v. Goss*, 262 S.W.3d 793, 795 (Tex. 2008) ).

Even assuming the trial court accepted the explanation

given by Simpson in his affidavit[2] that he did not appreciate that one of the boards was "higher than the rest of the [ ] boards" in the stack, the summary judgment evidence establishes as a matter of law that Simpson could see the stacked boards and he knew that the boards were unsafe to walk on before he fell, as he admitted he had a clear view of the stacked boards, and he knew it was dangerous when he walked on the stack of boards the first time, and his affidavit did not create a material fact issue pertaining thereto. Assuming without deciding that the stack of boards created an unreasonably dangerous condition, OCBM had no duty to warn Simpson about what was an open and obvious condition. And, Simpson knew when he walked on the boards that they were unsafe for him to walk upon. *See Austin*, 465 S.W.3d at 203-12; *Brookshire Grocery Co.*, 262 S.W.3d at 795; *Phillips*, 517 S.W.3d at 362. The trial court did not err in granting the summary judgment.

With respect to Simpson's argument that the "necessary-use" doctrine applied, we disagree. Simpson contends that he sufficiently established a genuine issue of material fact regarding "necessary use" when he stated in his affidavit that: " 'Due to the Defendant's placement of the steps and material, it was necessary that I step on the Hardie board to get to my truck after I had stepped down the steps and walked on the concrete to where the pallet was located.' " Simpson argues that the "necessary-use" exception recognized in *Parker v. Highland Park, Inc.,* 565 S.W.2d 512 (Tex. 1978), and further explained in *Austin v. Kroger, L.P., supra*, would apply.

**\*5** A "necessary use" occurs only when: (1) the invitee must use an unreasonably dangerous premises condition; and (2) the landowner should have anticipated that the invitee was unable to avoid the unreasonable risks associated with the condition despite his awareness. *Austin*, 465 S.W.3d at 206-07; *Wallace*, 536 S.W.3d at 24-26. Simpson had the burden on this point to establish that it was a "necessary use." *See generally Walker*, 924 S.W.2d at 377. Although Simpson claimed in his affidavit it was "necessary" for him to walk on the stacked boards, he put forth no evidence regarding the second element that OCBM should have anticipated that he was unable to avoid the alleged unreasonable risk associated with the condition despite his awareness. Additionally, when the summary judgment evidence establishes that the plaintiff could have avoided the condition, then the necessary-use exception does not apply, and summary judgment is appropriate. *See Lopez v. Ensign U.S. Southern Drilling LLC,* 524 S.W.3d 836, 850 (Tex. App.—Houston [14th Dist] 2017, no. pet.) (summary judgment is appropriate where evidence shows plaintiff could have avoided the

2019 WL 470090

risk through an alternate route); *Phillips,* 517 S.W.3d at 361 (necessary-use exception inapplicable as tenant could have maintained yard without walking on area of driveway with loose concrete).

Simpson does not contend that the boards changed from the time he first walked over them when he entered the store to get the twine, to the time when he exited the store and then tripped or fell on the boards. The stacked boards were in the same location and condition when Simpson exited as when he entered, and there was no evidence that anything had changed. *See, e.g.*, *Wallace,* 536 S.W.3d at 24-26 (invitee security guard who tripped on scraps located in front of a machine shop when she exited the shop knew about the scraps when she first entered the shop and could not rely upon the necessary-use exception because nothing changed from the time she entered the shop and when she exited the shop immediately prior to the fall). Therefore, we conclude the trial court did not err in concluding that the "necessary-use" exception would not apply.

Therefore, we overrule Simpson's issue and affirm the judgment of the trial court.

AFFIRMED.

**All Citations**

Not Reported in S.W. Rptr., 2019 WL 470090

Footnotes

1    The Motion for Summary Judgment did not specify whether it was a Traditional Motion for Summary Judgment or a No Evidence Motion for Summary Judgment, but the motion cites to Texas Rule of Civil Procedure 166a(b) and asserts arguments that conform to a traditional motion for summary judgment. For example, in the motion, the Defendant argued that there was no genuine issue of a material fact and that the existence of a duty is a question of law for the trial court. Both parties treated the motion as a traditional motion for summary judgment in the trial court.

2    When reviewing a summary judgment, a trial court may conclude that a party does not raise a genuine issue of a material fact simply by submitting what amounts to a "sham affidavit" that materially conflicts with the same witness's prior sworn testimony. *See* *Lujan v. Navistar, Inc.,* 555 S.W.3d 79, 87 (Tex. 2018). The trial court did not make a ruling on the record regarding whether the Simpson affidavit materially conflicts with the testimony Simpson provided in his deposition.

    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Smith v. Dallas County Hosp. Dist., Not Reported in F.Supp.3d (2014)

2014 WL 6991482

2014 WL 6991482
Only the Westlaw citation is currently available.
United States District Court,
N.D. Texas,
Dallas Division.

Octavia SMITH, Plaintiff,
v.
DALLAS COUNTY HOSPITAL DISTRICT d/b/a
Parkland Health & Hospital System, Defendant.

Civil Action No. 3:13−CV−0792−G (BN).
|
Signed Dec. 9, 2014.

**Attorneys and Law Firms**

Octavia Smith, Dallas, TX, pro se.

E. Leon Carter, Courtney Barksdale Perez, Sheria Dranise Smith, Carter Scholer Arnett Hamada & Mockler PLLC, Dallas, TX, for Defendant.

*ORDER ACCEPTING FINDINGS, CONCLUSIONS, AND RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE*

A. JOE FISH, Senior District Judge.

**\*1** After making an independent review of the pleadings, files and records in this case and of the findings, conclusions, and recommendation of the United States Magistrate Judge dated October 22, 2014, the court finds that the findings, conclusions, and recommendation of the magistrate judge are correct and they are accepted as the findings and conclusions of the court.

It is therefore **ORDERED** that the findings, conclusions, and recommendation of the United States Magistrate Judge are accepted.

*FINDINGS, CONCLUSIONS, AND RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE*

DAVID L. HORAN, United States Magistrate Judge.

This case has been referred to the United States magistrate judge for pretrial management pursuant to 28 U.S.C. § 636(b) and an order of reference from the District Court. The undersigned magistrate judge issues the following findings of fact, conclusions of law, and recommendation that Defendant's Supplemental Motion for Summary Judgment [Dkt. No. 52] should be granted.

**Background**

Plaintiff Octavia Smith, who is appearing *pro se,* sued her former employer Defendant Dallas County Hospital District d/b/a Parkland Health and Hospital System under Title VII of the Civil Rights Act of 1964. *See* Dkt. No. 8 (Plaintiff's First Amended Complaint).

Defendant moves for summary judgment under Federal Rule of Civil Procedure 56. *See* Dkt. Nos. 35 & 52. Defendant argues that Plaintiffs claims are, among other things, barred by the doctrine of judicial estoppel because Plaintiff failed to disclose the present claim to the Bankruptcy Court during her pending Chapter 13 bankruptcy. *See* Dkt. No. 52. Specifically, Defendant argues that Plaintiff's legal position in the present action is plainly inconsistent with her prior legal position before the Bankruptcy Court, that the Bankruptcy Court accepted Plaintiff's prior legal position by confirming her bankruptcy plan, and that Plaintiff has acted deliberately in her non-disclosure of this claim. *See id.* Defendant also asserts that Plaintiff has not offered any summary judgment evidence sufficient to establish a genuine dispute as to any material fact. *See* Dkt. No. 58.

The undersigned concludes that Defendant's Supplemental Motion for Summary Judgment [Dkt. No. 52] should be granted because there is no genuine dispute as to any material fact.



**060**

Smith v. Dallas County Hosp. Dist., Not Reported in F.Supp.3d (2014)

2014 WL 6991482

### Legal Standards

Under Rule 56, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A factual "issue is material if its resolution could affect the outcome of the action." *Weeks Marine, Inc. v. Fireman's Fund Ins. Co.,* 340 F.3d 233, 235 (5th Cir.2003). "A factual dispute is 'genuine,' if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Crowe v. Henry,* 115 F.3d 294, 296 (5th Cir.1997).

**\*2** If the moving party seeks summary judgment as to his opponent's claims or defenses, "[t]he moving party bears the initial burden of identifying those portions of the pleadings and discovery in the record that it believes demonstrate the absence of a genuine issue of material fact, but is not required to negate elements of the nonmoving party's case." *Lynch Props., Inc. v. Potomac Ins. Co.,* 140 F.3d 622, 625 (5th Cir.1998). "Once the moving party meets this burden, the nonmoving party must set forth"—and submit evidence of—"specific facts showing a genuine issue for trial and not rest upon the allegations or denials contained in its pleadings." *Id.*; *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994) (en banc).

The Court is required to view all facts and draw all reasonable inferences in the light most favorable to the nonmoving party and resolve all disputed factual controversies in favor of the nonmoving party—but only if both parties have introduced evidence showing that an actual controversy exists. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Boudreaux v. Swift Transp. Co., Inc.,* 402 F.3d 536, 540 (5th Cir.2005); *Lynch Props.,* 140 F.3d at 625. "Unsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment," *Brown v. City of Houston,* 337 F.3d 539, 541 (5th Cir.2003), and neither will "only a scintilla of evidence" meet the nonmovant's burden, *Little,* 37 F.3d at 1075. Rather, the nonmoving party must "set forth specific facts showing the existence of a 'genuine' issue concerning every essential component of its case." *Morris v. Covan World Wide Moving, Inc.,* 144 F.3d 377, 380 (5th Cir.1998).

If, "after the nonmovant has been given an opportunity to raise a genuine factual issue," "the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party, then there is no genuine issue for trial." *DIRECTV, Inc. v. Minor,* 420 F.3d 546, 549 (5th Cir.2005); *Steadman v. Texas Rangers,* 179 F.3d 360, 366 (5th Cir.1999). The Court will not assume "in the absence of any proof ... that the nonmoving party could or would prove the necessary facts" and will grant summary judgment "in any case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant." *Little,* 37 F.3d at 1075. "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment," and "[a] failure on the part of the nonmoving party to offer proof concerning an essential element of its case necessarily renders all other facts immaterial and mandates a finding that no genuine issue of fact exists." *Adams v. Travelers Indent. Co. of Conn.,* 465 F.3d 156, 164 (5th Cir.2006) (internal quotation marks omitted).

**\*3** While the Local Rules in this district do not require the parties to submit statements or counter-statements of undisputed facts, where the Defendant cites a fact that Plaintiffs do not controvert with evidence, the Court may accept it as true. *See Eversley v. MBank of Dallas,* 843 F.2d 172, 174 (5th Cir.1988); *Bradley v. Chevron U.S.A., Inc.,* No. 2:04–cv–92–J, 2004 WL 2847463, at \*1 n. 2 (N.D.Tex. Dec.10, 2004).

Here, Plaintiffs pleadings are not verified and therefore do not themselves constitute summary judgment evidence. *See Estate of Newton ex rel. Newton v. Grandstaff,* No. 3:10–cv–809–L, 2012 WL 3013929, at \*2 (N.D.Tex. July 20, 2012).

### Analysis

### I. Plaintiff's claims are barred by the doctrine of judicial estoppel.

"The doctrine of judicial estoppel prevents a party from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding." *Reed v. City of Arlington,* 650 F.3d 571, 573–74 (5th Cir.2011) (en banc) (citation omitted). The purpose of this doctrine "is to protect the integrity of the judicial process, by preventing parties from playing fast and loose with the courts to suit the exigencies of self interest." *In re Wakefield,* 293 B.R. 372, 378 (N.D.Tex.2003) (quoting *In re Coastal Plains, Inc.,* 179 F.3d 197, 205 (5th Cir.1999); internal quotation marks and brackets omitted). In the bankruptcy context, "judicial estoppel must be applied in such a way as to deter

061